**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DISTRICT (at Cincinnati)**

| | | |
|---|---|---|
| **THOMAS AUGST** | ) | |
| **314 A St. Andrews Dr** | ) | **Case No.** |
| **Cincinnati, OH 45245** | ) | |
| | ) | |
| **and** | ) | **Judge** |
| | ) | |
| **AMANDA AYRES** | ) | |
| **476 Harts Creek** | ) | **COMPLAINT FOR DAMAGES WITH** |
| **Harts, WV 25524** | ) | **JURY TRIAL ENDORSED HEREON** |
| | ) | |
| **and** | ) | |
| | ) | |
| **JODY BAUER** | ) | |
| **4241 Roselawn Avenue** | ) | |
| **Batavia, OH 45103** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MACKENZIE BENDER, by her next** | ) | |
| **friends and parents, BOB BENDER and** | ) | |
| **AMY YOUNG,** | ) | |
| **316 Farmbrook Circle** | ) | |
| **Frankfort, KY 40601** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **LINDSEY BRAY** | ) | |
| **14189 Plum Creek Road** | ) | |
| **Butler, KY 41006** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SHARON BRICE** | ) | |
| **5504 Kennedy Avenue** | ) | |
| **Cincinnati, OH 45213** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **DAWN BROWN** | ) | |
| **2607 Linden Street** | ) | |
| **Cincinnati, OH 45225** | ) | |
| | ) | |
| **and** | ) | |

**TARA BROWN**                      )
**4207 St. Thomas Ave**             )
**Louisville, KY 40218**            )
                                    )
**and**                             )
                                    )
**KAYLA BURTON**                    )
**10892 Collins Riley Rd.**         )
**Blanchester, OH 45107**           )
                                    )
**and**                             )
                                    )
**TIMOTHY BYRD**                    )
**482 A Oxford Drive**              )
**Lebanon, OH 45036**               )
                                    )
**and**                             )
                                    )
**ROBERT CAMPBELL**                 )
**7668 Old Walnut Drive**           )
**West Chester, OH 45069**          )
                                    )
**and**                             )
                                    )
**JACOB COTTER**                    )
**6202 Otter Creek Drive**          )
**Middletown, OH 45042**            )
                                    )
**and**                             )
                                    )
**BARBARA COUCH**                   )
**750 Grand Avenue, Apt. #408**     )
**Cincinnati, OH 45205**            )
                                    )
**and**                             )
                                    )
**TODD GREEN**                      )
**2349 Joshua Circle**              )
**Middletown, OH 45044**            )
                                    )
**and**                             )
                                    )
**DAVID HARRIS**                    )
**170 Richardson Place #1**         )
**Cincinnati, OH 45233**            )

```
                                              )
 and                                          )
                                              )
ADAM HARTMAN                                  )
4110 Randal Parkway Apt. 1F                   )
Wilmington, NC 28403                          )
                                              )
and                                           )
                                              )
THERESA HELTON                                )
4700 West Fork Road                           )
Cincinnati, OH 45247                          )
                                              )
and                                           )
                                              )
MARTHA HUTTON                                 )
1727 Central Avenue                           )
Middletown, OH 45044                          )
                                              )
and                                           )
                                              )
JEFFREY HYDE                                  )
105 Crystal Lake Drive                        )
Covington, KY 41017                           )
                                              )
and                                           )
                                              )
ALYSSA JACKSON                                )
6118 Lancashire Trail                         )
Liberty Township, OH 45044                    )
                                              )
and                                           )
                                              )
TRACY JANSON                                  )
785 Reed Kinman Road                          )
Williamstown, KY 41097                        )
                                              )
and                                           )
                                              )
JACQUELINE JUDKINS                            )
6779 Yoakum Court                             )
Liberty Township, OH 45044                    )
                                              )
and                                           )
                                              )
```

**MICHELLE KEPLINGER** )
**170 Wideview Drive** )
**Sparta, KY 41086** )
)
**and** )
)
**MARTHA KIBLER** )
**9078 Canal Way** )
**West Chester, OH 45069** )
)
**and** )
)
**KATIE LEHMKUHL** )
**9504 Main Street** )
**Cincinnati, OH 45242** )
)
**and** )
)
**KIMBERLY LUSE** )
**4549 Amelia Circle** )
**Hahira, GA 31632** )
)
**and** )
)
**MARY MAUNTEL, by her next friend** )
**and parent, DONALD MAUNTEL** )
**1837 Ashbrook Drive** )
**Cincinnati, OH 45238** )
)
**and** )
)
**KERRY MCNEAL** )
**4114 Race Lane Road** )
**Okeana, OH 45053** )
)
**and** )
)
**DAWN BOWLING MERLAND** )
**17 Orchard Avenue #3** )
**Cincinnati, OH 45215** )
)
**and** )
)
**RYAN MILLER** )
**10949 Thornview Drive** )
**Cincinnati, OH 45241** )

)
**and** )
)
**WILLIAM MOORE** )
**11377 Mount Vernon Drive** )
**Duncanville, AL 35456** )
)
**and** )
)
**STEPHANIE MUELLER** )
**226 Short May Street** )
**Elsmere, KY 41018** )
)
**and** )
)
**GARY NEU** )
**6831 Parklake Drive** )
**Mason, OH 45040** )
)
**and** )
)
**GAIL NORDEMAN** )
**15031 Punta Rassa Road #503** )
**Fort Myers, FL 33908** )
)
**and** )
)
**WENDY OBERLANDER** )
**6910 Evanston** )
**Muskegon, MI 49442** )
)
**and** )
)
**JEFF POFF** )
**177 Richardson Pl.** )
**Cincinnati, OH 45233** )
)
**and** )
)
**DAVID ROHLING** )
**13207 Lazzaro Court** )
**Estero, FL 33928** )
)
**and** )
)

**DELORES SCOTT**
**124 Pamela Drive #105**
**Morrow, OH 45152**

**and**

**PATRICIA SHOTT, Executor of the**
**Estate of GREGORY SHOTT,**
**Sanctuary Point Nursing Home**
**11501 Hamilton Ave,**
**Cincinnati, OH 45231**

**and**

**SHANDON SIMMONS**
**16 Chase Drive**
**Centerville, OH 45458**

**and**

**KAREN SISSON**
**2219 Drex Avenue**
**Cincinnati, OH 45212**

**and**

**MICHELLE SIZEMORE**
**4165 Mt. Carmel-Tobasco Road, #8**
**Cincinnati, OH 45255**

**and**

**EARL STAMPS**
**10768 Shipley Ct.**
**Cincinnati, OH 45231**

**and**

**TEKIRA TAYLOR, by her next friend**
**and parent, KIMBERLY TAYLOR**
**6568 Willow Brook Dr.**
**Hamilton, OH 45011**

**and**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CLARA TUBBS-HILL )
5491 Beechmont Avenue, #102 )
Cincinnati, OH 45230 )
)
and )
)
BROOKE VANDERVORT )
6387 Farmers Rd )
Martinsville, OH 45146 )
)
and )
)
TERESA WORLEY )
9798 Otterbein Road )
Cincinnati, OH 45241 )
)
     Plaintiffs )
)
v. )
)
MEDTRONIC, INC., )
a Minnesota corporation, )
710 Medtronic Parkway )
Minneapolis, MN 55432 )
)
SERVE: CT CORPORATE SYSTEM )
       1300 East Ninth Street )
       Cleveland, OH 44114 )
)
and )
)
MEDTRONIC SOFAMOR )
DANEK USA, INC., )
a Tennessee corporation, )
2600 Sofamor Danek Drive )
Memphis, TN 38132 )
)
SERVE: CT CORPORATE SYSTEM )
       1300 East Ninth Street )
       Cleveland, OH 44114 )
)
     Defendants )

Plaintiffs Thomas Augst, Amanda Ayres, Jody Bauer, Mackenzie Bender, by her parents and next friends, Bob Bender and Amy Young, Lindsey Bray, Sharon Brice, Dawn Brown, Tara Brown, Kayla Burton, Timothy Byrd, Robert Campbell, Jacob Cotter, Barbara Couch, Todd Green, David Harris, Adam Hartman, Theresa Helton, Martha Hutton, Jeffrey Hyde, Alyssa Jackson, Tracy Janson, Jacqueline Judkins, Michelle Keplinger, Martha Kibler, Katie Lehmkuhl, Kimberly Luse, Mary Mauntel, by her parent and next friend, Donald Mauntel, Kerry McNeal, Dawn Bowling Merland, Ryan Miller, William Moore, Stephanie Mueller, Gary Neu, Gail Nordeman, Wendy Oberlander, Jeff Poff, David Rohling, Delores Scott, Patricia Shott, Administrator of the Estate of Greg Shott, Shandon Simmons, Karen Sisson, Michelle Sizemore, Earl Stamps, Tekira Taylor, by her parent and next friend, Kimberly Taylor, Clara Tubbs-Hill, Brooke Vandervort, and Teresa Worley (collectively, the "**Plaintiffs**"), for their *Complaint for Damages with Jury Trial Endorsed Hereon* (the "**Complaint**") against defendants Medtronic, Inc. and Medtronic Sofamor Danek USA, Inc.(together, the "**Defendants**"), state and allege as follows:

## I. <u>INTRODUCTION.</u>

1. This case involves a series of spinal surgeries performed by either Abubakar Atiq Durrani, M.D. ("**Dr. Durrani**") or his employees or associates in which a bio-engineered bone graft device known as the Infuse® Bone Graft ("**Infuse®**") was implanted unnecessarily into each Plaintiff in an "off- label" manner without his or her knowledge and consent. Dr. Durrani and his employees and associates did so as an agent, consultant, representative, or joint venturer of, and in conjunction with, Defendants , the developers, designers, manufacturers, marketers, distributors, and promoters of Infuse®.

2.      Infuse® is a bio-engineered liquid bone graft product classified by the FDA as a "medical device."

3.      Infuse® was developed, designed, manufactured, marketed and promoted, and distributed by Defendants. Infuse® is used in spinal fusion surgeries to foster fusion between the vertebrae in the spine without having to implant a patient's own bone or cadaver bone between the vertebrae, thereby preventing the need to harvest bone from the patient's own hip or risking rejection of cadaver bone.

4.      Defendants have the duty to abide by quality system regulation, good design and manufacturing practices, labeling requirements, medical devise reporting obligations, and must provide non-defective products to the public in accordance with the Medical Device Amendments to the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301*, et seq.*, and the regulations promulgated thereunder at 21 CFR § 800, *et seq.*

5.      This case involves many spinal fusion surgeries performed by Defendants' agent, consultant, representative, or joint venturer, Dr. Durrani, in which Infuse® was used in an "off-label" manner; that is, in a way not approved by the FDA, and in non-consensual and non-agreed upon manners.

*6.*      Infuse® is approved by the FDA and is indicated only for spinal fusion procedures in skeletally mature patients with degenerative disc disease at one level from L5-S1. Infuse® is only approved by the FDA for lumbar surgery performed through the abdomen (anterior approach). Further, Infuse® is only approved by the FDA when it is used in combination with an LT-Cage, a hollow metal cylinder used to insert the Infuse® into the spine. All other uses of Infuse® are off-label uses. *In each surgery performed by Dr. Durrani on each Plaintiff, Infuse® was used by Dr. Durrani in an off-label manner.*

7. Despite this lack of FDA approval and its explicit concerns about the dangers to patients of off-label uses, Infuse® was improperly promoted by Defendants for off-label use in posterior approach lumbar spine fusions, for cervical spine fusions, at multiple levels, in patients with complaints other than degenerative disc disease, and without an LT-Cage. Defendants specifically promoted these uses for implementation within Dr. Durrani's surgeries on the Plaintiffs.

*8.* Patients' spine surgeons were persuaded by Defendants, by the research Defendants funded, and by Defendants' consultant "opinion leaders," who are paid physician promoters, to expand their use of Infuse® for off-label uses. *In fact, Dr. Durrani was one of Defendants' consultants and paid promoters.*

9. When Infuse® is used off-label, it can cause severe injuries to the patient, including Infuse®-induced bone overgrowth, cyst formation, extreme inflammatory reactions, chronic radiculitis, retrograde ejaculation, sterility, osteolysis (or bone resorption), displacement or migration of the spacer cage, pseudoarthrosis, and other complications that often cause permanent disability or necessitate risky, painful, and costly revision surgeries, which may not cure the problems caused by the off-label use of Infuse®. The off-label use of Infuse® also increases the risk of cancer.

10. This uncontrolled bone overgrowth resulting from off-label use of Infuse® (also known as "ectopic" or "exuberant" bone growth) can result in severe damage to, or compression of, the surrounding neurologic structures in the spine, and bone can grow onto or around the spinal cord or the spinal nerve roots. When nerves are compressed by excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, and spasms, and the patient may need further surgery.

11.     Notwithstanding the overwhelming and substantial evidence (including Medtronic-sponsored studies) demonstrating these increased risks of adverse reactions from off-label use of Infuse®, Defendants intentionally or recklessly misrepresented, minimized, downplayed, disregarded, or completely omitted these off-label risks while promoting Infuse® for off-label uses.  In fact, Defendants promoted to patients the use of the product in dangerous off-label procedures, thereby demonstrating a conscious disregard for the health and safety of spinal fusion patients such as the Plaintiffs. Defendants' agent, consultant, representative, or joint venturer, Dr. Durrani (and his associates), used Infuse® in dangerous off-label procedures thereby causing Plaintiffs' injuries, damages, and losses.

12.     Moreover, the actual rate of incidence of serious side effects from off-label use of Infuse® is, in fact, much greater than that disclosed by Defendants to spine surgeons and patients.  With respect to the off-label approaches, Defendants failed accurately to disclose the significant off-label risks which they knew or should have known.

13.     Because of Defendants' wrongful conduct in actively and illegally promoting the off-label use of Infuse® and because of Defendants' additional wrongful conduct in minimizing, concealing, and downplaying the true risks of these non-FDA approved off-label uses of its product, Infuse®, thousands of spine patients, including the Plaintiffs, underwent surgeries without knowing the true risks inherent in the off-label use of Infuse®.

14.     These patients and the public at large relied on Defendants' false and misleading statements of material fact, including statements and publications by

Defendants' "opinion leaders," or "thought leaders" who are paid physician promoters of Infuse®, and Defendants' sales representatives.

15.     Defendants orchestrated a marketing campaign from and since at least 2002 to the present to persuade spine surgeons to use Infuse® in dangerous off-label uses in the spine.  Indeed, absent Defendants' extensive off-label promotion campaign, these risky off label procedures would not have been performed.

16.     Had true and correct information regarding the safety and effectives of Infuse® been known by each Plaintiff, and had Defendants and their agent, consultant, representative, or joint venturer, Dr. Durrani, informed and explained to Plaintiffs what Infuse® was and the risks associated with its off label uses, he or she would have declined to consent and agree to its use.

17.     Each Plaintiff underwent spinal surgery wherein Infuse® was implemented in him or her, and each Plaintiff suffered injuries and damages, including but not limited to, ectopic bone growth, chronic pain, sexual dysfunction, additional surgeries, additional medications, past and future medical expenses, wage loss, and loss of earning capacity as a result of having Infuse® implanted on an uninformed and unconsented to off-label basis.

18.     Plaintiffs' cases are distinguishable from others that have previously arisen involving the Infuse® device in that Dr. Durrani, a paid Medtronic agent, consultant, representative, or joint venturer, performed surgeries on the Plaintiffs and used Infuse® in those surgeries on an off-label basis without their knowledge and consent. Moreover, Dr. Durrani and Defendants were not only fully aware that Infuse® was being used without each Plaintiff's knowledge and consent, they intended that Infuse® be so used.  This conduct constituted massive fraud in the concealment.

19.    Defendants either had a duty to inform the Plaintiffs that Infuse® was being used in their spine surgeries or to stop Dr. Durrani from performing surgeries with Infuse® because they knew of the risks associated with off-label use and knew that Dr. Durrani was using Infuse in the Plaintiffs' surgeries in an off-label manner, as Defendants had encouraged him to do.

20.    As Defendants' paid representative, Dr. Durrani was in fact an agent, consultant, representative, or joint venturer of Defendants, and Defendants are responsible for Dr. Durrani's conduct, of which they were fully aware.

**II.    PARTIES.**

21.    Plaintiff Thomas Augst is an individual who is a citizen of the State of Ohio.

22.    Plaintiff Amanda Ayres is an individual who is a citizen of the State of West Virginia.

23.    Plaintiff Jody Bauer is an individual who is a citizen of the State of Ohio.

24.    Plaintiff Mackenzie Bender is a minor who is a citizen of the Commonwealth of Kentucky, and whose claims are brought on her behalf by her next friends and parents, Amy Young and Bob Bender.

25.    Plaintiff Lindsey Bray is an individual who is a citizen of the Commonwealth of Kentucky.

26.    Plaintiff Sharon Brice is an individual who is a citizen of the State of Ohio.

27.    Plaintiff Dawn Brown is an individual who is a citizen of the State of Ohio.

28.    Plaintiff Tara Brown is an individual who is a citizen of the Commonwealth of Kentucky.

29. Plaintiff Kayla Burton is an individual who is a citizen of the State of Ohio.

30. Plaintiff Timothy Byrd is an individual who is a citizen of the State of Ohio.

31. Plaintiff Robert Campbell is an individual who is a citizen of the State of Ohio.

32. Plaintiff Jacob Cotter is an individual who is a citizen of the State of Ohio.

33. Plaintiff Barbara Couch is an individual who is a citizen of the State of Ohio.

34. Plaintiff Todd Green is an individual who is a citizen of the State of Ohio.

35. Plaintiff David Harris is an individual who is a citizen of the State of Ohio.

36. Plaintiff Adam Hartman is an individual who is a citizen of the State of North Carolina.

37. Plaintiff Theresa Helton is an individual who is a citizen of the State of Ohio.

38. Plaintiff Martha Hutton is an individual who is a citizen of the State of Ohio.

39. Plaintiff Jeffrey Hyde is an individual who is a citizen of the Commonwealth of Kentucky.

40. Plaintiff Alyssa Jackson is an individual who is a citizen of the State of Ohio.

41. Plaintiff Tracy Janson is an individual who is a citizen of the Commonwealth of Kentucky.

42. Plaintiff Jacqueline Judkins is an individual who is a citizen of the State of Ohio.

43. Plaintiff Michelle Keplinger is an individual who is a citizen of the Commonwealth of Kentucky.

44. Plaintiff Martha Kibler is an individual who is a citizen of the State of Ohio.

45.     Plaintiff Katie Lehmkuhl is an individual who is a citizen of the State of Ohio.

46.     Plaintiff Kimberly Luse is an individual who is a citizen of the State of Georgia.

47.     Plaintiff Mary Mauntel is a minor who is a citizen of the State of Ohio, and whose claims are brought on her behalf by her next friend and parent, Donald Mauntel.

48.     Plaintiff Kerry McNeal is an individual who is a citizen of the State of Ohio.

49.     Plaintiff Dawn Bowling Merland is an individual who is a citizen of the State of Ohio.

50.     Plaintiff Ryan Miller is an individual who is a citizen of the State of Ohio.

51.     Plaintiff William Moore is an individual who is a citizen of the State of Alabama.

52.     Plaintiff Stephanie Mueller is an individual who is a citizen of the Commonwealth of Kentucky.

53.     Plaintiff Gary Neu is an individual who is a citizen of the State of Ohio.

54.     Plaintiff Gail Nordeman is an individual who is a citizen of the State of Florida.

55.     Plaintiff Wendy Oberlander is an individual who is a citizen of the State of Michigan.

56.     Plaintiff Jeff Poff is an individual who is a citizen of the State of Ohio.

57.     Plaintiff David Rohling is an individual who is a citizen of the State of Florida.

58.     Plaintiff Delores Scott is an individual who is a citizen of the State of Ohio.

59.     Plaintiff Patricia Shott, as Executor of the Estate of Greg Shott, Deceased, is an individual who is a citizen of the State of Ohio.  Prior to his death, Gregory Shott was a citizen of the State of Ohio.

60.     Plaintiff Deena Borchers is an individual who is a citizen of the Commonwealth of Kentucky.

61.     Plaintiff Shandon Simmons is an individual who is a citizen of the State of Ohio.

62.     Plaintiff Karen Sisson is an individual who is a citizen of the State of Ohio.

63.     Plaintiff Michelle Sizemore is an individual who is a citizen of the State of Ohio.

64.     Plaintiff Earl Stamps is an individual who is a citizen of the State of Ohio.

65.     Plaintiff Tekira Taylor is a minor who is a citizen of the State of Ohio, and whose claims are brought on her behalf by her next friend and parent, Kimberly Taylor.

66.     Plaintiff Clara Tubbs-Hill is an individual who is a citizen of the State of Ohio.

67.     Plaintiff Brooke Vandervort is an individual who is a citizen of the State of Ohio.

68.     Plaintiff Teresa Worley is an individual who is a citizen of the State of Ohio.

69.     Plaintiff Kimberly Taylor, mother of minor Tekira Taylor, is an individual who is a citizen of the State of Ohio.

70.     Defendant Medtronic, Inc. ("**Medtronic**") is a Minnesota corporation with its principal place of business  at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.  Medtronic is authorized to do business in the State of Ohio and has appointed

CT Corporate Systems, 1300 East Ninth Street, Cleveland, Ohio 44114 as its agent for service of process in Ohio.

71.     Defendant Medtronic Sofamor Danek USA, Inc. ("**Sofamor Danek**") is a Tennessee corporation with its principal place of business at 1800 Pyramid Place, Memphis, Tennessee 38132.  Sofamor Danek is authorized to do business in the State of Ohio and has appointed CT Corporate Systems, 1300 East Ninth Street, Cleveland, Ohio 44114 as its agent for service of process in Ohio.  Sofamor Danek is a wholly-owned subsidiary of Medtronic.

### III.     <u>ALTER EGO</u>.

72.     At all times relevant herein, each of the Defendants was the agent, representative, servant, partner, aider and abettor, co-conspirator and/or joint venturer of the other Defendant named herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, or joint venture and rendered substantial assistance and encouragement to the other Defendant, knowing that their collective conduct constituted breaches of duties owed to each Plaintiff herein.

73.     At all times herein mentioned, Defendants were fully informed of the actions of their agents, consultants, representatives, and joint venturer, including those of Dr. Durrani, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted approval and adoption of said actions and each Defendant thereby ratified those actions.

74.     There exists and, at all times herein mentioned there existed, a unity of interest in ownership between Defendants such that any individuality and separateness between them has ceased and they are the alter-ego of each other and exerted control

over each other.  Adherence to the legal fiction of the separate existence of Defendants as entities distinct from each other will permit an abuse of the corporate privilege and would sanction a fraud or would promote injustice.

75.     Upon information, at all relevant times herein, each Defendant was engaged in the business of, or was a successor in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by Plaintiffs.  As such, each Defendant is individually, as well as jointly and severally, liable to each Plaintiff for his or her damages.

76.     The harm and economic loss caused to each Plaintiff resulted from the conduct of a combination of Defendants, and through no fault of any of the Plaintiffs. There may be uncertainty as to which Defendant or a combination of Defendants caused the harms and economic losses.  Defendants have superior knowledge and information on the subject of which one or a combination of them caused Plaintiffs' respective injuries.

### IV.     JURISDICTION  AND VENUE.

77.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship between each Plaintiff and each Defendant, and because each Plaintiff alleges an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

78.     This Court has personal jurisdiction over Defendants because at all relevant times they have engaged in substantial business activities within the State of Ohio.  At all relevant times Defendants transacted, solicited, and conducted business in

Ohio through their employees, agents, consultants, representatives, and joint venturers, and derived substantial revenue from such business in Ohio.

79.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial portion of the wrongful acts upon which this lawsuit is based occurred in this District. Venue is also proper pursuant to 28 U.S.C. §1391(c)(2) because Defendants are corporations having substantial, systematic, and continuous contacts in this District and they are all subject to personal jurisdiction in this District.

80.     The Ohio Product Liability Act, R.C. §§2307.71, *et. seq.*, does not impose requirements that are different from or in addition to those imposed by the federal Food and Drug Administration (hereafter the "**FDA**"), the Medical Device Amendments, the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301, *et seq.* (the "**FDCA**"), and the regulations promulgated thereunder at 21 CFR § 800, *et seq.*

**V.     FACTUAL BACKGROUND.**

**A.     Summary of Allegations.**

**1.     Generally**

81.     All claims and causes of action in this Complaint are based on state law but involve significant matters under federal law.  Defendants' duties and obligations forming the bases of these state law claims and causes of action do not impose any greater, additional, or different requirements than applicable federal law.

82.     At all relevant times, Infuse® was researched, developed, manufactured, marketed, promoted, advertised, sold, and distributed by Defendants.

83.     At all relevant times, Defendants knew or should have known that Infuse® was unreasonably dangerous for off-label uses in the spine.

84.     In off-label lumbar or cervical spine surgeries, Infuse® often leads to

serious complications including, but not limited to, chronic permanent radiculitis and other nerve injuries, uncontrolled bone growth/ectopic and suberant bone formation, osteolysis, male sterility, cancer, increased progression of cancer, suffocation of the cervical region, birth defects in children, bone fracture, bowel/bladder problems, loss of mobility or function spine, change in mental status, damage to blood vessels and cardiovascular system compression, excessive bone mass blocking the ability to treat pain, damage to internal organs and connection tissue, death, respiratory problems, disassembly and migration of components, dural tears, fetal development complications, allergic reaction, gastrointestinal complication, incisional complications, infection, inhaling complications, neurological system compromise, non-union, delayed union, mal-union, change in curvature of the spine, retrograde ejaculation, scars, tissue and nerve damage, itching, pain, hematoma, anaphylactic reaction, elevated erythrocyte sedimentation rate, additional surgeries to correct these potential complications, and poorer overall outcomes.  Defendants' risks of Infuse® use appear within their package insert.

85.     Each Plaintiff suffered grievous personal injuries and damages because of off-label uses of Infuse® that occurred as a direct and proximate result of Defendants' breaches of their legal duties owed to each of them and Defendants' misconduct.

### 2.     Defendants' Misrepresentations

86.     At all relevant times, Defendants negligently manufactured, marketed, advertised, promoted, sold, and distributed Infuse® as a safe and effective device to be used for spinal fusion surgery.

87.     Defendants negligently, recklessly, or intentionally promoted Infuse® for off-label use to physicians and spine patients, including Plaintiffs and their physicians,

and downplayed to physicians and spine patients its dangerous effects, including but not limited to the downplaying of the dangerous effects of Infuse® in off-label spine surgeries such as that performed on each Plaintiff.

88.     At all relevant times, Defendants misrepresented the safety of Infuse® to patients and the public at large.

89.     Defendants recklessly, willfully, or intentionally failed to alert patients and the public of the significant danger to patients resulting from the off-label uses of Infuse®; but instead, worked intentionally to give the false impression that Infuse® was safe and effective, even for off-label use.

### 3.     Defendants' Knowledge

90.     Defendants and their agents, consultants, representatives, and joint venturers knew or should have known and/or recklessly disregarded the materially incomplete, false, and misleading nature of the information that they caused to be disseminated to the public and to spine surgeons regarding Infuse®.

91.     Defendants engaged in a surreptitious campaign to promote Infuse® for off-label uses; that is, uses that had never been evaluated or approved by the FDA.  The ongoing scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of personnel at the highest levels of Defendants, including their officers.

92.     At all relevant times, Defendants knew, or had reason to know, that Infuse® was unsafe for off-label uses in the spine because the device had never been approved by the FDA for use in the spine, other than solely in anterior approach lumbar fusion surgeries with a LT-Cage.

93.     The use of Infuse® in the spine, other than in such an anterior approach, was at all pertinent times experimental.

94.     Defendants knew that the safety and efficacy of Infuse® for use without an LT-Cage has not been proven.

95.     At all relevant times, Defendants knew, or had reason to know, that Infuse® was unsafe for off-label use because it had not been approved for off-label use, and its safety and efficacy for off-label use was either unknown, or was known by Defendants to be unsafe and ineffective.

96.     Defendants' acts to promote off-label use of Infuse®, their knowledge of, but failure to disclose, the growing adverse events associated with the product, Defendants' continued payments to certain spine surgeon "Opinion Leaders" to promote off-label uses for the purpose of improperly influencing these surgeons' medical opinions, repeat FDA regulatory action against Defendants, whistleblower lawsuits against Defendants, a Department of Justice ("**DOJ**") settlement and resulting Corporate Integrity Agreement, and a United States Senate Finance Committee investigation culminating in a scathing report on Defendants' improper promotional activities on this product, all demonstrate a conscious and reckless disregard for the health and safety of spinal patients, including each Plaintiff.

97.     At all relevant times, Defendants knew, or had reason to know, that their representations and suggestions to physicians that Infuse® was safe and effective for off-label use were materially false and misleading and that physicians and patients would rely on such representations.

98.     Defendants knew, or had reason to know, of the likelihood of serious injuries caused by the off-label use of Infuse® in the spine, but they concealed this

information or improperly downplayed the danger of such use to Plaintiffs of these risks, thereby preventing them from making informed choices in selecting other treatments or therapies prior to each Plaintiff's implantation surgery and preventing them from timely discovering his or her injuries.

99.     The prevailing best scientific and medical knowledge, discussed herein, demonstrated prior to the dates of each Plaintiff's injury that off-label Infuse® was likely to cause each Plaintiff's injuries as stated herein.  This prevailing scientific and medical knowledge was known or knowable by Defendants for at least a year or more prior to each Plaintiff's off-label Infuse® surgery.

### 4.     Defendants' Off-Label Promotion

100.     Defendants had knowledge and information reflecting the true risks and dangers to spine patents of off-label Infuse® use, the extent of the off-label use, and their reckless promotion of the off-label uses.  Despite this knowledge, Defendants knowingly and recklessly conducted an egregious off-label promotion campaign to the detriment of spine patients, including each Plaintiff.

101.     Defendants and their agents, consultants, representatives, and joint venturers encouraged the off-label promotion of Infuse® described throughout this Complaint, notwithstanding their knowledge of the serious adverse events that patients could, and did, suffer, which have often resulted in the need for additional surgery, emergency intervention, and, in at least one case, the death of a patient.

102.     Defendants improperly promoted and marketed Infuse® to Dr. Durrani for off-label use in the spine, and this improper promotion and marketing improperly influenced his decisions to implant Infuse® in each Plaintiff's spine using an off-label approach.

103.    Defendants directly and indirectly promoted, trained, and encouraged Dr. Durrani to perform each Plaintiff's spinal procedure using Infuse® in a dangerous off-label manner.

104.    Defendants recklessly and/or fraudulently promoted and marketed Infuse® to each Plaintiff and Plaintiffs' physician for off-label use in the spine.

### 5.    Defendants' Failure to Warn

105.    At all relevant times, Defendants misrepresented the safety of Infuse® to physicians and spine patients, including to Plaintiffs and Dr. Durrani, and recklessly, willfully, or intentionally failed to inform each Plaintiff and Dr. Durrani of the significant dangers to patients resulting from the off-label use of Infuse®.

106.    Any warnings Defendants may have issued concerning the dangers of off-label uses of Infuse® or regarding the specific risks of those uses were insufficient in light of Defendants' contradictory prior, contemporaneous, and continuing illegal promotional efforts and promotion of Infuse® for non-FDA-approved off-label uses in the spine and Defendants' contemporaneous efforts to hide or downplay the true risks and dangers of the off-label uses of Infuse®.

### 6.    Causation

107.    None of the Plaintiffs would have consented to treatment with the off-label use of Infuse® had he or she known of or been informed by Defendants or Dr. Durrani of the true risks of the off-label use of Infuse®.

108.    Each Plaintiff directly or inferential relied on Defendants' misrepresentations regarding the safety and efficacy of Infuse® in his or her spine surgery.

109.     Each Plaintiff either did not know of these risks or was misled by Defendants, who knew or should have known of these risks.

110.     Neither Defendants nor Dr. Durrani informed Plaintiffs of the specific risks of the off-label use of Infuse® or were misled by Defendants, who knew or should have known of the true risks.  Defendants consciously chose not to inform Plaintiffs of the risks.

111.     Defendants' off-label promotion and marketing and business relationship with Dr. Durrani caused him to decide to implant Infuse® in each Plaintiff's spine using an off-label approach.  As a result, Defendants and Dr. Durrani incurred substantial financial gain.

### B.     The Infuse® Device and Spinal Fusion Surgery Generally.

112.     Defendants designed and marketed Infuse® for lumbar spine fusion surgery, a surgical technique in which one or more of the vertebrae of the spine are united together, or "fused," so that motion no longer occurs between them.

113.     Spinal fusion is used to treat a number of conditions, including treatment of a fractured vertebra, spinal deformities (spinal curves or slippages), back pain from instability, or abnormal or excessive movement between vertebrae.  Similar to the concept of welding, spinal fusion surgery uses bone grafts to join vertebrae together and eliminate or reduce movement between vertebrae.

114.     The fusion of the vertebrae is intended to relieve pain and disability caused by pressure or impingement of the spinal cord.

115.     In a spinal fusion procedure, the graft -- usually the patient's own harvested bone (i.e. autograft) or cadaver bone (i.e. allograft) -- is placed in a spacer cage within the disc space between the vertebrae during the surgery.  Over the following

months, a physiological mechanism similar to that which occurs when a fractured bone heals causes the graft to join, or "weld," the vertebrae together. The goal of spinal fusion is to obtain a solid fusion of the vertebrae.

116. For years, the medical Standard of Care ("**SOC**") was to use autologous bone graft in fusion surgery. In an autologous bone graft, or "autograft," the surgeon procures bone graft material from another part of the patient's body, typically from the patient's pelvis or iliac crest or from the patient's own spine (from the parts of one or more vertebrae removed to gain access to the disc space to perform the fusion), and implants the bone graft in the site where fusion is desired. Successful fusions occur at very high rates in autograft procedures, as the harvested bone exhibits all the properties necessary for bone growth (including osteogenic, osteoconductive and osteoinductive properties).

117. As an alternative to autograft, patients can undergo an allograft procedure using cadaver bone instead of autograft. Although healing and fusion are not as predictable when using allograft as when using autograft (the patient's own bone), an allograft eliminates the need for the harvest procedure required in an autograft.

118. A newer option to traditional bone graft procedures is bio-engineered and bio-manufactured bone growth materials, including Infuse®. Infuse® and similar materials were (at least initially) appealing to some spine surgeons, since they can obviate the need for using autograft harvested from the patient's own body.

119. Infuse® is a genetically engineered material containing a bone morphogenetic protein ("**rhBMP-2**"), and is used as an alternative or supplement to autograft and allograft to help fuse the vertebrae in the spine as part of the spinal fusion surgery. The purpose of Infuse® is to accomplish the same clinical outcomes as

grafting a patient's own bone into these locations but without the need to harvest bone from the patient's hip or spine.

120.    Defendants' Infuse® product consists of:  (i) a metallic spinal fusion cage, or the LT-Cage; (ii) the bone graft substitute which consists of liquid rhBMP-2 (derived from Chinese hamster cells); and (iii) a sponge-like carrier or scaffold for the protein (manufactured from bovine collagen) that is placed inside the fusion cage.

121.    The fusion cage component maintains the spacing and temporarily stabilizes the diseased region of the spine, while the Infuse® bone graft component is used to form bone, which is intended to permanently stabilize (fuse) this portion of the spine.

122.    During surgery, the rhBMP-2 is soaked into, and is intended to bind with, the absorbable collagen sponge that is designed to reabsorb, or disappear, over time. As the sponge dissolves, the rhBMP-2 stimulates the cells to produce new bone.

123.    Certain bone morphogenetic proteins ("**BMP**"s) have been studied for decades because of their ability to heal bone and potentially decrease or eliminate the need for bone graft harvesting from other parts of the body.

124.    Scientists isolated the gene for one protein; to wit, rhBMP-2, from bone tissue and used molecular biology techniques to create genetically engineered cells. These cells then produce large quantities of rhBMP-2.  A similar process is used to manufacture other proteins, such as insulin.

125.    Attempting to seize on this potentially lucrative opportunity to develop a new spinal fusion method, Sofamor Danek acquired the exclusive rights to rhBMP-2 for spinal applications in February 1995.  The rhBMP-2 liquid bone protein sold as

Infuse® is a genetically engineered version of a naturally occurring protein that stimulates bone growth, developed as a commercially viable BMP technology.

126.    In October 1996, Sofamor Danek filed with the FDA an application for an Investigational Device Exemption to conduct a pilot study on the effects of rhBMP-2 in humans, marking the first step to obtaining approval to market BMP commercially.

127.    In January 1999, Medtronic purchased Sofamor Danek for approximately $3.6 billion.

128.    On January 12, 2001, Medtronic filed the Infuse® bone graft PMA and was granted expedited review status by the FDA.

129.    On July 2, 2002, the FDA approved Infuse®, a medical device containing an absorbable collagen sponge that is treated with rhBMP-2, for one limited and very specific spinal fusion procedure.

### C.    FDA and FDCA Regulations Applicable to Medical Devices

130.    At all times relevant herein, the United States Food and Drug Administration (the "**FDA**") was, and is, the federal agency of the United States responsible for protecting the health and safety of the public by enforcing the FDCA, and ensuring, among other things, that medical devices intended for use in humans are safe and effective for each of their intended uses and that the labeling of such medical devices bears true and accurate information.

131.    At all times herein relevant, the FDCA stated that a "device" for use in humans includes "an…implant…or other similar or related article…which is…intended for use in …the treatment or prevention of disease of man…or intended to affect the structure or any function of the body of man…which does not achieve its primary intended purposes through chemical action within or on the body of man and which is

not dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. §§ 321(h).

132. At all times herein relevant, the FDCA required every manufacturer of a new device to obtain approval from the FDA prior to marketing and selling its device in interstate commerce.

133. To obtain such approval, the FDCA assigned all devices into one of three classes of devices, depending on the degree of regulatory control necessary to provide reasonable assurance of the safety and effectiveness of the device for its intended use. Class I devices pose the lowest risk to consumers' health, do not require FDA approval for marketing, and include devices such as tongue depressors; Class II devices pose intermediate risk and often include special controls including post-market surveillance and guidance documents; and Class III devices pose the greatest risk of death or complications and include most implantable surgical devices including several types of implantable orthopedic devices for spine and hip surgery.

134. At all times herein relevant, the FDCA provides four different ways for a manufacturer to obtain approval to introduce the device intended for human use into interstate commerce:

    a.  Premarket Approval.  Before a company could market a Class III device,
        that company is required to submit a premarket approval ("**PMA**")
        application to the FDA that provided the FDA with a reasonable
        assurance that the device was safe and effective for its intended use.  21
        U.S.C. §§360e(a)(2) and 360e(d)(2).  In order to show safety and
        effectiveness, the applicant is required to submit proof to the FDA,
        typically in the form of clinical trial results.

29

b.    510(k) Approval.  Alternately, a company could seek a premarket
notification, commonly referred to as a "510(k)", from the FDA seeking a
determination that the device was "substantially equivalent" to a legally
marketed device.  21 U.S.C. §§360c(f) and (i) and 360(k).  If the FDA
"cleared" the device by determining that the device was substantially
equivalent to a device that had already demonstrated safety and efficacy,
the company could market the device, which was then considered to be in
the same class as the device to which it was compared.  21 U.S.C. §360
c(f)(1).

c.    Investigational Device Exemption.  This exemption allows for clinical
investigation of devices to determine safety and effectiveness for new
uses. 21 U.S.C.§360j(g) and 21 C.F.R. §812. Submission, and subsequent
approval, of an Investigational Device Exemption ("IDE") permits a
device that would otherwise be required to obtain premarket approval to
be shipped in interstate commerce for the purpose of conducting clinical
investigations.

d.    Humanitarian Device Exemption. The fourth option to obtain approval
was the submission of an application for a Humanitarian Device
Exemption ("**HDE**").  An HDE application is not required to contain the
results of scientifically valid clinical investigations demonstrating that the
device was effective for its intended purpose.  The application, however,
has to contain sufficient information for the FDA to determine that the
device did not pose an unreasonable or significant risk of illness or injury,
and that the probable benefit to health outweighed the risk of injury or
illness from its use, taking into account the probable risks and benefits of

currently available devices or alternative forms of treatment. Additionally, the applicant has to demonstrate that no comparable devices were available to treat or diagnose the disease or condition, and that they could not otherwise bring the device to market. An HDE approval is accompanied by certain additional requirements:

i.   An HDE can only be granted upon a finding by the FDA that the device was designed to treat or diagnose a disease or condition that affects fewer than 4,000 individuals in the United States.

ii.  A device approved under an HDE cannot be sold for an amount that exceeds the costs of research and development, fabrication, and distribution of the device; thus, the holder of an HDE is not allowed to make a profit on the sale of an HDE device.

iii.  An HDE device can only be used at a medical facility after an institutional review board ("**IRB**") at or on behalf of the medical facility approved the use of the device for the FDA approved indication; the IRBs acts as a safeguard that the HDE devices were being used properly.

135.  The FDCA required that a submission for approval of a device include proposed labeling for the proposed intended uses of the device that includes, and among other things, the conditions for therapeutic use. A device manufacturer is not permitted to promote and market a new device until it has an approval, including approval for the proposed labeling. Moreover, if approved, the device manufacturer is permitted to promote the device only for the medical conditions of use specified in the approved labeling. Uses not approved by the FDA are known as "unapproved" or "off-label" uses.

136.    Devices that are promoted for uses that have not been approved by the FDA are deemed to be misbranded under the FDCA. 21 U.S.C. §§331(a) and 333(a)(2).

### D.    The Medtronic Infuse® Bone Graft Product.

137.    Infuse® is recombinant human bone morphogenetic protein-2 known as dibotermin alfa.  It is a produced by a genetically engineered Chinese hamster ovary line.  It induces new bone tissue at the site of implantation.

138.    Infuse® is sold with ACS, a soft, white, pliable absorbent implantable matrix that is intended to act as a carrier and scaffold for new bone formation.

139.    At all relevant times, Infuse® was researched, developed, manufactured, marketed, promoted, advertised and sold by Defendants.

### E.    FDA Premarket Approval Process.

140.    The current regulatory framework for medical device approval was established in the Medical Device Amendments of 1976 (the "**MDA**") to the FDCA.

141.    The MDA contains a three-class classification system for medical devices. Class I devices pose the lowest risk to consumers' health, do not require FDA approval for marketing, and include devices such as tongue depressors.   Class II devices pose an intermediate risk and often include special controls including post-market surveillance and guidance documents.  Finally, Class III devices pose the greatest risk of death or complications and include most implantable surgical devices such as cardiac pacemakers, coronary artery stents, automated external defibrillators, and several types of implantable orthopedic devices for spine and hip surgery.  Infuse® is a Class III device.

142. Manufacturers such as Defendants seeking to a market a Class III device, such as Infuse®, are required to submit a Premarket Approval Application ("**PMA**") that must be evaluated and approved by the FDA.

143. The PMA requires the manufacturer to demonstrate the product's safety and efficacy to the FDA through a process that analyzes clinical and other data, including: (i) technical data and information on the product, including non-clinical laboratory studies and clinical investigations; (ii) non-clinical laboratory studies that provide information on microbiology, toxicology, immunology, biocompatibility, stress, wear, shelf life, and other laboratory or animal tests of the device-all of which must be conducted in compliance with federal regulations that set forth, inter alia, criteria for researcher qualifications, facility standards, and testing procedures; and (iii) clinical investigations in which study protocols, safety and effectiveness data, adverse reactions and complications, device failures and replacements, patient information, patient complaints, tabulations of data from all individual subjects, results of statistical analyses, and any other information from the clinical investigations are provided, including the results of any investigation conducted under an Investigational Device Exemption ("**IDE**").

144. A PMA requires that all pertinent information about the device be articulated in the application and requires the manufacturer to specify the medical device's "intended use." The indications for use required on the label are based on the nonclinical and clinical studies described in the PMA. Indications for use for a device include a general description of the disease or condition the device will diagnose, treat, prevent, cure, or mitigate, including a description of the patient population for whom the device is intended.

145.     In addition, each PMA submission must include copies of all proposed labeling for the device, which must comply with federal requirements.

146.     Specifically, the label must include the common name of the device, the quantity of contents, the name and address of the manufacturer, as well as any prescription use restrictions, information for use (including indications, effects, routes, methods, frequency and duration of administration; and any relevant hazards, contraindications, side effects, and precautions), instructions for installation and operation, and any other information, literature, or advertising that constitutes "labeling" under the FDCA.

147.     Approval of the product's labeling is conditioned on the applicant incorporating any labeling changes exactly as directed by the FDA.  A copy of the final printed labeling must be submitted to the FDA before marketing.

148.     Devices that are promoted for uses that have not been approved by the FDA are deemed to be misbranded under the FDCA.  21 U.S.C. §§ 331(a) and 333(a)(2).

### F.     Infuse® Bone Graft Limited FDA Approval.

149.     In October of 1996, Sofamor Danek submitted an IDE to the FDA to study the use of rhBMP-2 as applied to an absorbable collagen sponge inserted into an LT-Cage interbody fusion device to treat patients with degenerative disc disease.  Designed as a pilot study intended to support the initiation of a larger pivotal study, the IDE involved 14 patients, 11 of which received spinal fusion procedures using the rhBMP-2/ACS/LT-Cage device and 3 of which received the LT-Cage with autologous bone.  This study marked the first time rhBMP-2 was used in patients undergoing spinal fusion.  In this initial clinical trial, all 11 patients who had been implanted with rhBMP-2 achieved successful fusion within six months from the time of surgery.

150.    Sofamor Danek used the results of the pilot study to petition the FDA to initiate a pivotal trial of rhBMP-2 with the LT-Cage. This trial, which was approved by the FDA in July 1998, involved 135 investigational patients who had rhBMP-2 implanted in a single-level Anterior Lumbar Interbody Fusion ("**ALIF**") procedure and 135 control patients who underwent the same procedure using autologous bone graft instead of rhBMP-2.

151.    After acquiring Sofamor Danek in 1999, Defendants filed the Infuse® PMA on January 12, 2001, and was granted expedited review status by the FDA.

152.    As presented in Defendants' original PMA (eventually approved by the FDA in July of 2002), the initially-approved Infuse® product consisted of two components:

a.    A specific type of spacer (the LT-Cage Lumbar Tapered Fusion Device) component, which is a thimble-sized hollow metal cylinder which keeps the two vertebrae in place and provides a frame that contains and directs the development of new bone growth; and

b.    The Infuse® Bone Graft Component, which includes a collagen sponge that acts as a carrier and scaffold for the active ingredient in Infuse®, and rhBMP-2, the actual active ingredient that is reconstituted in sterile water and applied to the collagen sponge before it is placed inside the spacer cage.

153.    On July 2, 2002, the FDA approved Infuse® for certain limited uses. The FDA approved Infuse® Bone Graft for a small percentage of overall spine fusion surgeries, with the device specifying the limited surgical application to be used.

35

154.    As presented in Medtronic's original PMA and eventually approved by the FDA in July 2002, the initially-approved INFUSE® Bone Graft product consisted of two components: (1) the LT-CAGE® Lumbar Tapered Fusion Device Component, a thimble-sized hollow metal cylinder; and (2) the INFUSE® Bone Graft Component, which includes: (a) an absorbable collagen sponge ("ACS") that acts as a carrier and scaffold for the active ingredient in INFUSE® Bone Graft, and (b) rhBMP-2, the active ingredient that is reconstituted in sterile water and applied to the ACS.  Although these two components are sold separately, the initial approved labeling for the product indicates that the INFUSE® Bone Graft must be used with the LT-CAGE component.

155.    According to the label sought by Defendants in the PMA and subsequently approved by the FDA (and which remains substantially the same), Infuse® can only be used in an ALIF procedure, involving a single-level fusion in the L4-S1 region of the lumbar spine.  (The FDA did make minor amendments to the label, first in 2004, when it approved a supplement expanding the indicated spinal region from L4-S1 to L2-S1, and again when approved Infuse® for certain oral maxillofacial surgeries and repair of tibial fractures that have already been stabilized with IM nail fixation after appropriate would management.)  ALIF is performed by approaching the spine from the front through an incision in the abdomen and is primarily used to treat pain resulting from disc collapse.

156.    INFUSE® was approved by the FDA only for use in a single-level fusion at the L4-S1 region of the lumbar spine, in a skeletally mature patient with degenerative disc disease at one level from L4-S1 (including patients with Grade I spondylolisthesis at the involved level), via the ALIF procedure and in combination with the LT-Cage Lumbar Tapered Fusion Device.

157.    INFUSE® has never been approved by the FDA for use in other parts of the body or for use in any other type of procedure, other than two non-spinal uses as noted in footnote 1 below.  Any such uses are thus, by definition, "off-label" experimental uses not approved by the FDA.[1]

158.    INFUSE® was approved to be sold in kit sizes small (2.8 ml rhBMP-2), medium (5.6 ml rhBMP-2) and large (8.0 ml rhBMP-2).  Defendants sought approval from the FDA for a product called *AMPLIFY*, which utilized a higher dose of rhBMP-2, but the FDA denied approval of the product.

### G.    Off-Label Use of INFUSE® is Dangerous.

159.    Significantly, the initial approved labeling for INFUSE® indicates in bold underlined formatting: "**These components must be used as a system.  The Infuse® Bone Graft component must not be used without the LT-Cage Lumbar Tapered Fusion Device component.**"  The labeling also directs the specific manner in which both components are to be used in a fusion procedure.

160.    Approval by the FDA of Infuse® using the three components helped assure that Infuse® would not be used for unapproved purposes, such as use in the cervical spine, or for any lumbar surgery performed through the back or side of the body (posterior approaches).  This is because the LT-Cage was designed solely for use in an anterior approach limited to lumbar surgery.

---

[1]  While the product's label remains substantially the same as that approved by the FDA in 2002, the FDA has made minor amendments to the label through post-approval supplements.  For example, on July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4-S1 to L2-S1.  INFUSE® has been approved by the FDA for only two other uses:  certain oral maxillofacial surgeries and repair of tibial fractures that have already been stabilized with IM nail fixation after appropriate wound management.  INFUSE® was approved by the FDA on March 9, 2007, for certain oral maxillofacial uses.  While INFUSE® has also been approved for treatment of certain tibial fractures and certain oral maxillofacial uses, these uses represent a very minor percentage of the product's overall sales.

161.     The FDA required that the components described above be used in combination as a matter of safety and efficacy of the patient.

162.     Despite the fact that the FDA only approved rhBMP-2 for use in the spine in combination with use of the LT-Cage, Defendants sell Infuse® separately from the LT-Cage and have done so continuously since the FDA's approval in July 2002.

163.     There are numerous lumbar and cervical spine surgical procedures for which Infuse® was not initially approved by the FDA, and for which it has never subsequently been approved.  No cervical fusion procedure, whatsoever, using Infuse® has ever been approved by FDA, regardless of the approach or procedure.  The non-approved lumbar procedures include:

   a.     Posterior Lumbar Interbody Fusion ("**PLIF**"), a procedure used to treat nerve compression and back pain resulting from a number of causes, involves approaching the spine from the back.  PLIF, however, is a more delicate surgical approach in some respects because the spinal canal and nerves are posterior to the vertebral body and because the surgeon must manipulate the dural sac (the membranous sac that encases the spinal cord within the vertebral column) to perform the PLIF procedure;

   b.     Posterolateral Fusion ("**PLF**") which is similar to the PLIF procedure, but instead of removing the disc space and replacing it with a bone graft, the disc space remains intact and the bone graft is placed between the transverse processes in the back of the spine.  This allows the bone to heal and stabilizes the spine by fusing the transverse process of one vertebra to the transverse process of the next vertebra; and

c.  Transforaminal Lumbar Interbody Fusion ("**TLIF**"), which is also similar to the PLIF procedure, and is a technique utilized when an inter-body fusion is performed via a posterior approach. TLIF allows the surgeon to perform a fusion from a posterior approach without disturbing the dural sac by approaching the spine by a more lateral, or sideways, approach.

164.  Physicians may use FDA-approved medical devices in any way they see fit — either on-label or off-label -- but medical device companies like Defendants are prohibited by federal law to promote off-label uses for their medical devices or to pay doctors inducements or kickbacks to promote off-label uses, or to perform procedures using the devices off-label.  When a physician wishes to use a medical device in an off-label manner, he or she must inform the patient of the off-label nature of the surgery and the expected risks and benefits of such off-label use, and obtain the patient's informed consent to such use.

165.  The FDA's approval of INFUSE® was limited to one specific lumbar procedure (the ALIF procedure) due to FDA's concerns about potential adverse events in posterior uses that had already been reported at the time of the product's approval. As a result, the FDA approved INFUSE® for the small percentage of overall spinal fusion surgeries which are ALIF procedures, with the device label specifying this limited surgical application.

166.  FDA approval of INFUSE® was limited to ALIF only because of  adverse events resulting from the use of rhBMP-2 in off-label applications. In particular, a MEDTRONIC sponsored trial examining the application of rhBMP-2 in off-label PLIF (Posterior Lumbar Interbody Fixation) procedures was halted in December 1999 when uncontrolled bone growth developed in a number of the patients. Indeed, the study

reported that one patient required two additional surgeries to remove excessive bone growth from the spinal canal. Such bone overgrowth observed in this PLIF trial was particularly alarming because it could, and did in many patients, result in worsening the very pain that the fusion procedure was designed to eliminate, and in some cases necessitating difficult revision surgeries to remove the bone overgrowth.

167.    Moreover, the 1999 PLIF trial demonstrated that bone overgrowth complications from INFUSE® result from the product's very mechanism of action; i.e., rhBMP-2 stimulates the growth of new bone. Thus adverse events can result when the rhBMP-2 leaks out of the area in which bone growth is desired and/or when too much rhBMP-2 is used. In such cases, INFUSE® can stimulate bone growth where new bone is not desired or can lead to excessive bone growth in the target area, which is often associated with other complications such as swelling, compression of nerves, and associated pain. Such unintended bone growth and swelling can be especially problematic in spinal surgeries because of the proximity to sensitive neurological structures in which INFUSE® is used; i.e., the spinal cord and the exiting nerve roots.

168.    During the FDA Advisory Committee Panel (the "**FDA Panel**") hearing on January 10, 2002, concerning potential FDA approval of INFUSE®, panel members voiced concerns regarding potential off-label use of the product, and asked Defendants to describe its efforts to guard against off-label use of the product.

169.    In response to FDA concerns of off-label applications, one Medtronic consultant, who is alleged to have received hundreds of thousands of dollars in the form of kickbacks from consulting agreements promoting INFUSE®, dismissed the FDA Panel's concerns of off-label use, stating: "this specific application before the

panel today is through an anterior approach," and thus, "seems to me to be outside the scope of what we ought to be focusing on today."

170.    Reiterating its concerns on off-label use, the FDA Panel cautioned Defendants to guard against procedures outside the specifically approved ALIF procedure provided in the labeled application. The FDA Panel's admonishment included concerns voiced by panel member Dr. John Kirkpatrick that off-label use could result in harm to patients.  More specifically, the use of the tapered LT-Cage— which is difficult to implant in a posterior approach—would, if required, "prevent a majority of surgeons from applying this from a Posterior Lumbar Interbody Fusion [PLIF] perspective."  In other words, the FDA explicitly warned Defendants against promoting INFUSE® for use in off- label PLIF procedures because, according to the statements of the FDA Panel, such use could endanger patients.

171.    At this 2002 FDA Advisory Committee Panel hearing, the panel members stressed concerns regarding potential off-label use of the product and repeatedly asked the MEDTRONIC presenters questions about how Defendants would seek to guard against off-label applications of the product.

172.    At the conclusion of the hearing, the FDA Advisory Panel again reiterated concerns regarding the potential for off-label use, specifically admonishing Defendants to guard against procedures other than the specific ALIF (anterior lumbar interbody fusion) procedure approved by the FDA.

173.    The off-label use of Infuse® in the spine frequently causes serious adverse events. This has been known to Defendants and its key "opinion leaders" for many years.

174.    The FDA Panel's initial fears in 2002 concerning the dangers of off-label use of Infuse® were confirmed by subsequent medical studies which demonstrate that off-label use of Infuse® could present severe risks and dangers to patient safety.

175.    For example, an early study sponsored and funded by Defendants in 1999 demonstrated an approximately 70% rate of ectopic bone growth -- meaning bone overgrowth where such growth is not desired.  Only a few months into this clinical trial of Infuse®, CT scans showed unwanted bone had already formed in the spinal canals of 70% of the patients treated with Infuse®.  This clinical trial, intended to include hundreds of persons with degenerative disc disease, was halted after only 34 patients received Infuse®.

176.    A spine surgeon who participated in this PLIF with Infuse® study reported that one of the patients he treated required two extra surgeries to clear the excessive bone growth from the patient's spinal canal.  The complications observed in this PLIF trial were particularly serious given the potential of neural impingement (or nerve pinching) from such bony overgrowth in that procedure, potentially triggering the very sort of pain that a fusion procedure is intended to eliminate.

177.    This bone overgrowth results from Infuse®'s very mechanism of action. In such cases, Infuse® can stimulate bone growth where new bone is not desired and can lead to excessive bone growth into areas where bone should not be growing; i.e., into or against the spinal cord or other spinal nerves.

178.    There is insufficient scientific evidence concerning the proper dosages of rhBMP-2 for use in the off-label procedures such as PLIF, TLIF, PLF, and cervical fusions and the expected responses to the protein in different biological environments. Many adverse events associated with the use of Infuse® result from off-label use of the

product by surgeons who do not fully understand the highly potent nature of this molecule.

179.    A study, entitled *Prevalence, Complications, and Hospital Charges Associated with Use of Bone-Morphogenetic Proteins in Spinal Fusion Procedures*, Cahill, *et al.*, *JAMA,* 2009 Jul 1;302(1):58-66, analyzed the integration of BMP into spinal surgeries since 2002, and the association between its use and postoperative complications, length of hospital stays, and hospital charges.  Significantly, the study determined that use of bone morphogenetic proteins is associated with a substantially higher rate of complications in anterior cervical fusion procedures, which has resulted in an approximate 41% increase in hospital charges for these procedures.  Notably, the study only considered complications that occurred during postoperative inpatient hospitalization immediately following the surgical procedure, and did "not include delayed complications in the outpatient setting," such as hospital readmission-related complications.

180.    Such a shortcoming likely resulted in a significant understatement of the extent of complications resulting from use of bone morphogenetic proteins because, as an FDA Public Health Notification regarding complications from use of BMP in the cervical spine indicated, "[m]ost complications occurred between 2 and 14 days post-operatively with only a few events occurring prior to day 2." Indeed, acknowledging this fact, Dr. Kevin S. Cahill, who led the study, publicly commented, "ours is probably a bottom estimate."

181.    Aside from potential understatement of complications, the study found that the rate of complications in anterior cervical fusions was 51.4% higher when using bone morphogenetic protein than in similar cases when bone morphogenetic protein

was not used. These complications included increased rates of voice and swallowing-related problems and swelling of the neck. The study's authors noted a "significantly greater" rate of complications when using bone morphogenetic proteins in these surgeries, even after considering and compensating for numerous other variables that could affect complications rates, such as age, sex, etc.

182. Astonishingly, it was not until 2004 that a paper about the disastrous 1999 PLIF trial by spine surgeons with financial ties to Defendants was finally published in a medical journal. This article inaccurately maintained that these patients were not harmed by Infuse®. The paper (Haid, *et al.*, *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages,* The Spine Journal, 4(5):527-538, September 2004) downplayed the bone overgrowth complications claiming that while it showed up on CT scans, patients did not suffer ill effects. This claim was false and misleading and further encouraged dangerous off-label uses of Infuse®.

183. In fact, David Malone, M.D., a Tulsa, Oklahoma spine surgeon involved in this 1999 PLIF clinical trial with Infuse, told the *Milwaukee Journal Sentinel* that two of his patients had to undergo additional surgeries because the BMP-induced bone overgrowth was painfully impinging on their nerve roots. One of the patients, a man who was in his 50s at the time, needed three operations - one for the implant, a second to remove the unwanted bone formation, and then a third when the additional bone grew back yet again.[2]

---

[2] *See, e.g., Infuse® Cited in Patients' Painful Bone Overgrowth: More Surgery Needed After Use, Surgeon Says*, by John Fauber, *Milwaukee Journal Sentinel,* June 27, 2011.

184.    "It was a pretty amazing biological response," Dr. Malone said in an interview.  "It grew back even larger than the first time.  It got to the point that secretaries in our clinic could look at X-rays and tell who got the BMP (Infuse®) and who did not.  You could see that much bone growth."[3]

185.    A May 15, 2006, medical article in *Spine*, entitled *Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone Growth Using Fibrin Glue*, observed that these complications often result from the product's mechanism of action.  As the authors stated, "rhBMP-2 may stimulate bone growth in areas in which bone is not desired, especially as the material 'leaks' into such spaces. . . .  Although this phenomenon has not been thoroughly studied, it implies that the release of rhBMP-2 into the soft tissues stimulates a rapid, potentially life-threatening, inflammatory reaction."[4]

186.    Again, in a November 2006 issue of *Spine*, several authors noted a significantly increased risk of swelling from off-label use of Infuse® in cervical spine fusions compared to traditional fusion surgeries.  Of the 234 patients studied, 27.5% of those patients treated with Infuse® had significant swelling after the surgery, while only 3.6% of those patients not treated with Infuse® experienced such a complication.  Further analysis demonstrated that "patients receiving rhBMP-2 were *10.1 times more likely* to have a swelling complication versus those who did not receive rhBMP-2."[5] (emphasis added.)

---

[3] *Id.*

[4] Patel, *et al.*, *Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone Growth Using Fibrin Glue, Spine*, 31(11): 1201-1206, May 2006.

[5] Smucker, *et al.*, *Increased Swelling Complications Associated with Off-Label Usage of rhBMP-2 in the Anterior Cervical Spine, Spine,* 31(24): 2813-2819, November 2006.

187.    A March 2007 article in *The Spine Journal* highlighted the severity of the complications associated with off-label use of Infuse®.  According to this article, five days after Infuse® was implanted off-label in a cervical spine fusion surgery, the implanted patient experienced severe swelling of the neck and difficulty swallowing which required emergency medical treatment such as an exploratory surgery and implantation of a breathing tube.[6]

188.    A *European Spine Journal* article in August 2007 found that use of INFUSE® in certain cervical spine fusions resulted in a statistically significant increase in the number of complications, including dysphagia (difficulty in swallowing) and swelling in the neck area.  The authors determined that "[d]ysphagia was a common complication and it was significantly more frequent and more severe in patients in whom rhBMP-2 was used.  Post-operative swelling . . . was significantly larger in the rhBMP-2 group."  Of the patients evaluated, 85% of those treated with INFUSE® reported difficulty swallowing after the surgery; a complication that was far less severe in those not treated with INFUSE®.  Indeed, one patient required a feeding tube for six weeks after the surgery as a result of the complication the surgery as a result of the complication. [7]

189.    On July 1, 2008, the FDA issued a Public Health Notification to healthcare practitioners, entitled "*Life-threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion*" (the

---

[6]  Perri, *et al.*, *Adverse Swelling Associated with Use of rh-BMP-2 in Anterior Cervical Disectomy and Fusion: A Case Study, The Spine Journal,* 7(2): 235-239,  March 2007.

[7]  Vaidya, *et al.*, *Complications of Anterior Cervical Disectomy and Fusion Using Recombinant Human Bone Morphogenetic Protein-2, European Spine Journal,* 16(8): 1257-1265, March 2007.

"**FDA Notification**"), which strongly warned medical professionals who used Infuse® and other BMP products of serious complications that had occurred from the off-label use of these products in the cervical spine.[8]

190.   The FDA Notification stated that the agency had received numerous reports of complications from BMP use in the cervical spine that "were associated with swelling of neck and throat tissue, which resulted in compression of the airway and/or neurological structures in the neck.  Some reports describe difficulty swallowing, breathing or speaking."  The FDA Notification further stated that these complications had resulted in "the need for emergency medical intervention," which included "respiratory support with intubation, anti-inflammatory medication, tracheotomy and most commonly second surgeries to drain the surgical site."  The FDA Notification concluded that "in light of the serious adverse events described above, FDA recommends that practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies."

191.   As indicated in detail at Section VI below, many of the Plaintiffs received Infuse® off label after the FDA Notification alerting the medical profession to concerns with using Infuse® in the cervical area.

192.   On September 4, 2008, *The Wall Street Journal* published a front-page article entitled "MEDTRONIC Product Linked to Surgery Problems."[9]  This article noted both the complications resulting from the use of Infuse® in the cervical spine

---

[8] FDA Public Health Notification:  *Life-threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion*, July 1, 2008, http://www.fda.gov/ MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm062000.htm.

[9] *Medtronic Product Linked to Surgery Problems*, by David Armstrong and Thomas M. Burton, *Wall Street Journal,* September 4, 2008.

already disclosed in the FDA Notification and additional complications resulting from other off label applications of the product, stating:

> The FDA's alert about Infuse® was specific to neck surgeries. But a review of FDA records and medical literature shows there have been scores of other cases in which serious complications arose after the product was used in other off-label situations. Many of these cases involve unwanted bone growth near nerves or in areas outside targeted fusion sites. That can lead to pain, repeat surgeries and, in some cases, emergency intervention.

193. The article further stated that at least three-quarters, or 75%, of the adverse events reported to the FDA involved off-label use of Infuse®. Of course, this news had serious implications for Defendants because off-label use of Infuse® accounted for the majority of all Infuse® sales.

194. A September 2008 article in *The Spine Journal* also observed that the use of Infuse® in the cervical spine "has been associated with reports of serious adverse events.[10] Postoperative hematoma formation [a collection of blood outside the blood vessels, generally manifesting as bruises], prevertebral soft tissue swelling, [and] swallowing difficulty. . . are a few examples." Of the complications observed in this patient study group, 17% occurred in patients treated with traditional techniques, while 83% occurred in patients treated off-label with Infuse®. The authors concluded that the "cervical spine has proven much less forgiving with the institution of rhBMP-2 use. Complications induced by . . . rhBMP-2 were clearly evident in our review."

195. On November 18, 2008, in connection with reporting Defendants' financial results for its 2009 second quarter, ended October 24, 2008, Defendants reported that revenue from its Spinal segment had, in fact, declined to $829 million for the quarter -- down $30 million from the previous quarter. The decreased sales in the

---

[10] Jarosz, et al., *Complications of BMP Use in Cervical Spine Surgery, The Spine Journal,* 8(5): 23S-24S, September 2008.

Spinal segment, clearly stemming from a significant decline in Infuse® sales, were a sharp deviation from Defendants' reports of repeated, double-digit, growth in the Spinal segment in previous quarters.  Moreover, Defendants disclosed, for the first time, that they "recently received a subpoena from the Department of Justice looking into off-label use of Infuse®."[11]

196.    Thereafter, Defendants continued to report lower sales of Infuse®, which they admittedly linked to: (a) a public health notice from the FDA regarding off-label use of recombinant human bone morphogenetic protein in the cervical spine that was issued in July 2008, (b) a previously disclosed government investigation, negative newspaper stories, and (c) a whistleblower lawsuit filed by two former Medtronic employees against it and a number of spine surgeons and distributors of the Infuse® bone graft.

197.    The use of Infuse® in off-label procedures was further scrutinized in a study published in the July 1, 2009, issue of *JAMA* that documented the health risks associated with off-label use of Infuse® and, contrary to previous studies conducted by Medtronic-funded physicians, cast doubt on the cost-effectiveness of the product.[12]

198.    At least 1,200 reports of adverse events involving Infuse® have been made to the FDA from 2002 to 2011.  In 2011, for example, 278 Infuse®-related adverse events were reported; in 2010, 362 adverse events were reported; and in 2009, 244 adverse events were reported.  The vast majority of these adverse event reports involve off-label use of Infuse®.

---

[11] Cahill, *et al., Prevalence, Complications, and Hospital Charges Associated with Use of Bone-Morphogenetic Proteins in Spinal Fusion Procedures, JAMA*, 302(1): 58-66, July 2009.
[12] Cahill, *et al., Prevalence, Complications, and Hospital Charges Associated with Use of Bone-Morphogenetic Proteins in Spinal Fusion Procedures, JAMA,* 302(1): 58-66, July 2009.

199. In fact, in a 2012 article published in *The Spine Journal*, FDA researcher Emily Woo, M.P.H. concluded on-label use of Infuse® accounts for only a tiny percentage (0.5%) of adverse events. Off-label use of Infuse® accounts for 99.5% of adverse events.[13]

200. The number of Infuse®-related adverse events is growing steadily over the years. The proportion of off-label adverse events increases as a direct result of the Defendants' long-standing campaign of improper off-label promotion of the more dangerous off-label uses of Infuse® that were never approved by the FDA. At all relevant times, the extent of these adverse events was hidden or downplayed by Defendants and their paid consultants.

### H. Defendants' Knew and Concealed the Dangers of Off-Label Uses of Infuse®.

201. Even at the time of FDA approval, Defendants and their senior management and their paid consultant "opinion leaders," were well aware of the concerns regarding off-label uses of Infuse® and the serious dangers to patients posed by those off-label uses.

202. Notwithstanding the original FDA Panel's well-founded concerns regarding off-label use of Infuse®, as well as the medical literature's corroboration of the same, both of which Defendants had knowledge, Defendants intentionally, negligently and recklessly concealed these dangers from the general public, including Plaintiffs, and surreptitiously promoted the widespread off label use of Infuse®.

---

[13] Emily Jane Woo, *Recombinant Human Bone Morphogenetic Protein 2: Adverse Events Reported to the Manufacturer and User Facility Device Experience Database, The Spine Journal*, 12(10): 894-899, October 2012.

203.   Defendants had actual knowledge of the Advisory Committee's concerns regarding off-label use of the product, and the dangers posed by off-label use.  Indeed, Defendants were on actual notice at the time of the Advisory Committee's warnings that Defendants should guard against off-label uses of this potent genetically-engineered liquid bone protein.  Thus, even prior to FDA approval, Defendants were on actual notice of the dangers that off-label use of Infuse® posed to patients, such as the Plaintiffs.

204.   Further, as described *infra*, the Medtronic-funded studies on Infuse® from 1999 until at least 2007 failed accurately to describe the adverse effects that were observed in the earliest trials of Infuse®, such as severe uncontrolled or ectopic bone growth, severe inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation in men, urinary retention, bone resorption, and implant displacement.  These Medtronic-funded articles also omitted any mention of the risks of sterility and cancer associated with rhBMP-2 use, as reported in FDA documents and hearings.  Defendants discouraged the publication of these adverse events in the medical journal literature, thereby hiding significant side effects from spine surgeons and patients.

205.   Further, Confidential Witness #2 ("**CW 2**") in a shareholder derivative lawsuit filed against Medtronic, more fully discussed *supra*, stated that Defendants were aware of adverse events resulting from off-label use of Infuse® in the cervical spine, including swallowing and breathing problems.

206.   In response to these reports of adverse events, CW 2 stated that Defendants attempted to disseminate information to the medical community regarding what they considered to be the proper dose of Infuse® for this off-label application.

Defendants also issued a "Safety Alert" letter to surgeons on September 14, 2004, informing them that Defendants had received reports of complications associated with off-label use of Infuse® in anterior cervical fusion procedures. Defendants wrote, *"[l]ocalized soft tissue edema has been reported in anterior cervical spine fusion surgery following the use of Infuse® Bone Graft . . . . Some reports were accompanied by patient complaints of swelling and difficulty in swallowing and breathing, three of which resulted in surgical intervention."* (emphasis added.)

207.   These adverse events were not isolated incidents, as described above. These adverse event reports from off-label uses of Infuse® indicate the very same complications as those noted in the studies discussed above, including, swelling, difficulty swallowing and breathing, excessive bone growth resulting in dangerous and painful spinal nerve compression and corresponding injuries, etc., and often require emergency medical intervention or a second surgery.

208.   For example, a report, dated December 12, 2005, indicated that four or five days after an off-label PLIF procedure using Infuse®, the patient's swelling became so severe that surgical intervention was required. These are only a few examples of the hundreds of similar reports of serious complications related to off-label uses of Infuse® found on the MAUDE Database.

209.   A report, dated November 3, 2006, indicates that a patient reported neck swelling, difficulty swallowing, and possible shortness of breath two to three days after a cervical spine fusion using Infuse®. As a result, this patient had to undergo another surgery four days after the initial fusion.

210.   A report, dated July 21, 2008, indicates that a patient developed massive neck swelling, very thick tracheal and bronchial secretions, and required a

tracheotomy-a procedure in which an incision is made in the neck and a tube inserted to allow the patient to breathe-following a cervical fusion procedure with Infuse®.

211.    Through Defendants' monitoring procedures, which include written procedures for complaints, corrective and preventative actions and adverse event reporting, all complaints and adverse events are documented, tracked, and trended (or should be) in a database.  Defendants are required by federal regulation to "establish and maintain" such an adverse event database.  21 C.F.R. §803.1(a).  In addition, a report from a June 2006 FDA inspection of Defendants' facility at 1800 Pyramid Place, Memphis, Tennessee, revealed that Defendants had initiated a Preventative Action, dated April 21, 2006, and was "studding [*sic*] the reason for an increase in the number of reported fluid collection, hematoma, and seroma complaints since 4/2005." According to the report, the "study indicated that sales for the Infuse® Bone Graph [sic] have increased and more graphs [sic] are being implanted," and that the "study is still open."

212.    According to Confidential Witness #15 ("**CW 15**") in the *Minneapolis Firefighters* lawsuit against Medtronic, more fully discussed *infra*, a Senior Vice President who worked at Defendants for several years until 2006 and a "Quality Group" at Defendants' Spine Division were responsible for addressing adverse events. According to CW 15, former COO Michael DeMane, former President of Medtronic Spinal and Biologics, Peter Wehrly, and former Worldwide Vice President and General Manager, Biologics, Jon Serbousek, were all aware of the adverse events related to Infuse®.  As a part of his employment with Defendants, CW 15 discussed the complaints related to Infuse® at meetings with these individuals and members of the Quality Group to decide whether or not certain adverse events should be reported to

the FDA. Moreover, Defendants' Spinal Division used the very same complaint/ adverse event reporting system as Medtronic corporate, which provided Defendants' executive officers access to a database containing details of every complaint/adverse event Defendants received relating to Infuse®.

213. Medtronic was further clearly aware of its settlement with the Department of Justice and entry into a Corporate Integrity Agreement, discussed *supra*, in July 2006. As a result, Defendants had actual knowledge of the heightened risks to spine patients associated with their illegal, improper, and unethical promotion of off-label use of Infuse® by Defendants' Spinal or Biologics Divisions.

### I. **Infuse® is Profitable and thus Defendants had an Pecuniary Motive to Promote Infuse® Off-Label Use.**

214. Infuse® has become a best seller for Defendants. Infuse® sales exceeded $3.6 billion since the launch of the Infuse® in July 2002. As a J.P. Morgan research analyst covering Medtronic noted in a report, dated November 12, 2008:

> Infuse® is an $800M product for MEDTRONIC (6% of sales), having enjoyed robust growth since its initial approval in the U.S. in July 2002. In fact, it is the one piece of Medtronic's Spine business that continues to post strong double-digit growth without any issues (LTM: +16.9%). That is, until now.

215. Defendants have depended heavily on Infuse® sales because so many of their other products, such as cardiac defibrillators, have slowed as the result of recalls of those defective defibrillators in the past several years.

216. Sales of Infuse® was approximately $800 million for the 2011 fiscal year, and the vast majority of these sales were attributable to off-label use of the product. Off-label uses of Infuse® account for 85% to 90% of all spine surgeries involving Infuse®.

217.    Plaintiffs are informed and believe that as a result of Defendants' illegal and improper off-label promotion of off-label uses of Infuse®, sales of Infuse® have soared and have totaled more than four billion dollars from 2002 to 2011.

218.    Defendants have consistently sought to expand the use of Infuse® by, among other things, illegally and improperly promoting dangerous and/or insufficiently studied off-label uses for Infuse® in various parts of the spine for various types of spine surgeries, as discussed throughout this Complaint.

### J.    Defendants Improperly Promoted Off-Label Uses of Infuse®.

219.    In spite of the very specific and limited FDA approval of Infuse® for ALIF procedures only, the overwhelming majority of Infuse® sales have been by non-FDA approved, or "off-label," uses such as that used on Plaintiffs in this action.  Defendants had been very successful in driving off-label sales of Infuse® through undisclosed "consulting" and royalty agreements with physicians who, in exchange for handsome sums of money from Defendants or lavish trips paid for by Defendants, would push off-label usage in a number of ways, including by authoring scientific and medical literature promoting such uses, and by direct advocacy to other spine surgeons.

220.    Defendants directed their own sales representatives to promote off label uses of the product, many of whom went so far as to recommend dosages of this potent molecule in risky off-label procedures, and guide surgeons through off-label uses of the product during surgery.  Indeed, Defendants' unlawful off-label promotion campaign was so extensive that it caught the attention of, among others, the FDA (on numerous occasions), the DOJ, Congress, the United States Army, several major universities,

multiple medical journals, numerous major newspapers, independent physicians, and investors.

221.    Moreover, Defendants' unlawful off-label campaign resulted in, among other actions, two whistleblower lawsuits (resulting in a multi-million dollar settlement with the DOJ, which included a five-year Corporate Integrity Agreement (the "**CIA**"), a shareholder derivative lawsuit that settled for $85 million, several adverse regulatory actions by the FDA, and a congressional investigation led by the United States Senate Committee on Finance.

222.    Indeed, even following Medtronic's settlement with the DOJ in 2006 for unlawful kickbacks to physicians to use and promote its products, and corresponding entry into the CIA, discussed *supra*, Defendants failed to disclose their continued reliance on kick-backs, royalties, and other undisclosed payments to physicians to drive Infuse® sales, primarily for off-label use.

223.    Off-label use of Infuse® was and remains particularly concerning due to the known adverse (and in at least one case deadly) side effects known to Defendants at the time of the product's original FDA approval in 2002.  Nonetheless, off-label use of Infuse® increased year-after-year from the time of its original limited use approval by the FDA in 2002, to the point where off-label use of Infuse® accounted for an astounding 85% to 90% of all Infuse® sales.

224.    Although undisclosed by Defendants, the first-hand accounts of former employees demonstrate that this extraordinarily high off-label use was driven by their sales force.  Specifically, Defendants' marketing and sales employees directed spine surgeons to Defendants-compensated consultants or "Opinion Leaders" or "Thought Leaders" -- other spine surgeons paid by enormous sums of money by Medtronic -- the

sole purpose of which was to promote off-label uses of Infuse®.  Through these and other illegal and improper practices, Defendants were able to increase Infuse® sales year after year while continuing to hide and downplay the product's dangerous side effects when used off-label in the spine.

225.    Defendants actively promoted off-label use of Infuse® through its sales representatives and massive payments to their "Opinion Leader" spine surgeon consultants, which included sponsoring presentations at continuing medical education courses, and appearances at consulting engagements promoting off-label applications of Infuse®.  In turn, Defendants' sales force directed other physicians to these consultants and "Opinion Leaders" or to their written work, paid for by Defendants, to further drive off-label sales of Infuse®.  Indeed, Defendants engaged in such conduct even after the settlement of the whistleblower action with the DOJ in which they agreed to employ stricter compliance controls regarding the sale and marketing of its spine products.

226.    Defendants, while providing spine surgeons with self-funded studies and published articles purporting to support the efficacy and safety of the off-label uses, simultaneously and systematically concealed or downplayed other studies and articles not funded by Defendants demonstrating serious and frequent adverse events caused by the same off-label uses.

227.    Several spine surgeons have already testified under oath at depositions that Defendants' sales personnel overtly and directly promoted to them the off-label uses of Infuse® in the spine, and Plaintiffs are thus informed and believe that at all relevant times Defendants engaged in a scheme to expand its market share of this product by improperly encouraging such off-label uses.

228.     In this particular case, Defendants actively promoted the off-label procedures to the Plaintiffs' spine surgeon, Dr Durrani.  He would not have performed the off-label Infuse® procedures on each Plaintiff in the absence of such promotion.  Defendants' off-label promotion of Infuse® to Dr. Durrani was false and misleading, because it overemphasized the purported benefits of the off-label use, and hid, minimized, or downplayed the true risks and dangers of the off-label use, all of which were known to Defendants at all relevant times.

### K.     Off-Label Promotion of Infuse® Violates the Food, Drug and Cosmetic Act and Parallel Duties and Obligations Under Ohio Law.

229.     Under Ohio law, a devise manufacturer has a duty to exercise reasonable and ordinary care in the promotion and marketing of its products, which would include the duty not to engage in off-label promotion, for application of the device for purposes and in a manner not proven to be safe and effective.  The claims and causes of action in each Count alleged below for breach of this duty under Ohio law are parallel to and consistent with applicable federal law.

230.     The MDA and the FDCA provide specifically that the FDA has no authority to "limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed [medical] device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship," and physicians are free to prescribe or use medical devices in any manner they deem medically appropriate.  21 U.S.C. §396.

231.     Importantly, under applicable FDCA and FDA regulations, device manufacturers like Defendants are prohibited from actively promoting products for

uses not approved by the FDA. Indeed, federal law provides significant penalties for manufacturers that promote their products in ways inconsistent with a product's labeling. Severe penalties for off-label promotion, such as fines of up to twice the amount of the gross pecuniary gain from the offense, were designed to ensure that the FDA's careful, deliberate consideration of a product's suitability for public consumption is not undermined by manufacturers seeking to circumvent that process. Defendants are medical device companies, not physicians, and they were thus prohibited by federal law, including the relevant FDA regulations, at all relevant times, from promoting to physicians or patients any off-label use of Infuse®.

232. Under the FDCA and its accompanying regulations, a device manufacturer must include all intended uses in the label, otherwise the device is misbranded. 21 C.F.R. §801.4. Under the FDCA, device manufacturers can be held liable for off-label promotion when their products are deemed "misbranded" under the statute. 21 U.S.C. § 331(b).

233. A product is "misbranded" when the directions and indications for the unapproved uses that the manufacturer "intends" the product to be used for have not been included on the label. See 21 C.F.R. §801.4. Further, a device's intended uses are evidenced by the manufacturer's conduct, not by reference to what the FDA has approved. *Id.* A product's intended uses can be derived from oral statements by persons speaking on behalf of a company about its product. In other words, a manufacturer can be liable if its conduct demonstrates intent to encourage product use inconsistent with or outside the scope of the product's approved label. *Id.*

234. The FDCA's accompanying regulations require that medical devices sold by manufacturers have adequate directions for use, 21 C.F.R. §801.5, and failure to

have adequate instructions for use is considered "misbranding," 21 U.S.C. §352(f), which is prohibited. 21 U.S.C. §331(b).

235. The FDCA requires medical device manufacturers to disclose all material facts in advertising and labeling,[14] 21 U.S.C. §321(n), and false or misleading labeling is considered "misbranding," 21 U.S.C. § 352(a), (q)(1), which is prohibited. 21 U.S.C. §331(b).

236. Further, the FDCA requires medical device manufacturers to maintain and submit information as required by regulation, 21 U.S.C. §360i, including submitting adverse event reports, 21 C.F.R. §803.50, and establishing internal procedures for reviewing complaints and event reports. 21 C.F.R. § 820.198(a).

237. Any application of Infuse® outside of its FDA-approved usage is considered off label. As set forth above, examples of off-label uses of Infuse® include: when the rhBMP-2 is applied without using the LT-CAGE or with a substitute cage; use of Infuse® in a PLIF, a Posterolater Fusion, TLIF, or any other procedure besides an ALIF using the LT-CAGE; or use of Infuse® in a ALIF procedure that involves a multiple-level fusion.

238. Defendants violated these FDCA statutes and accompanying regulations by promoting Infuse® for off-label uses, and by failing to account for adverse events and update its labeling, directions for use, and advertising to account for the adverse events resulting from these off-label uses.

239. As a result of their illegal off-label promotion, sales of Defendants' Infuse® have soared and have totaled billions of dollars.

---

[14] 21 U.S.C. §321(m) defines the scope of medical device labeling.

240.    Defendants' violations of these FDCA statutes and accompanying regulations, as discussed above, constitute violations of the state law tort claims and causes of action alleged in this Complaint, as set forth below.  Thus, as repeated alleged herein, Plaintiffs make claims under Ohio law that are parallel to and consistent with federal law, and are not inconsistent with or in addition to such law.

241.    Defendants' violations of the FDCA statutes and accompanying regulations, as discussed above, directly caused or significantly contributed to the off-label use of Infuse® generally, and directly caused or significantly contributed to the off-label use of Infuse® in these particular Plaintiffs, and Defendants' misconduct in this regard thus caused or contributed to Plaintiffs' injuries and damages.

### L.    Defendants Settle Whistleblower Litigation with the DOJ and Entered into a Corporate Integrity Agreement.

242.    Defendants were named as defendants in two federal *qui tam* actions, *United States, ex rel. (Under Seal) v. Medtronic, Inc.,  et al.,* Civil Action No. 02-2709 (W.D. Tenn. 2002) (hereinafter ("***Under Seal***"), and *United States, ex rel. Poteet v. Medtronic, Inc., et al.,* Civil Action No. 03-2979 (W.D. Tenn. 2003) (hereinafter "***Poteet***") (together, the "**qui tam lawsuits**"), both of which alleged that Defendants violated the federal False Claims Act, 31 U.S.C. §3729, *et seq.,* by paying illegal kickbacks to physicians in connection with promoting the off-label use of Infuse® in the spine, which resulted in the submission of false or fraudulent claims to federal health care programs.

243.    Based on its investigation, the DOJ contended that certain of the payments, services, and remuneration mentioned above were improper and resulted in the submission of false or fraudulent claims in violation of the Federal Anti-Kickback

Statute, 42 U.S.C. §1320a-7b(b), *et seq.,* which prohibits the offering, soliciting, or making any payment or remuneration to induce business reimbursed under a federal or state health care program, and the False Claims Act, 31 U.S.C. §3729, *et seq.,* which provides penalties for the submission of false claims to the federal government.  Both *Under Seal* and *Poteet* were brought by Defendants' former employees who made these allegations.

244.    In these lawsuits, the DOJ contended that between January 1, 1998, and April 30, 2003, Defendants made payments and provided other remuneration to a number of physicians and entities in connection with its spinal products in the form of: (i) payments and other remuneration for physicians' attendance and expenses at medical education events, "think tanks," VIP/opinion leader events, and meetings at resort locations, (ii) services and payments for services to physicians through Medtronic's Healthcare Economic Services and eBusiness Departments, and (iii) payments made pursuant to consulting, royalty, fellowship and research agreements with various physicians and entities.

245.    Specifically, *Under Seal* was brought by a former Medtronic in-house counsel, who alleged that Defendants' "aggressive and illegal" sales and marketing efforts were intended by Defendants improperly to induce physicians to use Defendants' spinal products, including Infuse®.  The unlawful conduct alleged included, *inter alia*: (i) lucrative consulting and royalty agreements with physicians that used Defendants' spinal products, "the true purpose [which were] to funnel money to the physicians so that they will be induced to use [Medtronic Spinal] products," and (ii) "[l]avish all-expense paid trips to fine resorts. . . disguised as Medical Education seminars, think tanks, or discussion groups . . . held in places such as Hawaii, Cancun,

Alaska, Beaver Creek, Whistler, Malaysia, Amelia Island, Teton Valley, and New Orleans at Mardi Gras . . . [t]he purpose of these lavish trips was to induce the physicians to use [Medtronic Spinal] products."

246.  The *Under Seal* complaint further alleged that: "Most of the illegal kickback practices described herein were begun by Sofamor Danek and continued by [Medtronic] after the acquisition.  Kickbacks were the culture and way of doing business at Sofamor Danek and the company was determined to continue that culture, and did continue that culture, when Sofamor Danek became part of the Medtronic empire."

247.  *Poteet* was brought by a former Medtronic employee who was tasked by Defendants to arrange travel (including expense reimbursement) for numerous spinal surgeons to attend Medtronic-sponsored events and other professional meetings.  This former employee also alleged that Defendants paid surgeons substantial fees -- sometimes up to hundreds of thousands of dollars per year -- for consulting services that were grossly in excess of their fair market value, entered into royalty agreements that were designed to disguise illegal remuneration, and provided physicians opportunities for lavish travel and recreational activities, including "upgraded lodging for physicians, dinners, entertainment and activities such as golf, snorkeling, sailing, fishing, shopping trips, [and] horse-back riding" for using Defendants' products.  These consulting agreements and other payments were illegitimate means of inducing physicians to use Defendants' products and to recommend to other physicians that they do the same.

248.  On July 18, 2006, Medtronic agreed to pay $40 million to the United States of America to settle these lawsuits under the False Claims Act, 31 U.S.C. §§3729-

3733, the Civil Monetary Penalties Law, 42 U.S.C. §1320a-7a, and the Program Fraud

Civil Remedies Act, 31 U.S.C. §§3801-3812.

249.    As part of the settlement with the DOJ, Medtronic agreed to enter into a

five-year CIA with the Office of the Inspector General/Health and Human Services

that, as Medtronic described in its press release, dated July 18, 2006, implemented

substantial oversight structures and procedures meant to ensure "top-level attention to

corporate compliance measures."  Among other things, the CIA required Medtronic to

establish an electronic database to capture and manage all non-sales related

transactions between Medtronic's Spinal segment and its physicians or customers, with

all such transactions subject to an established set of internal controls and review

processes, including monitoring by Medtronic senior management and Medtronic's

Chief Compliance Officer.

250.    Moreover, the CIA required Medtronic to implement internal policies and

procedures to ensure stricter regulatory compliance, which obligated Medtronic to

institute a number of changes to improve oversight of its Spinal division.

251.    Significantly, the CIA required Medtronic to adopt procedures to ensure

that any "arrangements" -- a term intended to cover physician consulting agreements

and broadly defined as engagements involving "directly or indirectly, the offer,

payment, solicitation, or receipt of anything of value between [Medtronic] and any

actual or potential source of health care business [e.g., physicians]" -- would not violate

federal law.  Such procedures were to include, among other things: (i) creating a

database of all existing and new or renewed arrangements, (ii) tracking remuneration

from Medtronic to all other parties to such arrangements, (iii) tracking service and

activity logs to ensure that parties to an arrangement are performing their duties under

the applicable arrangement, (iv) implementing procedures that ensure all arrangements are reviewed for adherence to the Anti-Kickback Statute, and (v) regular (at least quarterly) review by the Medtronic Compliance Officer of the arrangements database along with reporting (at least quarterly) to the Medtronic Compliance Committee.

252. The CIA and the previous whistleblower and wrongful termination litigation placed Medtronic and its agents, consultants, representatives, and joint venturers on actual notice that its practice of marketing and promoting Infuse® for off-label uses was improper and required wholesale change to avoid further adverse regulatory action or other liability.

253. As a result of this settlement, Medtronic agreed to negotiate with representatives of the National Association of Medicaid Fraud Control Units to reach an agreement providing for distribution of certain sums to the several states with which Medtronic agreed to a settlement concerning the conduct at issue in the False Claims lawsuits.

254. Nonetheless, Defendants' unlawful practices continued, as did their aggressive efforts to drive Infuse® sales by promoting off-label applications, such as precisely those used on the Plaintiffs. Defendants continued improperly and illegally to promote the off-label use of Infuse® for non-FDA-approved uses of the product. Indeed, they were motivated to do so knowing that, absent off-label use, sales of Infuse® would dramatically decline. To obviate a decline in sales revenue, Defendants continued covertly to employ the same lucrative "consulting" arrangements and other unlawful conduct to promote off-label uses of Infuse®.

255. As a result of Medtronic's undisclosed misconduct, the percentage of off-

label Infuse® usage increased over time, including after the DOJ settlement on July 14,

2006. By 2011, off-label use of Infuse® constituted more than 90% of the total use of

Infuse® in spinal fusion procedures.

256. Indeed, Defendants' unlawful product marketing and promotion was so

effective that an analyst from Bernstein Research noted in a report, dated November

21, 2006, that analysts were "expecting continued indication expansion (e.g., recent

dental approval and likely approval for posterior lateral fusion) for Infuse® to be the

main driver for the spinal business in the mid-term." What this analyst and the public

at large did not know was that, despite the limited FDA-approved applications of

Infuse®, Defendants continued to drive sales through off-label indications.

Defendants persisted in doing so despite the CIA, the material risk of further regulatory

action or other liability, and in conscious disregard for the health and welfare of spine

patients such as the Plaintiffs.

### M. Testimonies of Former Medtronic Employees Regarding Off-Label Promotion of Infuse® in a Shareholder Derivative Action Against Medtronic

257. A federal securities lawsuit filed on behalf of the Minneapolis Firefighters'

Relief Association against Medtronic, styled *Minneapolis Firefighters' Relief Assoc. v.

Medtronic, Inc.,* Civil No. 08-6324 PAM/AJB (D. Minn. 2009), also alleged evidence of

Medtronic's egregious campaign of off-label promotion of Infuse®, even after the entry

of the CIA. Medtronic's actions, described by the "Confidential Witnesses" (the "**CW**"),

included:

a. Medtronic-sponsored physician meetings during which Medtronic would

employ paid consultants -- typically surgeons hand selected by Medtronic

-- to present off-label presentations to local physicians.  CW1,
Consolidated Class Action Complaint, dated August 21, 2009, at ¶93.

b.     Medtronic's instructions to its sales representatives regarding various off-label uses of Infuse®, including how much of the biologic to use with off-label cervical fusions, the purpose of which was to instruct physicians regarding off- label uses.  CW1, *Id*. at ¶94.

c.     Medtronic's directions to its sales representatives that they be present during off-label Infuse® surgeries "to assist and direct and give advice when asked."  CW1, *Id*. at ¶95; CW2, *Id*. at ¶97; CW5, *Id*. at ¶101; CW6, *Id*. at ¶102.

d.     Medtronic's creation of sales quotas that were described by the CWs as impossible to reach without pushing off-label use.  CW1, *Id*. at ¶95; CW9, *Id*. at ¶105; CW11, *Id*. at ¶107; CW12, *Id*. at ¶108.

e.     Medtronic's sales representatives' references to data from published literature (presumably funded by Medtronic) when questioned by surgeons, the purpose of which was to provide surgeons with information regarding proffered techniques for off-label procedures and to educate them regarding off-label uses.  CW2, *Id*. at ¶96.

f.     Medtronic's development of smaller-sized bone graft kits under the guise of selling them for FDA-approved uses, when, in actuality, Medtronic had designed each kit to be used in an off-label cervical fusion surgery.  CW2, *Id*. at ¶97; CW7, *Id*. at ¶103.

g.     Moreover, by comparing the number of units of rhBMP-2 with the sales of the LT-Cage component -- which were packaged and sold separately -

CW2, CW11, and CW12 determined that the driving force behind Medtronic's $750 million in sales of Infuse® was solely attributable to off-label uses. Although the FDA required the rhBMP-2 and LT-Cage to be used together, sales of the rhBMP-2 component greatly outpaced those of the LT-Cage component. CW2, *Id*. at ¶98; CW11, *Id*. at ¶107; CW12, *Id*. at ¶108.

h.  When questioned by a physician about how to use Infuse® off-label, Medtronic sales representatives directed them to other surgeons who used the product off-label and also would demonstrate or explain how to do so. CW3, *Id*. at ¶99; CW5, *Id*. at ¶101; CW6, *Id*. at ¶102; CW10, *Id*. at ¶106; CW11, *Id*. at ¶107.

i.  Medtronic held quarterly meetings in at least one sales region during which a national biologics specialist would attend to explain how to conduct off-label applications of Infuse®. CW3, *Id*. at ¶99.

j.  Medtronic directed its sales representatives to instruct physicians to use half the dose of rhBMP-2 during cervical fusion, and Medtronic, aware of adverse events, instructed the representatives to tell physicians to use steroids to combat potential inflammation. CW4, *Id*. at ¶100; CW5, *Id*. at ¶101.

k.  Medtronic-directed physicians using the product in cervical spine fusion to throw away a large portion, sometimes up to half, of the rhBMP-2 dosage. CW6, *Id*. at ¶102.

l.  Medtronic gave to physicians a small book containing no reference to Medtronic, which contained information regarding the volume or dosage

of rhBMP-2 that should be used for off-label applications of Infuse®.
CW7, *Id.* at ¶103; CW8, *Id.* at ¶104; CW9, *Id.* at ¶105.

m.    Medtronic instructed CW8 and others during sales presentations
regarding how to "get around" restrictions on off-label promotion. CW8,
*Id.* at ¶104.

n.     CW 13 was brought into Medtronic to develop a marketing plan that
included: (i) development of a "referral marketing" campaign designed to
promote the product for off-label uses via a physician referral network,
(ii) identifying which surgeons who should be targeted as part of
Medtronic's off-label campaign and what claims Medtronic would make
about the product, and (iii) development of a "cookie-cutter" CD series
that outlined Medtronic's off-label campaign and included information
on off-label procedures that was distributed to Medtronic sales
representatives. According to CW13, the referral marketing program
involved having surgeons meet with other surgeons as a means of
prompting discussion of off-label uses of Infuse® among practitioners.
CW13 also stated that Medtronic used a physician training program
involving cadaver labs as a means to instruct surgeons regarding off label
applications. CW13, *Id.* at ¶109.

o.    CW13 was rebuffed for raising concerns about off-label promotion and
was told "we're paying you a lot of money to launch this. Shut your
mouth and take the money. Let us worry about what is off-label or isn't."
CW13, *Id.* at ¶110.

p.   A sales representative was present in the operating room during an off-label cervical procedure which led to the patient's death.  The patient's family subsequently initiated civil litigation against Medtronic and the sales representative who was allegedly encouraging the off-label procedure at Medtronic's behest.  CW13, *Id*. at ¶111.

q.   Although Medtronic is obligated to report all serious adverse events associated with Infuse®, Medtronic failed to report the death of this patient until three months after it occurred.  FDA guidelines recommend that a manufacturer make a minimum of three attempts to retrieve additional information regarding any adverse event.  While Medtronic filed an adverse event report with the FDA in which it noted the complications immediately following the procedure, Medtronic did not inform the agency of her death until after a lawsuit was filed by the patient's family and reported in *The Wall Street Journal*.  CW13, *Id*. at ¶112.

r.   In a separate civil suit against Medtronic, a physician admitted to attending numerous national spine meetings during which off-label uses of rhBMP-2 in the cervical spine were promoted.  A Medtronic sales representative was in the operating room a lot when he performed off-label uses.  The physician admitted to doing over 100 cervical procedures, insinuating that the Medtronic sales representative was in the room for a fair number of the procedures.  CW13, *Id*. at ¶113.

258.   A Medtronic representative was always in the operating room whenever Dr. Durrani used Infuse®.

259. The plaintiffs in *Minneapolis Firefighters* also discovered the growing percentage of off-label Infuse® usage from 2003-2007 by analyzing surgical procedural codes used by hospitals.[15] The results of this analysis demonstrate that off-label usage of Infuse® was high, even from the inception of FDA approval, and increased by an astonishing 10% over the next 4 years; to wit:

---

[15] The methodology employed was consistent with a report, dated July 1, 2009, in the JAMA that conducted a retrospective cohort study of 328,468 patients undergoing spinal fusion procedures from 2002-2006 using the same codes from the NIS database.

| Year | Estimated On-Label Procedures | Estimated Off-Label Procedures |
|---|---|---|
| 2003 | 25.7% | 74.3% |
| 2004 | 20.6% | 79.4% |
| 2005 | 15.8% | 84.2% |
| 2006 | 15.3% | 84.7% |
| 2007 | 14.8% | 85.2% |

260. Moreover, the data further demonstrate that off-label use of Infuse® in the cervical spine grew to as much as 18% of overall Infuse® use as of 2007, despite the known increased medical risks associated with that application.

261. Indeed, to set sales projections for Infuse®, CW2 stated that Medtronic's marketing department accounted for the scope and number of procedures performed, including the numbers of off-label procedures, such as PLIFs and TLIFs, to predict sales projections. This analysis was based, in part, on data purchased from market research companies demonstrating the number of procedures involving different areas of the spine, e.g., certain lumbar (on or off-label) versus cervical (off-label). Once Medtronic determined its sales projections, these figures were incorporated into a budget presented to Medtronic's senior management. Importantly, the final sales quotas for Infuse® were dictated by Medtronic senior management, and were far in excess of what Medtronic's Spinal Division had projected, or could be achievable absent promotion of Infuse® for off-label uses. According to CW2, "when the numbers came back down, they never reflected the projections. They were much larger."

262. Numerous confidential witnesses, including CWs 1, 9, 12, and 14 (the latter a senior manager for Medtronic's Spinal and Biologics Division from 2005 to 2008), confirm the intense pressure Medtronic's management placed on its sales representatives to meet the sales quotas it set for them. Like CW2, CW14 explained

that sales goals were set by a handful of Medtronic executives, and that they were "very, very, very aggressive."  Likewise, CW12 stated that there was a lot of pressure on Medtronic's Spinal and Biologics Division to reach unreasonable sales targets.

263.   As heretofore demonstrated, by years 2006-2007, off-label uses accounted for an astounding 85% of Infuse® sales; a fact known or recklessly disregarded by all employees, who reviewed marketing data and analyses to set sales quotas for Infuse®.  Indeed, sales quotas for Infuse® required sales to grow 20% year-over-year, and Medtronic knew that such increases could not be achieved without substantial off-label sales, and thus that such aggressive sales targets would encourage off-label promotion by its employees and representatives.

## N.  Medtronic's Payments to Its Opinion Leaders

264.   In addition to encouraging its sales representatives to promote off-label use of Infuse®, Medtronic also promoted the off-label use of the product through its outside physician "Opinion Leaders" to whom Medtronic paid undisclosed sums in return for publishing medical journal articles and delivering presentations explaining, endorsing, and promoting off-label applications of the product.  Indeed, even after the settlement with the DOJ and entry into the CIA as a result of this very same activity, Medtronic continued its practice of providing lucrative consulting fees (amounting to millions of dollars per year) to surgeons who actively promoted off-label use of Infuse®, often with direct involvement by Medtronic's senior management.

265.   Medtronic has sought to expand the off-label uses (and has succeeded in doing so) by paying large amounts of money to key "Opinion Leader" spine surgeons around the country some of whom then published studies and articles advocating the off-label use of Infuse® and minimizing the risks or dangers to patients of these uses.

266.     Medical device companies look for surgeons who are known as "Opinion Leaders" and who will not only use a high volume of their products, but who can and will persuade other surgeons to use a particular device.  Opinion Leaders are physicians whose opinions on medical procedures and medical devices are held in high regard by other surgeons.  If these influential physicians are willing to promote the use of a certain device, then other surgeons are likely to follow suit and use that device, sometimes including off-label uses that are illegal for the company itself to promote. Dr. Durrani was an Opinion Leader for Defendants.

267.     Many medical device companies, including Defendants, cultivate relationships with these Opinion Leaders, including Dr. Durrani, paying them handsome (and in the case of Infuse®, sometimes seven-figure) consulting fees, travel expenses for seminars, sham or exaggerated royalty payments, and numerous other perks, to encourage these physicians to promote the use of a particular medical device.

268.     Prior to the dates of Plaintiffs' spine surgeries that involved off-label Infuse®, Medtronic provided millions of dollars in undisclosed payments to certain spine surgeon "Opinion Leaders" who published articles in medical journals, delivered presentations at continuing medical education courses, and appeared at consulting engagements to promote off-label applications of Infuse®  in the spine.  In turn, Medtronic's sales force would direct other physicians to these "Opinion Leaders" or to their written work to further drive off-label sales of the Infuse®.  In this way, Medtronic consciously and deliberately orchestrated a campaign to end-run the FDA's 2002 approval of and labeling for the Infuse® device.

269.     Medtronic, for example, paid more than $45 million to the 12 spine surgeons who authored the first 13 studies sponsored by Medtronic on Infuse®.

Additionally, "Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty, and other miscellaneous arrangements." *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* U.S. Senate Committee on Finance, October 25, 2012.

> **1.     Walter Reed "Opinion Leaders" Timothy Kuklo, M.D., Rick Sasso, M.D., and David Polly, M.D.**

270.     Just one of Medtronic's highly compensated "consultants" - Dr. Timothy Kuklo, a former Army physician who retired from the military as chief of orthopedic surgery at Walter Reed Army Medical Center ("**Walter Reed**"), the nation's premier military research hospital, in December 2006 - received hundreds of thousands of dollars per year in fees in the years following the DOJ settlement. Specifically, *The Wall Street Journal* and *New York Times* reported in 2009 that Dr. Kuklo received $356,242 in 2007, $249,772 in 2008 and $132,453 in the first few months of 2009 from Medtronic for consulting, speaking, travel, and training services. Medtronic paid Dr. Kuklo $42,627 in 2006 while he was still on active duty at Walter Reed, as well as amounts totaling $42,295 from 2001 through 2005, primarily for travel to medical conferences and speeches at Medtronic events, including direct payments to hotels and airlines. Medtronic confirmed that Dr. Kuklo was a paid consultant for it and that the company has paid him more than $800,000 over an eight year period.

271.     While it is not inherently illegal or unethical for physicians to perform paid consulting work for medical device companies, the history of the growing Infuse® scandal demonstrates an egregious pattern of both Medtronic and its "Opinion Leaders" overstepping ethical lines while recklessly promoting dangerous off-label uses

of this product.  Dr. Kuklo, for example, worked closely with Medtronic as an active promoter of off-label uses of Infuse®; that is, until a U.S. Army investigation into a falsified study touting the benefits of Infuse® uncovered shocking misconduct by this former Army surgeon.  For example, Dr. Kuklo appeared as a "distinguished guest surgeon" at a Medtronic Spine Division Business Overview Conference Call on September 28, 2006, alongside another Medtronic consultant, Dr. Rick Sasso -- who received $150,000 in consulting fees in 2006 -- as well as Peter Wehrly ("**Wehrly**"), Medtronic Spinal Division Senior Vice President.  During the call, a Merrill Lynch analyst asked about "issues that have come up in the past in terms of potential side effects with using Infuse® in the cervical region," and whether such off-label use was a concern for surgeons.  Dr. Sasso responded by referring to a "Level 1, controlled randomized study which was published in 2002" which, according to Dr. Sasso, demonstrated that "when you used the appropriate dosage of Infuse®, you did not get problems with esophageal obstruction and problems swallowing."  For his part, Dr. Kuklo responded that the question "was well answered as far as appropriate dosage.  I think it's really the bottom line."

272.    Although Dr. Kuklo's and Dr. Sasso's rendition of the medical literature may not have been entirely accurate -- in fact they baldly misrepresented the seriousness of the adverse events that Defendants knew were occurring in the cervical spine -- their misrepresentations only hinted at the influence of Medtronic's payments on its consultants' medical judgment.  Indeed, an Army investigation later revealed that Dr. Kuklo deliberately falsified data by exaggerating the benefits of off-label use of Infuse® in a study published in the August 2008 issue of *The Journal of Bone and Joint Surgery*.

273.    Dr. Kuklo's "study," which purported to compare fusion results of 67 patients who received an autogenous bone graft versus 62 that were treated with Infuse® to treat certain tibial (shin bone) fractures in injured soldiers (including certain off-label uses), reported that employing Infuse® resulted in "strikingly" better outcomes than a traditional (autogenous) bone graft.  Specifically, Dr. Kuklo reported that those receiving autogenous bone grafts had successful fusions in 76% of procedures, while the union rate for the Infuse® group was significantly better at 92% -- a claimed "striking finding."

274.    According to Dr. Kuklo, not only were the reported union rates claimed better with Infuse® than with an autograft, but, according to this (falsified) study, patients who received Infuse® also reportedly experienced favorable outcomes in other clinical measures.  Specifically, the study concluded that "the primary outcome measures of union, rate of infection, and reoperation were all improved with rhBMP-2," and that those treated with Infuse® had a "strikingly lower infection rate (3.2%), which we believe is directly attributable to rhBMP-2."

275.    Medtronic continued paying Dr. Kuklo as a consultant even after his article was discovered to be largely fabricated and thus retracted by *The Journal of Bone and Joint Surgery*.  Indeed, Medtronic only placed Dr. Kuklo on "inactive status" after reports that he had falsified the study's data were published in *The New York Times*.

276.    On May 13, 2009, *The New York Times* reported that the U.S. Army's investigation into a study authored by Dr. Kuklo concluded that he falsified an entire study touting the benefits of Infuse® to treat wounded soldiers injured in Iraq –

conduct that Col. J. Edwin Atwood, an Army physician who led the Army's inquiry, described as "the ultimate tragedy and catastrophe in academic medicine."

277.    Per *The New York Times* and *The Wall Street Journal*, the true facts regarding Dr. Kuklo's study were only uncovered when one of the study's supposed "co-authors," Lt. Col. Romney C. Andersen, was congratulated on its publication by a colleague.  After this discovery, Lt. Col. Andersen alerted Army investigators who found that:

a.    Dr. Kuklo listed four other Army surgeons as "co-authors" without their knowledge, and these four physicians did not participate in or review the article's preparation or submission for publication;

b.    The signatures of the four physicians listed as co-authors on the copyright release forms submitted to *The Journal of Bone and Joint Surgery* were forged by Dr. Kuklo;

c.    The number of cases cited by Dr. Kuklo in the article differed from the number of cases contained in the U.S. Army's wartime casualty database, with no explanation for the discrepancies in the article;

d.    Contrary to Army policy, Dr. Kuklo did not obtain publication review or clearance from Walter Reed prior to submitting the article for publication; and

e.    The published results of the article suggested a much higher efficacy rate for Infuse® than is supported by the experience of the purported co-authors.

278.    According to one of the Army's investigators, Col. Norvell V. Coots, the study cited higher numbers of patients and injuries than the hospital could account for.

According to Col. Coots, "[i]t's like a ghost population that were reported in the article as having been treated that we have no record of ever having existed . . . this really was all falsified information."

279.    After receiving correspondence from Walter Reed, dated November 6, 2008, stating that Dr. Kuklo did not follow Army regulations in submitting the article, that the signatures of the purported co-authors had been forged, and that the article's purported co-authors had questioned the study's findings, *The Journal of Bone and Joint Surgery* formally retracted the article and banned Dr. Kuklo from submitting further papers to *The Journal of Bone and Joint Surgery*.  As noted in a follow-up article in *The New York Times*, dated May 19, 2009, when questioned about its ties to Dr. Kuklo, Medtronic repeatedly declined to disclose when it began its financial relationship with him or the extent of funding it provided.

280.    As discussed in more detail herein, U.S. Senator Charles Grassley discovered that Dr. Kuklo's name did not appear on a list of paid consultants for Infuse® provided by Medtronic that the Senator had requested in a letter to Medtronic, dated September 30, 2008.  Senator Grassley disclosed the list Medtronic provided -- which included 22 physicians who were paid a total of $943,000 from 2005 to 2008 -- in a letter, dated May 18, 2009, letter to Medtronic that was published in the Congressional Record the following day.  According to the May 18, 2009 letter, Senator Grassley was "concerned" that Medtronic did not provide Dr. Kuklo's name in response to his inquiry that specifically requested information regarding consultants who work on Infuse®, as it was "clear that Dr. Kuklo had some sort of consulting agreement" and was named in *The New York Times* as a consultant on Infuse®.  Indeed, by this time,

Dr. Kuklo had given countless presentations on behalf of Medtronic about off-label use of Infuse®.

281.    The list provided to Senator Grassley also omitted names of other Medtronic consultants who had promoted off-label uses of Infuse®, such as David Polly, M.D., another former orthopaedic surgeon at Walter Reed.  Frustrated with Medtronic's omissions, Senator Grassley stated that "[i]n the future, I hope that instead of not providing me with the name of the physician involved in Infuse®, or any other matter that I am looking into, that Medtronic contact me to avoid the situation in which we find ourselves."  A *New York Times* article, dated May 19, 2009, reported that Medtronic also faced a DOJ inquiry regarding its illegal promotion of Infuse®.

282.    As a result, on June 18, 2009, Medtronic disclosed to *The Wall Street Journal* that Dr. Kuklo had received almost $850,000 in payments from Medtronic over the past 10 years, the majority of which -- nearly $800,000 -- were made in the preceding three years when Dr. Kuklo was shopping his fabricated study on Infuse® to medical journals for publication.  Specifically, Medtronic paid Dr. Kuklo $356,242 in 2007, the year Dr. Kuklo sought publication of the study in two medical journals, and $249,772 in 2008, the year the study was published in the *Journal of Bone and Joint Surgery*.  Medtronic made both of these payments after Medtronic announced the settlement with the DOJ in July 2006.

283.    In July 2009, Senator Grassley publicly disclosed information demonstrating that Dr. Kuklo hid his financial relationship from Washington University and failed to disclose his financial ties in conflict-of-interest disclosure forms while he was conducting research related to Infuse®.  In fact, Medtronic financed two separate, unpublished studies that also examined the use of Infuse® on

Walter Reed patients with combat-related leg injuries while Dr. Kuklo was supposedly conducting research for the falsified study. At the time Washington University approved the study protocols, Dr. Kuklo indicated on disclosure forms that he did not receive any payments from Medtronic when, in fact, Dr. Kuklo signed a contract with Medtronic shortly after joining the University faculty and had received payments from Medtronic for almost a year into his research.

284. In mid-2007, after Dr. Kuklo disclosed to Washington University that he had received funding from Medtronic, the University's internal disclosure review board re-reviewed Dr. Kuklo's involvement in the Medtronic-sponsored studies and informed him he would have to reduce his personal financial interest with Medtronic to less than $10,000 per year or discontinue his involvement with the research. Dr. Kuklo opted to stop the two studies, which were closed in February 2008.

285. Another highly compensated Medtronic consultant involved in the promotion of off-label Infuse® use, David Polly, M.D., a professor and Chief of the Spine Service at the University of Minnesota Department of Orthopaedic Surgery, received consulting fees from Medtronic totaling $1.14 million from 2003 to 2007. As with Dr. Kuklo, Medtronic's financial relationship with Dr. Polly began while the surgeon was on active military duty at Walter Reed. Although Dr. Polly has claimed that his consulting relationship with Medtronic did not begin until 2004, documents obtained through requests under the Freedom of Information Act reveal that Medtronic paid almost $30,000 in travel expenses for Dr. Polly to speak at various medical conferences in the Bahamas, San Diego, and a $10,000 trip to Switzerland, while he was stationed at Walter Reed in 2003. Dr. Polly attended these conferences to

report on his research that purportedly demonstrated that Infuse® was more cost effective than traditional spinal fusion procedures.

286. After his discharge from the military, Dr. Polly authored an article with Dr. Kuklo reporting positive results in treating wounded soldiers with rhBMP-2 at Walter Reed. According to their article, published in the November 2004 issue of *Minnesota Medicine*, rhBMP-2 was used in more than 100 military patients with traumatic bone fractures who had served in Iraq and Afghanistan. Although the use of Infuse® in tibial fractures was not approved until April 30, 2004, Dr. Polly reported that the "decision to use rhBMP-2 was made early in the Afghanistan conflict and was based on evidence from clinical trials in Europe on open tibial fractures that suggested use of rhBMP-2 not only improved bone healing but led to a decreased number of secondary interventions and lower rates of infection." According to Dr. Polly, "the military's experience with rhBMP-2 has been favorable."

287. Moreover, additional evidence demonstrates that, even before his and Dr. Polly's November 2004 article was published, Medtronic reimbursed Dr. Kuklo for a meeting with Medtronic representatives in Memphis, Tennessee, on April 20, 2004, regarding "Review of BMP Trauma and Spine Surgery."

288. Dr. Polly later sought a government grant for a similar study in May 2006, when he testified before the Defense Subcommittee of the U.S. Senate Appropriations Committee regarding research that would examine the use of Infuse® and antibiotics to treat traumatic and infected bone fractures. Dr. Polly represented that he was "speaking on behalf of the American Academy of Orthopedic Surgeons." However, according to information recently released by Senator Grassley, who, in conjunction with Senator Baucus, has been conducting an inquiry into Medtronic's

consulting payments, Dr. Polly actually billed Medtronic $7,000 in connection with his Senate testimony, and was therefore speaking on behalf of Medtronic, not the American Academy of Orthopedic Surgeons, as he had claimed. Furthermore, Dr. Polly billed Medtronic a total of $50,000 over several months for his lobbying efforts in securing the $466,644 Department of Defense grant for this Infuse® research study.

289. The information released by Senator Grassley, discussed more fully *supra*, which includes billing reports submitted to Medtronic by Dr. Polly and approved by Medtronic, indicates that throughout this period, Dr. Polly had frequent meetings, telephone calls, and email correspondence with numerous Medtronic senior executives, including former COO Michael DeMane ("**DeMane**"), and former President of Medtronic Spinal and Biologics Wehrly, while speaking frequently regarding Infuse® at medical conferences and other events. For example, the records show meetings and other contacts with Dr. Polly on the following dates: February 13, 2007; June 15, 2007; July 27, 2007; August 8, 2007; August 24, 2007; September 26, 2007; and September 27, 2007. Indeed, they further show that Dr. Polly billed Medtronic for a meeting with "Hawkins" on July 13, 2005, to discuss a "spine surgery advocacy effort."

### 2. Opinion Leader Dr. Thomas A. Zdeblick.

290. Thomas A. Zdeblick, M.D., the Chairman of the Department of Orthopedics and Rehabilitation at the University of Wisconsin, received over $19 million from Medtronic from 2003 to 2007 for consulting services and royalty payments. Although Dr. Zdeblick only disclosed annual payments exceeding $20,000 in University conflict of interest forms, he actually received between $2.6 and $4.6 million per year. In 2007 alone, Dr. Zdeblick received $2,641,000 in consulting fees

from Medtronic. From 1998 through 2004, Dr. Zdeblick was paid an annual salary of $400,000 by Medtronic under a contract that only required him to work eight days per year at a Medtronic site in Memphis, Tennessee, and to participate in "workshops" for surgeons.

291. Dr. Zdeblick also has been a significant contributor to Medtronic's promotion of Infuse®, authoring seven peer-reviewed articles on rhBMP-2 and appearing as a presenter at medical conferences and symposia in which the topics included discussion of off-label uses of the product. On a Medtronic-owned website, "www.Back.com," Dr. Zdeblick describes the advantages of Infuse® and appears in an online video discussing the benefits of the product.

292. As discussed more fully *supra*, on January 16, 2009, *The Wall Street Journal* reported on a letter sent by Senator Charles Grassley to Kevin P. Reilly, President at the University of Wisconsin, regarding Medtronic's consulting and royalty payments to Dr. Zdeblick, who co-authored preliminary studies that led to the FDA's approval of Infuse®. Although the University is required to monitor its researchers' financial conflicts-of-interest, the amounts Medtronic paid Dr. Zdeblick far exceeded those he reported to the University. Specifically, Dr. Zdeblick was required to disclose annual amounts in excess of $20,000 per year, and in one year reported payments in excess of $40,000. In reality, Dr. Zdeblick received between $2.6 million and $4.6 million per year from Medtronic, totaling an astonishing $19 million in payments, from 2003 through 2007.

293. As revealed in an article in the *Milwaukee Journal Sentinel*, dated June 20, 2009, Dr. Paul A. Anderson, an orthopedic surgeon and colleague of Dr. Zdeblick at the University of Wisconsin School of Medicine and Public Health, was paid $150,000

by Medtronic for just eight days of work.  Dr. Anderson, along with Medtronic consultants Drs. Boden, Keith H. Bridwell, and Jeffrey C. Wang, authored a July 2007 article in the *Journal of Bone and Joint Surgery*, titled *What's New in Spine Surgery*. The article discussed, among other things, a study that examined the use of Infuse® in an off- label Posterolateral Fusion procedure.  According to the authors, the study reported that Infuse® improved fusion rates when used in combination with iliac crest bone graft in a procedure in which the BMP was wrapped around local bone as a bulking agent.  According to the authors, the study's findings suggested that "the current [Infuse®] kit, while likely not sufficient as a stand-alone graft substitute for the posterolateral spine, can provide a significant enhancer effect, improving the success of an autogenous bone graft."

294.   On June 20, 2009, the *Milwaukee Journal Sentinel* reported that, during calendar year 2008, Medtronic paid Dr. Zdeblick $2 million in royalty payments for eight days of consulting work, and that Dr. Paul Anderson received $150,000 in Medtronic consulting fees for working just eight days.

### 3.   Norton Hospital Leatherman Spine Center Opinion Leaders

295.   Another set of highly compensated surgeons, those affiliated with the Norton Hospital Leatherman Spine Center in Louisville, Kentucky, collectively received more than one million dollars in consulting fees in 2006 alone, including Drs. John R. Johnson ($162,750), Steven D. Glassman ($200,300), Rolando M. Puno ($106,000), John R. Dimar, II ($192,300), David Rouben ($109,300), Mitch Campbell ($212,000), and Mladen Djurasovic ($55,900).

296.    According to CW1, several surgeons from the Leatherman Spine Center were requested by Medtronic to speak at Medtronic-sponsored physician talks attended by between 10 and 25 surgeons, including several "pretty high profile" physicians.  At these physician talks a Medtronic consultant, such as one of the aforementioned surgeons at the Leatherman Spine Center, provided presentations covering off-label usage of Infuse®.  According to CW1, "[w]hat [Medtronic] would do is bring in one of their 'paid consultants' and set up a dinner in the area and invited a number of physicians to attend." The guest surgeon -- the "paid consultant" -- would then "basically give a presentation on off-label usage."  Importantly, these physician talks were also attended by all Medtronic sales representatives who worked in the area.

297.    These same Medtronic-funded surgeons associated with the Leatherman Spine Center have also written extensively on off-label uses of Infuse®.  These surgeons have collectively authored at least 15 articles addressing the use of BMP, including many of the early medical articles on the use of Infuse® in off-label posterolateral lumbar and anterior cervical fusion procedures.  Specifically, Dr. Campbell contributed to at least eight articles examining the use of BMP; Dr. Dimar authored nine; Dr. Djurasovic, four; Dr. Johnson, five; Dr. Puno, five; and Dr. Glassman wrote at least fifteen articles addressing the use of BMP, the vast majority of which involve applications of the product in off-label procedures.

298.    Two surgeons at Norton's Leatherman Spine Center, Dr. Steven D. Glassman and Dr. John R. Dimar II, received directly and indirectly millions of dollars in compensation from Medtronic from 1996 through 2010 as reported in the *Staff Report on Medtronic's Influence on Infuse Clinical Studies*, U.S. Senate Committee on Finance, October 25, 2012, pages 5-6.  Dr. Dimar received $1,766,366.21.  Dr.

Glassman received $1,748,263.36.  During that period, Concept Properties, LLC received $64,831,268.  Drs. Glassman and Demar are listed by the Kentucky Secretary of State as "current officers of Concept Properties, LLC as of June 18, 2012."  *Id.*

### 4.  Other Various Opinion Leaders

299.   Several physicians who authored an article in May 2003 describing positive results of Infuse® used in the cervical spine were paid tens of thousands of dollars in consulting fees by Medtronic.  The article, entitled *New Technologies in Anterior Cervical Spine Fixation*, published on *Spine Universe*, a website intended for the general public that provides information regarding spinal disorders and treatment, described the physicians' use of Infuse® "in the cervical spine with very good results." According to the authors, "[p]reliminary results are promising and Infuse® may be especially appropriate in people undergoing multiple level fusions" (emphasis added) -- i.e., for indications outside FDA limited approval to single-level fusion procedures.

300.   One of the authors of this article, Dr. Regis Haid, Jr., received Medtronic consulting fees of $50,000 in 2006 and similar amounts in the prior two years. Another author, Dr. Gerald Rodts, received payments of $80,000 from Medtronic in 2006 and similar amounts in the prior two years.  The *Spine Universe* article does not mention that its authors received compensation from Medtronic, nor do the website profiles of Dr. Haid and Dr. Rodts, both of whom serve on the publication's editorial board, disclosed their financial ties to Medtronic.

301.   Dr. Haid was also the lead author of an article describing the results of the study of Infuse® in off-label PLIF procedures that was halted in December 1999 after several patients experienced adverse incidents of uncontrolled bony overgrowth. In addition, two of the article's other authors -- Dr. J. Kenneth Burkus and Dr. Charles

L. Branch - received consulting fees from Medtronic.  Specifically, Medtronic paid Dr. Branch $154,900 in 2006 and similar amounts in the preceding two years, while Dr. Kenneth Burkus - who has written over a dozen articles addressing the use of rhBMP-2, including studies examining the use of Infuse®  in off-label PLIF and anterior cervical procedures – received $416,775 in 2006 and similar amounts in the two preceding years.

302.    Although the negative outcomes in the PLIF study prompted the FDA Advisory Panel to recommend a more restrictive labeling and indication in approving Infuse®, the Medtronic-funded authors reviewing the study's results surprisingly did not find the incidents of bony overgrowth to be a clinically significant concern. Shockingly, the physicians noted, "[a]lthough not desirable, bone formation in the spinal canal does not appear to have a discernible effect on patient outcomes," and "the de novo rhBMP-formed bone occurred predictably, not compressing the neural structures."

303.    In a commentary on the study, Dr. Neil Kahanovitz, an independent surgeon, questioned the authors' interpretations, suggesting that they may have been "overwhelmed by their enthusiasm of using" rhBMP-2 in a PLIF procedure.  Dr. Kahanovitz noted that, while there are "lengthy discussions of various trends throughout this study, which imply the superiority of rhBMP over autograft . . . one fact remains: in every clinical measure examined in this study, there were no statistically superior outcomes in the rhBMP group except one, and the clinical significance of this one statistically significant finding is unclear."

304.    Importantly, Dr. Kahanovitz also disagreed with the authors' conclusion that the presence of bone growth in the spinal canal and foramina (the two apertures

between vertebrae) in those patients who received rhBMP-2 had no clinical implications. Rather, Dr. Kahanovitz predicted that "most surgeons would be less than enthusiastic to see this statistically significant variable present in the majority of their patients."

305. CW1 stated that Dr. Lawrence "Larry" G. Lenke and Dr. Keith H. Bridwell, two surgeons from Washington University in St. Louis -- where Dr. Kuklo had worked as an associate professor -- similarly acted as "Opinion Leaders" or "guest surgeons" during "corporate visits" in which Medtronic would invite targeted surgeons to attend training sessions in Memphis, Tennessee. While in Memphis, the visiting surgeons met with Medtronic corporate officers, product managers, and guest surgeons, such as Drs. Lenke and Bridwell. The visiting surgeons also received "hands-on training" on Infuse®, including instruction in cadaver labs. According to CW1, who personally attended two such meetings, "[t]here was training on off-label procedures, for sure." The visiting surgeons "would bring up the use of Infuse® and ask how to use it, and [the guest surgeons] would show them how to do it." CW1 stated that Medtronic chose which surgeons to invite to these corporate visits based, in part, upon the volume of Infuse® procedures they performed.

306. Another prominent Medtronic consultant, Jeffrey Wang, M.D., the Chief of Spine Surgery for the Department of Orthopedic Surgery and Executive Co-Director of the University of California, Los Angeles's ("**UCLA**") Comprehensive Spine Center, also spoke about off-label uses of INFUSE®. Unsurprisingly, Senator Grassley discovered that Dr. Wang received $275,000 in royalty and consulting payments from Medtronic from 2003 until 2008.

307.    Furthermore, Dr. Wang failed to disclose his substantial financial relationship with Medtronic while researching Medtronic products, which violated UCLA's policy requiring him to do so.  For example, on a disclosure form to UCLA dated January 10, 2007, Dr. Wang checked "no" when asked if he received income of $500 or more from Medtronic, notwithstanding the fact that Medtronic was, at that very moment, funding one of Dr. Wang's studies.  In fact, Dr. Wang received $14,600 on January 4, 2007 for "lecture and teachings at spine meetings and universities in Korea for one week."  As a result of his repeated failures to disclose payments received from Medtronic, Dr. Wang lost his position as Executive Co-Director of UCLA's Comprehensive Spine Center.

308.    As discussed more fully elsewhere herein, Senator Grassley also discovered that, in addition to the compensation to Medtronic consultants, Medtronic collectively paid 22 other surgeons $943,000 from 2003 to 2008 to work on matters specific to Infuse®.

309.    In June 2011, one of the leading journals on spine surgery, *The Spine Journal*, described more fully elsewhere herein, devoted an entire issue to publishing various articles regarding the risks associated with Infuse®, including articles on Medtronic's failure accurately to report the side effects from its clinical trials; Medtronic's failure to report that many of the authors who studied and promoted Infuse® had significant financial ties to Medtronic, with a median range of $12 to $16 million per study; that Infuse® can cause severe injuries to the spinal nerves and spinal cord; that off-label use of Infuse® can lead to other severe side effects; and that Medtronic and its paid consultants/study authors downplayed the risks associated with

Infuse®, over-emphasized its benefits and over-emphasized the risks associated with traditional non-Infuse® spine fusion procedures.

### O. Medtronic's Misrepresentations and Concealments of Material Safety and Risk Information in Published Scientific Literature

310.   Medtronic was directly involved in drafting, editing, and shaping the content of medical journal articles on Infuse® authored by its physician consultants who, as discussed above, received significant amounts of money, totaling more than $210 million, through royalties and consulting fees from it.  Medtronic's significant role in authoring or substantively editing these articles was not disclosed in the published articles.

311.   From at least 2001 until the summer of 2006, Medtronic engaged in an active ghostwriting program of the articles and study reports in order to suppress any information about the real risks and dangers posed by the off-label uses of Infuse®.  The specific misrepresentations regarding the products' safety and efficacy include:  (1) the active concealment of adverse events; (2) the deliberate omission of related risks, including but not limited to, dangerous bone growth, inflammatory reactions, osteolysis, and an over-emphasis on the problems posed by traditional bone graft procedures, such as autograft; and (3) dosing requirements for patients, such that doctors were misled as to how much rhBMP-2 to use and what amount of bone growth would result.  The effect of these misrepresentations was that it was nearly impossible for a physician to understand the real risks associated with using Infuse® off-label.

312.   Medtronic officers and managers inserted language into studies that promoted Infuse® as a better technique than an alternative by emphasizing the pain associated with the alternative.

313. An e-mail exchange shows that a Medtronic employee recommended against publishing a complete list of adverse events, or side effects, possibly associated with Infuse® in a 2005 *Journal of Bone and Joint Surgery* article.

314. Although an early Medtronic-sponsored study conducted in 1999 had to be halted early when 70% of the patients developed ectopic bone growth in their spinal canals, the results were not published until 2004. When published, the article inaccurately maintained that these patients were not harmed by INFUSE®. The paper (Haid, et al, *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages. The Spine Journal*, 4(5):527-538, September 2004) downplayed the bone overgrowth complications by claiming that patients did not suffer ill effects from the bony overgrowth.

315. In all of the principal studies cited in the Baucus-Grassley report released by the Senate Committee on Finance, Medtronic officials inserted language into studies that promoted Infuse® as a better technique than harvesting bone from the patient's iliac crest by emphasizing the pain associated with using autograft, actively concealing adverse events (including severe uncontrolled or ectopic bone growth, severe inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation in men, urinary retention, bone resorption, and implant displacement) and/or manipulating success criteria to falsely inflate the benefits of Infuse®. This was done in a number of ways:

a. In one of the original studies, entitled *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages*," Dr. Haid, a Key Opinion Leader, and his co-authors caused adverse events to be underreported by requiring that an

"event" be classified "unanticipated" in order for recognition as an "adverse event." In this study, the authors noted in the Study Progress section of the report, "[n]o unanticipated adverse device events have been reported. . . The reports of posterior bone formation are not considered unanticipated adverse device events since this was a possible adverse event listed in the risk analysis and informed consent form." Because heterotypic bone formation was then a recognized potential risk of rhBMP-2 use, redefinition of adverse event in such manner circumvented recognition of the hazard. A.R. Poynton & J.M. Lane, *Safety profile for the clinical use of bone morphogenetic proteins in the spine,* 27 Spine (16 Suppl 1) S40, 40-48. (2002).

b.  Medtronic also concealed adverse events in the medical literature by classifying the events based on clinical consequence, rather than radiographic observation. Rodgers, *et al.*, 346 Brit. Med. J; 3981, 3985 (2013). "Medtronic confirmed that adverse events were classified on the basis or signs and symptoms, so potential adverse events such as heterotypic bone formation, osteolysis, and radiculitis not originally listed as adverse event categories in study protocols do not appear in summary tables in any internal reports." They suggested that any clinical consequence of such events may have been classified as "neurological" or as "back and/or leg pain." *Id.* Under this methodology, adverse events were lumped into large and vague categories to mask the severity of what was occurring.

316.    Additionally, specific misrepresentations in the Medtronic-sponsored articles include the following:

a.    Burkus, J.K., Gornet, M.F., Dickman, C.A., Zdeblick, T.A. *Anterior lumbar interbody fusion using rhBMP–2 with tapered interbody cages.* J. Spinal Disord. Tech. 2002; 15:337–49: "There were no unanticipated adverse events in either group."  Yet, the executive summary includes information about adverse events resulting from local bone graft harvesting, but none regarding Infuse®-related adverse effects.

b.    Burkus, J.K., Transfeldt, E.E., Kitchel, S.H., *et al. Clinical and radiographic outcomes of anterior lumbar interbody fusion using recombinant human bone morphogenetic protein.*  2 Spine 2002: "In a clinical series of patients undergoing an ALIF procedure with a tapered cylindrical metal fusion cage, Infuse™ Bone Graft has been shown to promote osteoinduction and increase rates of fusion" (citing article above).  Furthermore, the authors stated, "[n]o unanticipated adverse events that were related to the use of Infuse Bone Graft (rhBMP-2 and the collagen sponge carrier) occurred during the course of the study."

a.    Burkus, J.K., Heim, S.E., Gornet, M.F., & Zdeblick, T.A. *Is Infuse bone graft superior to autograft bone? An integrated analysis of clinical trials using the LT–CAGE lumbar tapered fusion device.*  J. Spinal Disord. Tech. 2003: "The probability of noninferiority of Infuse Bone Graft to autograft was shown to be essentially 100%."  This study also reported a 100% fusion rate for those patients receiving rhBMP.

b.    Baskin, D.S., Ryan, P., Sonntag, V., et al.  *A prospective, randomized, controlled cervical fusion study using recombinant human bone morphogenetic protein–2 with the CORNERSTONE–SR allograft ring and the ATLANTIS anterior cervical plate*.  Spine 2003: "All the patients evaluated had solid fusions, 6, 12, and 24 months after surgery.  There were no device-related adverse events. . .This pilot study demonstrates the feasibility of using rhBMP-2 safely and effectively in the cervical spine." (p. 1219)  This study also reported a 100% fusion rate for those patients receiving rhBMP-2 and noted, "[t]he use of rhBMP-2 in anterior cervical fusion procedures eliminates the pain, scarring, and morbidity of iliac crest bone harvesting."

c.    Burkus, J.K., Dorchak, J.D., & Sanders, D.L.  *Radiographic assessment of interbody fusion using recombinant human bone morphogenetic protein type 2*. Spine 2003: "High fusion rates associated with new bone formation inside and outside the cages can be achieved without harvesting bone from the iliac crest and without device-related adverse events."

d.    Haid, R.W., Branch, C.L., Alexander, J.T., & Burkus, J.K.  *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages*.  Spine J. 2004: "No unanticipated device-related adverse events occurred."

e.    Burkus, J.K., Sandhu, H.S., Gornet, M.F., Longley, M.C.  *Use of rhBMP–2 in combination with structural cortical allograft surgery: clinical and radiographic outcomes in anterior lumbar spinal fusion*.  J. Bone Joint

Surg. Am. 2005; 87:1205–12: "The patients in the [rhBMP-2] group had significantly better outcomes than the control group with regard to the average length of surgery (p < 0.001), blood loss (p < 0.001), and hospital stay (p = 0.020). Fusion rates were significantly better in the study group (p < 0.001) . . . In patients undergoing anterior lumbar interbody arthrodesis with threaded allograft cortical bone dowels, rhBMP-2/ACS was an effective replacement for autogeneous bone graft and eliminated the morbidity associated with graft harvesting."

f.  Glassman, S.D., Dimar, J.R., Burkus, K., *et al. The efficacy of rhBMP–2 for posterolateral lumbar fusion in smokers.* Spine 2007: This article reported a 100% fusion rate for non-smokers who received rhBMP-2 and a 95.2% fusion rate for smokers who received rhBMP-2, whereas non-smokers in the autograft group were reported to have a 94.15 fusion rate, and smokers were reported to have a 76.2% fusion rate."

g.  Dimar, J.R., Glassman, S.D., Burkus, J.K., *et al. Clinical and radiographic analysis of an optimized rhBMP–2 formulation as an autograft replacement in posterolateral lumbar spine arthrodesis.* J. Bone Joint Surg. Am. 2009: "No adverse event that was specifically attributed to the use of rhBMP-2 metric in the study group was identified."

h.  Burkus, J.K. & Gornet, M.F. *Six-Year Outcomes of Anterior Lumbar Interbody Arthrodesis with Use of Interbody Fusion Cages and Recombinant Human Bone Morphogenetic Protein–2.* JBJS 2009: "In conclusion, the use of rhBMP-2 on an absorbable collagen sponge is an

effective method of obtaining anterior intervertebral spinal fusion with use of a stand-alone interbody fusion device. In this long-term study, treatment with Infuse Bone Graft and threaded titanium cages was shown to lead to high rates of fusion that were maintained at six years after surgery, and significant improvements in clinical outcome measures were maintained."

317. A more current example of underreporting and concealing adverse event data can be seen in the study entitled, *Recombinant human bone morphogenetic protein-2 on an absorbable collagen sponge with an osteoconductive bulking agent in posterolateral arthrodesis with instrumentation. A prospective randomized clinical trial.* In this study, published in the *Journal and Bone and Joint Surgery* in 2009, the authors, who were also Medtronic-paid consultants, under-reported "back and/or leg pain" by simply failing to acknowledge elevated rates of back and/or leg pain as an adverse event. Instead, the authors reported no adverse events associated with rhBMP-2. *Id.* A later analysis by Dr. Eugene Carragee, looking at documents provided to the FDA for this same study, revealed a three-fold increase in the number of back and leg pain adverse events as compared to the control group.

318. Infuse® had significant financial ties to Defendants, with a median range of $12 to $16 million per study; that Infuse® can cause severe injuries to the spinal nerves and spinal cord; that off-label use of Infuse® can lead to other severe side effects; and that Medtronic and its paid consultants/study authors downplayed the risks associated with Infuse®, over-emphasized its benefits and over-emphasized the risks associated with traditional non-Infuse® spine fusion procedures.

319.     *The Spine Journal*'s investigators and authors looked at the original data underlying the Medtronic-sponsored articles and found that the thirteen leading articles most heavily relied on by the spine surgery community (consisting of controlled, randomized clinical trials published in peer-reviewed journals) unanimously claimed that there were zero adverse events associated with the use of Infuse®, yet that these thirteen studies in fact revealed a substantial number of adverse events likely attributable to Infuse®.

320.     *The Spine Journal's* investigators found that the industry-sponsored peer-review publications of BMP-2 clinical trials had a methodological bias against the control group.  There were unpublished adverse events and internal inconsistencies within those studies.

321.     *The Spine Journal* authors, including Dr. Eugene Carragee, performed a retrospective analysis, finding that the true rate of adverse events attributable to Infuse® was closer to 50% rather than the 0% reported.

**P.**     **U.S. Senators' Letters to Medtronic Regarding the Promotion and Marketing of Infuse®**

**1.     Letter, dated September 30, 2008**

322.     Despite the July 2006 Settlement Agreement with the DOJ, concerns continued regarding Medtronic's off-label marketing activities and related payments to doctors.

323.     On September 30, 2008, U.S. Senator Herb Kohl sent a letter to Medtronic noting that earlier in 2008, Medtronic's outside counsel provided to the Special Committee on Aging a written account of Medtronic's efforts to comply with the July 2006 Settlement Agreement with the DOJ concerning allegations that Medtronic

and its subsidiary improperly compensated surgeons and physicians in connection with

the Infuse® device.

324.    Senator Kohl's letter expressed several concerns, including the following:

That account also addressed the corporate integrity agreement (CIA) that Medtronic and its subsidiary entered into with the Office of the Inspector General of the United States Department of Health and Human Services stemming from those same allegations.  In that same letter to the Committee, Medtronic and its subsidiary both denied that "improper payments were made to physicians in the first place (Medtronic's agreement with DOJ does not contain any admission of liability), much less that improper payments "have continued."  Consequently, it was with concern that I read recent articles, in the Wall Street Journal and elsewhere, which outlined highly disturbing allegations of improper, if not illegal, payments by Medtronic to surgeons and physicians.

These continuing allegations are directly relevant to the Committee's oversight of inappropriate physician compensation practices within the medical device industry.  All of the major orthopedic device companies that settled with DOJ over such allegations were required to publicly reveal information related to their payments to physicians.  Medtronic's response to the Committee's initial inquiry articulated no specific reasons as to why Medtronic has yet to voluntarily make the same disclosures.

325.    In his letter, Senator Kohl requested both documentation of Medtronic's

efforts to comply with the July 2006 Settlement Agreement and interviews with

corporate witnesses and documents "given the ongoing, serious concerns publicly

raised regarding the integrity and transparency of Medtronic's physician compensation

practices."

326.    Senator Kohl also asked Medtronic to explain "the circumstances that led

Medtronic's former counsel to file suit against the company [alleging improper

payments to physicians] and how that matter was subsequently settled."

327.    Also on September 30, 2008, U.S. Senator Charles Grassley sent a similar

letter to Medtronic pertaining to the marketing of Infuse® and allegations of related

kickbacks to physicians regarding the sale of Infuse®, noting that:

Last week, the *Wall Street Journal (WSJ)* reported on allegations of financial perks provided to doctors that included "entertainment at a Memphis strip club, trips to Alaska and patent royalties on inventions they played no part in." I would appreciate your assistance in better understanding these allegations and would like to take this opportunity to lay out my specific concerns and questions.

328.    Senator Grassley went on to express his concern over the *Wall Street Journal's* reports "that one of the incentives Medtronic provided physicians was to include them on patents for medical devices and reward them with royalties, even though the physicians may not have contributed to the development of the product."

329.    This letter specifically addressed issues related to Medtronic's marketing of Infuse®:

Fourth, earlier this year the WSJ reported on problems with off-label use of Medtronic's Infuse®.[16] Infuse® is a bone graft replacement technology that uses a protein which creates bone. Specifically, it was reported that Medtronic gave payments to physicians in the form of consulting agreements, as a means of increasing sales of Infuse®. The allegations that Medtronic has been disguising these consulting agreements as inducements or kickbacks for physicians to use Infuse® are equally troubling. Likewise, this is a practice that I would like to better understand and I would like to know what if anything has changed since these reported events.

330.    Within in his September 30, 2008, letter, Senator Grassley also questioned several lawsuits against Medtronic pertaining to Infuse® remained under seal, and indicated that he would like to "better understand the status of these lawsuits and the procedural process that has led to the current situation."

### 2.    Letter, dated June 21, 2011.

331.    The U.S. Senate Committee on Finance investigated whether Medtronic continued misrepresenting the adverse events resulting from Infuse® and rhBMP-2, as

---

[16] David Armstrong, *Lawsuit Says Medtronic Gave Doctors Array of Perks. Wall St. J.,* Sept. 25, 2008.

well as the possibility that Medtronic improperly influencing clinical trials and reporting regarding rhBMP-2.

332.   On June 21, 2011, U.S. Senators Charles Grassley and Max Baucus sent another letter to Medtronic on behalf of the Senate Committee on Finance requesting that Medtronic produce documents and communications pertaining to "adverse postoperative events and/or medical complications" resulting from the use of rhBMP-2.  The letter also requests that Medtronic provide "[a] detailed account of payments that Medtronic made to all Infuse® clinical investigators."

333.   In their letter, Senators Grassley and Baucus state: "[w]e are extremely troubled by press reports suggesting that doctors conducting clinical trials examining the safety and effectiveness of Infuse® on behalf of Medtronic were aware that Infuse®, a treatment commonly used in spinal surgery, may cause medical complications, but failed to report this in the medical literature.  This issue is compounded by the fact that some clinical investigators have substantial financial ties to Medtronic."

334.   The letter further states: "[w]e are also concerned that other severe side-effects of Infuse® and similar bone-growth products developed by Medtronic may have been unreported or under-reported in clinical literature.  Reports have linked Infuse® to potentially fatal swelling in the neck and throat, and radiating leg pain.  Concerns have also been expressed about a potential link to cancer."

### 3.   Letter, dated December  13, 2011.

335.   Senators Herb Kohl, Charles Grassley, and Richard Blumenthal wrote to Medtronic again on December 13, 2011, demanding more information over adverse

events caused by on-label and off-label use of Infuse®.  The letter noted that "your company has experienced safety issues, such as with your spine product Infuse®."

336.    The Senators' letter also demanded that Medtronic explain whether or not it requires physicians who receive funds from Medtronic to disclose those payments to their patients before the patients receive one of Medtronic's medical devices.  And "[i]f not, why not?"

337.    This letter requires that Medtronic produce this information to the U.S. Senate's Special Committee on Aging by no later than January 23, 2012.

338.    This continued investigation by a U.S. Senate Committee suggests that Medtronic has not changed its ways with regard to its illegal promotion of Infuse®, despite signing the CIA and paying a $40 million fine to DOJ in 2006.

### Q.    June 1, 2011, Issue of *The Spine Journal*

339.    On June 1, 2011, *The Spine Journal* published a special edition dedicated to addressing serious patient safety and ethical concerns related to the use of rhBMP-2 (Infuse®) in the spine.

340.    This special edition reviewed thirteen peer-reviewed articles about rhBMP-2 by Medtronic-sponsored authors, and concluded that these articles had inaccurately reported the safety of rhBMP-2 applications in the spine by underestimating its risks.

341.    In an editorial summarizing the findings of this special issue, five prominent physicians, including spine surgeons at Stanford University Medical Center, wrote that the earlier industry-sponsored trials and reports were "remarkable for the complete absence of reported rhBMP-2-related clinical adverse events."  For example, the industry-sponsored articles omitted mention of indications from the earliest trials

of inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation, urinary retention, bone resorption, and implant displacement.  These articles also omitted mention of sterility and cancer risks associated with rhBMP-2, as reported in FDA documents and hearings.  The trials and reports suffered from idiosyncratic trial design, reporting bias, and peer-review/publication shortfalls.

342.    According to this editorial and several of the accompanying articles, the thirteen Medtronic-funded articles reported only successful fusions and extremely low or nonexistent rates of complications with Infuse®, which led to the growth of "off-label" use of Infuse® in lumbar fusion procedures.  According to the authors in *The Spine Journal*, the Medtronic-funded articles "may have promoted widespread poorly considered on-and off-label use, eventual life-threatening complications and deaths."

343.    Contrary to the conclusions of the earlier Medtronic-sponsored trials and articles, an article in this special issue of the *Spine Journal* suggested "an estimate of adverse events associated with rhBMP-2 use in spine fusion ranging from 10% to 50% depending on approach."

> Anterior cervical fusion with rhBMP-2 has an estimated 40% greater risk of adverse events with rhBMP-2 in the early postoperative period, including life-threatening events.  After anterior interbody lumbar fusion rates of implant displacement, subsidence, infection, urogenital events, and retrograde ejaculation were higher after using rhBMP-2 than controls. *Posterior lumbar interbody fusion was associated with radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes.*  In posterolateral fusions, the risk of adverse effects associated with rhBMP-2 use was equivalent to or greater than that of iliac crest bone graft harvesting, and 15% to 20% of subjects reported early back pain and leg pain adverse events; higher doses of rhBMP-2 were also associated with a greater apparent risk of new malignancy.  Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A Critical Review Of Recombinant Human Bone Morphogenetic Protein-2 Trials In Spinal Surgery: Emerging Safety Concerns And Lessons Learned, The Spine Journal* 11, 471-72 (2011) (emphasis added).

344.   This article also reported that ten of the earlier industry-sponsored rhBMP trials were funded in whole or in part by the manufacturer of rhBMP-2 (Infuse®) -- Medtronic.  Furthermore, in twelve of these earlier studies, the median-known financial association between the authors and Medtronic was approximately $12,000,000 to $16,000,000 per study (ranging between $560,000 to $23,500,000). *Id.* at 475.

345.   The following are some of the other significant conclusions in these articles in the June 1, 2011, issue of *The Spine Journal*:

a.   Many of the risks now accepted have been known since a publication by Poynton and Lane in 2002, which listed overgrown and uncontrolled bone formation, osteoclast activity (graft subsidence, migration, loss of fixation etc.), local safety (inflammation, edema, wound problems, and infection), potential negative effect of BMPs on exposed dura and nerves (neurologic events, retrograde ejaculation, persistent bladder retention, early back pain, leg pain, radiculitis, functional loss, carcinogenicity). However, it appears that these risks were ultimately washed out and marginalized by the wealth of positive data from industry-sponsored studies.

b.   A two-year rhBMP-2 follow-up published by Burkus, *et al*., reported no adverse events.  However, in a six-year follow-up publication using the same subjects, the authors contradict their earlier publication stating that there had been seven early adverse events associated with subsidence in the rhBMP-2 group, yet they were not reported in the two year follow-up.

c.   In fact, on closer inspection of the Burkus studies, it was noted that all adverse events mentioned in the six-year follow-up had occurred within the first two years.

d.   Furthermore, four of the adverse events required further surgery, and 22 additional surgeries for device failures occurred in the same rhBMP-2 group between 0-2 years after surgery according to the FDA summary, but were not specifically reported in the 2003 or 2004 studies, which were the same patients over the same time frame.

e.   The estimates of rhBMP-2 safety from the original publications underestimated rhBMP-2-related adverse events of the product.  In the small pilot studies, there were inadequate numbers to assess safety, but some suggestion of potential harm was seen in at least one study.  In the larger trials, there is evidence in each trial that rhBMP-2 complications may be common and may be serious, but in each publication these were underreported.

f.   The presence and magnitude of conflicts of interest and the potential for reporting bias were either not reported or were unclear in each of the original industry sponsored studies.  Some of the conflicts-of-interest statements reported appeared to be vague, unintelligible, or were internally inconsistent.

g.   The original estimates of ICBG (Iliac Crest Bone Graft, the pre-rhBMP-2 gold standard procedure for spinal fusion) harvesting morbidity were based on invalid assumptions and methodology.  This, in turn, may have

exaggerated the benefit or underestimated the morbidity of rhBMP-2 in
the clinical situations tested.

h. The control group methods and techniques, as selected for both posterior
approach methods (PLIF and PLF) were potentially handicapped by
significant design bias against the controls.

i. In those studies for which other data sources have been made available
on the same patient sets (either FDA documents or subsequent reporting
of follow-up data), serious contradictory findings have emerged. Major
complications, additional surgeries, eurologic/ urologic injury, and major
back/leg pain events were apparently observed but not reported in the
original articles.

j. By reporting perfect or near perfect safety, the original studies might have
led others to widespread off-label use of the product with some
potentially catastrophic outcomes. Revised estimates of adverse events
are:

    i. Posterior lumbar interbody fusion techniques: 25-50% risk of
    associated adverse events.

    ii. Anterior lumbar interbody fusion: 10-15% risk of adverse events.

    iii. Anterior cervical fusion: 40% greater risk of adverse events in the
    acute postoperative period including potentially life threatening
    complications.

    iv. Posterolateral fusions: equivalent or greater early postoperative
    risk of morbidity compared with ICBG harvesting for this dosage:
    16-20% of rhBMP-2 subjects had adverse back and leg pain events,

*a probable two to threefold increase in the first three months*

*after surgery over control groups* (emphasis added).

### R.  U.S. Senate Committee on Finance Report on Medtronic's Manipulation of the Infuse® Studies and Close Financial Ties with Researchers, dated October 25, 2012

346.    On October 25, 2012, Senate Finance Committee Chairman Max Baucus (D-Mont.) and senior minority member Chuck Grassley (R-Iowa) released the results of the Committee's 16-month investigation into Medtronic, which revealed questionable ties between the company and its physician "Opinion Leader" consultants tasked with testing and reviewing Infuse®.  Without public disclosure of their roles, Medtronic employees collaborated with the physician authors to edit - and in some cases, write - segments of published studies on Infuse®.  The studies may have inaccurately represented Infuse®'s risks and may have over-emphasized the side effects of prior more traditional treatments. The Senate report found that Medtronic also maintained significant, previously-undisclosed financial ties with the physicians who authored the early studies on Infuse®, making $210 million in payments to physicians over a 15-year period.

347.    Senator Baucus said that "Medtronic's actions violate the trust patients have in their medical care.  Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has.  Patients everywhere will be better served by a more open, honest system without this kind of collusion."

348.    Senator Grassley said that "These findings emphasize the value of the Grassley-Kohl Physician Payments Sunshine Act, which will result in public disclosure of industry payments to physicians starting next year.  The findings also should prompt

medical journals to take a very proactive approach to accounting for the content of the articles along with the authorship of the articles and studies they feature. These publications are prestigious and influential, and their standing rests on rigorous science and objectivity. It is in the interest of these journals to take action, and the public will benefit from more transparency and accountability on their part."

349. The U.S. Senate Finance Committee has jurisdiction over Medicare and Medicaid. Its report released on October 25, 2012, by Senators Baucus and Grassley was the product of an investigation began in June 2011.[17] The major findings of the investigation include:

a. Medtronic was involved in drafting, editing, and shaping the content of medical journal articles on Infuse® authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. Its significant role in authoring or substantively editing these articles was not disclosed in the published articles. Medical journals should ensure any industry role in drafting articles or contributions to authors be fully disclosed.

b. Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty, and other arrangements.

c. A Medtronic employee recommended against publishing a complete list of adverse events, or side effects, possibly associated with Infuse® in a 2005 *Journal of Bone and Joint Surgery* article.

---

[17] The Committee's full report is available on line at online at http://www.finance.senate.gov/ newsroom/chairman/download/?id=e54db17c-a475-4948-bd81-69c8740c6aaf.

d.     Medtronic officials inserted language into studies that promoted Infuse®
       as a better technique than an alternative by emphasizing the pain
       associated with the alternative.

### S.     Further Evidence of Medtronic's Off-label Promotion.

350.     Medtronic's knowledge and promotion of off-label use of Infuse® is
further evidenced by comparing sales of the rhBMP-2 component to the sales of the
LT-Cage component (both components are required pursuant to FDA approval).
Medtronic sells the rhBMP-2 component separately from the LT-Cage in order to
illegally and improperly promote off-label uses of Infuse® in the lumbar spine and in
the cervical spine, procedures in which the LT-Cage is not used.  As a result, sales of the
rhBMP-2 component are and were at all relevant times far larger than sales of the LT-
Cage component, despite FDA requirements that both be used according to the
product's  labeling; i.e. that the entire medical device (rhBMP-2 and the LT-Cage) be
used in the procedure.

351.     As described in detail above and throughout this Complaint, therefore,
Medtronic's off-label promotion of Infuse® was not truthful.  Instead, Medtronic's  off-
label promotion of Infuse® was false and misleading. "Of course, off-label promotion
that is false or misleading is not entitled to First Amendment protection." *United States
v. Caronia*, No. 09-5006-cr, 2012 U.S. App. LEXIS 24831, at *39, n. 11 (2d Cir. Dec. 3,
2012).

352.     Medtronic's false and misleading off-label promotion of Infuse®
described above created the conditions for widespread acceptance by spine surgeons of
the off-label uses of Infuse® after the 2002 PMA approval, and Medtronic's violations
of federal law described above (which parallel Plaintiffs' state-law tort claims) directly

caused or significantly contributed to the widespread off-label use of Infuse®
generally, and also specifically with respect to each Plaintiff. In particular, Medtronic's
off-label promotion activities and failure to report adverse events caused spine
surgeons, including Plaintiffs' surgeon, Dr. Durrani, to use Infuse® in dangerous off-
label procedures.

### T. The Gupta Guide on FDA Approval of Infuse®.

353. Sanjay Gupta, MD, is a medical doctor and editor of public articles on
medical issues which have been reported through the Gupta Guide webpage at
http://www.medpagetoday.com/Orthopedics/Orthopedics/45827?isalert=1.

354. On May 18, 2014, John Fauber, a reporter for the *Milwaukee Journal
Sentinel/MedPage Today* with contributions by reporter Kevin Crowe, reported about
the testing differences for the FDA to obtain market approval in the case of a Drug
versus Device as related to Medtronic and its product Infuse® at the aforementioned
webpage link.

355. The May 18, 2014 article reported that FDA testing for market approval
for a biologic agent requires clinical trials for 1,000 to 3,000 people.

356. The May 18, 2014 article reported that the FDA, however, allowed
INFUSE® on the market with clinical trials of only 277 patients because Infuse® was
treated as a combination of biologic agent and device.

357. FDA testing requirements for market approval of a device are not as
difficult when compared to the testing requirements for a biologic agent.

358. The May 18, 2014 article reported that the FDA approved BMP-2 known
as Infuse® in a "non-inferiority" trial as an alternative to traditional spinal fusion

surgery that did not require MEDTRONIC to prove in biologic agent clinical trials that it was better than the traditional method of spinal fusion surgery.

359.    The May 18, 2014 article reported that the FDA in 2004 approved use of the Taxus stent which was coated with the drug paclitaxel that had already been on the market for a decade as a cancer treatment.

360.    The May 18, 2014 article reported that the FDA in 2004 approved the Taxus stent when it had been in use in 39 countries outside of the United States of America and Infuse® had not been in use outside of the USA when it was approved.

361.    The May 18, 2014 article reported that the FDA in 2004 approved the Taxus stent when it was tested in 662 patients compared to only 143 patients were implanted with Infuse®.

362.    Infuse® got on the market then with less safety testing than a biologic agent.

363.    Infuse® got on the market then with less safety testing than a device.

364.    Infuse® got on the market then with less safety testing than a combination device and biologic agent.

## VI.    PLAINTIFFS' SPECIFIC ALLEGATIONS

365.    Each Plaintiff underwent a spine surgical procedure in which Infuse® was used in an off-label manner.  Each surgery was performed by Dr. Durrani or his associate, Dr. Shanti.

366.    During every surgery in which Dr. Durrani or Dr. Shanti inserted Infuse® within a Plaintiff, a Medtronic representative was present in the operating room and was fully aware that Dr. Durrani was placing Infuse® either in an area of a Plaintiff's spine that was not FDA-approved, on a person who was not FDA-approved for its use,

or in a manner that was not FDA-approved without obtaining each Plaintiff's informed consent. These representatives were encouraging Dr. Durrani and Dr. Shanti to use Infuse®.

367. Prior to each surgery, Defendants did not inform any of the Plaintiffs that there were any risks specific to the use of Infuse® in the spine. In addition, Defendants either: (i) did not adequately inform Plaintiffs of the true incidence of dangerous side effects resulting from the use of Infuse® in off-label surgeries or from the use of Infuse® in any surgery, whether off-label or otherwise, including ectopic or uncontrolled or unusual bone growth resulting from the use of Infuse® in off-label procedures, increased risks of cancer, or of other risks, dangers or complications associated with the off-label use of Infuse® in the spine, or (ii) acted in concert with Dr. Durrani in concealing these risks from the Plaintiffs due to his being their agent.

368. Each Plaintiff's post-operative period was marked by increasingly severe pain.

369. Imaging studies show that each Plaintiff developed uncontrolled bone growth and resulting nerve impingement at or near where the Infuse® was implanted in their surgeries. Indeed, these injuries and complications are the direct and proximate result of the use of off-label Infuse® in this surgery.

370. The first time that each Plaintiff had reason to suspect that their chronic pain was caused by Infuse®-induced bone overgrowth was from approximately July 2013 to the present, when Plaintiffs' legal counsel reviewed their medical bills. The medical bills frequently hid the use of BMP-2 by classifying it under "Miscellaneous."

371. Thus, each Plaintiff did not know, and could not have known by the exercise of reasonable diligence, until some point after July 2013, at the earliest that

the off-label use of Infuse® caused their bone overgrowth injuries and their other serious injuries.

372. Before and after the implantation surgeries using Infuse®, Defendants knowingly concealed from Plaintiffs the significant rate of injuries and complications resulting from the off-label use of Infuse® by their improper promotion of Infuse® and their concealment of serious patient safety risks associated with off-label Infuse®.

373. Defendants' fraudulent concealment of the relevant facts tolled any applicable statutes of limitation.

374. As a direct and proximate result of the use of Infuse® in their respective spine surgical procedures, each Plaintiff now suffers from severe injuries and damages, including but not limited to bone overgrowth causing nerve impingement, and chronic pain at or near where the Infuse® was implanted.

375. These injuries have caused each Plaintiff unrelenting agony.

376. As a result of the off-label use and failure to warn of the risks of off-label use of Infuse® as designed, manufactured, sold, supplied, and distributed by Defendants, and as a result of the negligence, callousness, and the other wrongdoing and misconduct of Defendants, as described herein, each Plaintiff has been injured and suffers injuries to his or her body and mind, the exact nature of which is not completely known to date.

377. Each Plaintiff has sustained economic losses, including loss of earnings and diminution of his or her earning capacity, the exact amount of which is presently unknown.

378. Each Plaintiff will be required to incur additional medical expenses in the future as a result of the injury and damages he or she has suffered.

379.    Each Plaintiff is therefore entitled to damages in an amount to be proven at trial.

380.    Defendants' conduct, and the conduct of their agent, consultant, representative, or joint venturer, Dr. Durrani, as alleged above, was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others.  Such conduct was directed specifically at each Plaintiff and as such, warrants an imposition of punitive damages.

## FACTUAL ALLEGATIONS OF PLAINTIFF THOMAS AUGST

381.    Plaintiff Thomas Augst first saw Dr. Shanti for numbness in hands and legs, pain in lower back and neck pain.  Dr. Shanti ordered MRIs at the first office visit.

382.    At the second office visit, Dr. Durrani told Plaintiff that he needed surgery.  Dr. Durrani told Plaintiff that if Plaintiff did not have surgery he would be paralyzed.  No consideration was given for conservative treatment for his symptoms.

383.    On March 5, 2011, Plaintiff had surgery at West Chester Hospital/UC Health.  Dr. Shanti performed the surgery with Dr. Durrani assisting.

384.    Infuse® was used on Plaintiff off-label, without his knowledge or consent, causing Plaintiff harm and economic loss.  Further, the surgery was not medically necessary.

385.    The use of BMP-2 increases a person's chance of cancer by 3.5%.

386.    Due to the unnecessary surgery Plaintiff has a 3.5% increased chance of cancer because of the off label, unconsented to use of BMP-2.

387.    As a direct and proximate result of the use and implementation of Infuse®, Plaintiff incurred a 3.5% increase in the risk of Cancer.  Plaintiff now has an increased fear of cancer.

388.    Plaintiff went to Dr. Durrani's surgical practice group, Center for Advanced Spine Technologies, Inc. ("**CAST**") for follow-up care.  Dr. Durrani informed Plaintiff that with time Plaintiff's pain would get better.

389.    Shortly after Plaintiff's first follow-up care appointment Dr. Durrani told Plaintiff that he needed a second surgery to correct nerve damage Plaintiff allegedly had in his right side.

390.    Plaintiff had his second surgery on June 29, 2012.  Dr. Shanti performed the surgery under Dr. Durrani's supervision.

391.    At follow-up appointments, Dr. Shanti told Plaintiff not to look up or down for long periods of time.  Dr. Shanti also told Plaintiff that Plaintiff would never work again.

392.    After the two surgeries, Plaintiff had muscle loss in his chest, shoulder, and arms with pain in his arms.  Plaintiff cannot bend or stand without pain.  Plaintiff now has nerve damage in his right hand.

393.    Before the two surgeries, Plaintiff could exercise, work, play with his kids; after the surgeries Plaintiff can no longer work, play with his children or exercise.

394.    The second surgery was also medically unnecessary.

395.    As a direct and proximate result of the two surgeries and Dr. Shanti's, Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

396.    Plaintiff did not become aware of the off-label use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF AMANDA AYRES

397.    During August 2008, Plaintiff Amanda Ayres visited her primary care physician because of low back pain, which radiated down both legs and hips. Plaintiff's primary care physician referred her to Dr. Durrani at CAST.

398.    At her first visit with Dr. Durrani at CAST, Dr. Durrani stated if she did not undergo surgery with him, her back issues would only get worse. No consideration was given for conservative treatment.

399.    In late summer of 2008, Dr. Durrani performed surgery on Plaintiff's lumbar spine at Christ Hospital. Infuse® was used on Plaintiff off-label, without her knowledge or consent, causing Plaintiff harm and economic loss.

400.    The surgery performed by Dr. Durrani using Infuse® off label was medically unnecessary.

401.    At her six week follow-up visit, Dr. Durrani told Plaintiff that she should not be in pain and that it was all in her head.

402.    Plaintiff underwent physical therapy and treated with Dr. Durrani at CAST until winter of 2008.

403.    After her surgery with Dr. Durrani, Plaintiff experienced, and continues to experience, severe pain in her lower back, hips, and legs—pain much worse than she experienced before Dr. Durrani performed surgery.

404.    As a direct and proximate result of this surgery and Dr. Durrani's actions using Infuse® off label, Plaintiff suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

405.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF JODY BAUER

406.    Plaintiff Jody Bauer first saw Dr. Durrani in March 2010 after having severe back pain.

407.    Dr. Durrani immediately scheduled surgery on the first visit.  Dr. Durrani assured Plaintiff he could fix her, it would not be a problem, and she would have no more pain following the surgery.  No consideration was given for conservative treatment.

408.    On August 4, 2010, Plaintiff underwent a L5-S1 Axial lumbar interbody fusion at West Chester Hospital.  Infuse® was used on Plaintiff off-label during this surgery, without her knowledge or consent, causing Plaintiff harm and economic loss.

409.    The surgery performed by Dr. Durrani was medically unnecessary.

410.    The use of Infuse® increases a person's chance of cancer by 3.5%.

411.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

412.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result, Plaintiff has an increased fear of cancer.

413.    Plaintiff's had follow up care at CAST from 2010-2012.

414.    During follow up care, Dr. Durrani said that the pain would get better with time.  Dr. Durrani informed Plaintiff when she complained of pain that the body was adjusting and it would take time.  Dr. Durrani also stated that Plaintiff's leg being numb would go away with therapy.

415.    Notwithstanding Dr. Durrani's representations, Plaintiff's pain still continues.  Additionally, after the back surgery Plaintiff's back pain went to the upper

part of her back where had previously been no pain. Plaintiff now has problems walking and sitting. Plaintiff is no longer employable and now suffers from depression.

416.     As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

417.     Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF MACKENZIE BENDER

418.     Plaintiff MacKenzie Bender is a minor individual. Her claims and causes of action are brought by her parents and next friends, Amy Young and Bob Bender.

419.     Plaintiff MacKenzie Bender was initially diagnosed with scoliosis in September 2008 during a sports physical exam. At this evaluation, her curvature was 7 degrees and the treatment plan was only to watchfully wait to see if there would be curvature changes.

420.     One year later, Plaintiff's curvature had increased to 12 degrees.

421.     The fall of 2010, Plaintiff has another analysis of her spine and her curvature had progressed to 37 degrees. At this point, Plaintiff's primary care physician referred her to an orthopedic surgeon, Dr. Lyon.

422.     Dr. Lyon referred Plaintiff to the Shriners Hospital for Children in Lexington Kentucky.

423.     Shriner Hospital orthopedic surgeon took an x-ray of Plaintiff's spine and revealed a curvature of 41 degrees in November 2010. The surgeon recommended bracing her until she finished growing which would be until the age of 18, in another 5 years.

424.    Plaintiff was told that bracing would not correct the curvature only stop progression of the curvature.

425.    In December 2010, Plaintiff went to see Dr. Durrani.  Dr. Durrani recommended surgery by stating that there was a new procedure that he had been a part of the research on the procedure and that the procedure was called spinal stapling.

426.    Dr. Durrani told Plaintiff that many times a patient improves by more than 50% coming right out of this type of minimally invasive surgery.  The idea of the surgery was to staple the side of the spine that exhibited accelerated growth allowing the unstapled slower growth side to catch up as Plaintiff continued to grow taller.

427.    However, in February 2011, Plaintiff's health insurance company gave pre-authorization confirmation, from Active Health Management, for primary procedure 22810 Fusion of Spine.

428.    On March 9, 2011, spine stapling surgery was performed by Dr. Durrani at UC Health/West Chester Hospital.

429.    By January 2012, an x-ray revealed that Plaintiff's curvature had increased and that some of the initial straightening provided by the surgery Dr. Durrani had performed, was lost.

430.    Dr. Durrani used Infuse® during this surgery without Plaintiff's consent or knowledge.

431.    Dr. Durrani did not obtain Plaintiff's consent to use Infuse® prior to the surgery.

432.    The use of BMP-2 increases a person's chance of cancer by 3.5%.

433.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

434. As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result Plaintiff has an increased fear of cancer.

435. Dr. Durrani did not disclose any intent to use Infuse®, and further, did not disclose any intent to use Infuse® in a way not approved by the FDA.

436. The surgery performed by Dr. Durrani was medically unnecessary.

437. As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

438. Plaintiff had to withstand a very painful surgery at a young age; Plaintiff continues to have pain from the surgery with Dr. Durrani and now also has breathing issues.

439. Plaintiff has the possibility of additional spine surgeries in her future.

440. Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

**FACTUAL ALLEGATIONS OF PLAINTIFF LINDSAY BRAY**

441. Plaintiff Lindsay Bray was referred to seek treatment with Dr. Durrani in 2009 for lower back pain.

442. Dr. Durrani immediately recommended surgery to alleviate Plaintiff's pain without any consideration of conservative treatment.

443. On December 27, 2009 Dr. Durrani performed an L5-S1 spinal fusion surgery on Plaintiff at West Chester Hospital.

444. Immediately following surgery, Plaintiff began to feel new pain in her back, tailbone, and sciatic nerve.

445. Plaintiff continued to follow up with Dr. Durrani following surgery and complained of the new and severe pain.

446. Dr. Durrani continued Plaintiff on steroid shots and physical therapy to reduce Plaintiff's pain.

447. Plaintiff still has constant and extreme pain in her lower back, sciatic nerve, tailbone and pain radiating down her right side.

448. Dr. Durrani used Infuse® "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

449. The surgery performed by Dr. Durrani was medically unnecessary .

450. As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

451. Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF SHARON BRICE

452. In 2010 Plaintiff Sharon Brice experienced pain in her lower back that radiated down both of her legs, as well as muscle spasms that brought about instability while standing.

453. Plaintiff was referred to Dr. Durrani at his CAST offices to seek a solution to her pain.

454. At her consultation, Dr. Durrani reviewed Plaintiff's MRI films and immediately recommended that Plaintiff undergo surgery. Dr. Durrani told Plaintiff that if she did not have the surgery she could end up paralyzed or, at best, in a

wheelchair because there was "little to no discs" left in her spine.  No consideration of conservative treatment was given.

455.    On May 10, 2010 Dr. Durrani performed surgery on the Plaintiff consisting of a spinal fusion from L3-L4 and L4-L5 at West Chester Hospital.  Dr. Durrani used Infuse® off-label in this first surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

456.    Plaintiff received postoperative care from CAST consisting of physical therapy and pain medication after this surgery.

457.    Shortly after this surgery, Plaintiff's pain began to increase. Plaintiff now suffered from severe pain in both legs and was often falling down without warning when her legs would no longer support her.

458.    Dr. Durrani told Plaintiff that her recovery would take time and to just continue attending her physical therapy and taking her pain medication.

459.    Almost a year after Plaintiff's surgery, she continued to suffer from increased pain. Dr. Durrani recommended that Plaintiff undergo a spinal decompression surgery.

460.    In early August 2012 Dr. Durrani performed surgery on the Plaintiff consisting of a bilateral recess decompression from L2-L3 at West Chester Hospital. Dr. Durrani used Infuse® in this second surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

461.    On August 27, 2012, within two weeks of her second surgery, Dr. Durrani performed emergency surgery to place a drain in Plaintiff's lumbar spine to correct the formation of a hematoma.   Dr. Durrani used Infuse® "off-label" in this third surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

462.    After this third surgery, Plaintiff continued to receive postoperative care from Dr. Durrani and CAST.

463.    Dr. Durrani told the Plaintiff that her recovery was simply a matter of time, however more than a year later Plaintiff still suffers under intense pain and is now forced to walk with a cane.

464.    Plaintiff continued to receive treatment with CAST until September 19, 2013 when a representative of CAST called to tell her that they would no longer be assisting her.

465.    Plaintiff now suffers from pain in her middle and lower back as well as burning sensations down her left leg. Since her last surgery Plaintiff has lost most of the sensation in her left leg.

466.    The surgeries performed by Dr. Durrani were medically unnecessary .

467.    As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

468.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel reviewed Plaintiff's bills.

### FACTUAL ALLEGATIONS OF PLAINTIFF DAWN BROWN

469.    Plaintiff was referred to Dr. Durrani by her primary care physician.

470.    Plaintiff was experiencing lower back pain radiating down the right side of her body, and numbness in right hand and foot.

471.    Dr. Durrani told Plaintiff she needed surgery right away and that if she did not have the surgery she would be paralyzed from her waist down.  No consideration was given for conservative treatment.

472.   On December 27, 2010, Dr. Durrani performed a L4-L5 and L5-S1 fusion at West Chester Hospital.

473.   After surgery, Plaintiff went to the emergency room due to swelling in her feet, legs and hands.

474.   Plaintiff was admitted into the ICU, a nurse in the ICU helped Plaintiff use the restroom and noticed 2 cuts in Plaintiff's rectum; medical staff informed Plaintiff that they had never seen anything like that in the 12 years as medical staff.

475.   Plaintiff followed-up with Dr. Durrani at CAST until approximately February 2012.

476.   Plaintiff complained of new pain in her buttocks, left sided pain all the way down to her knees; Plaintiff continued to have lower back pain, after surgery constant and more intense than before.  Dr. Durrani told Plaintiff to give it time and her pain should go away.

477.   Plaintiff sought treatment from another doctor for pain management.

478.   For two months, after surgery, Plaintiff could not move from the waist down. During these two months Plaintiff had to have assistance with preparing meals, bathing and all household chores.

479.   Dr. Durrani used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

480.   The use of Infuse® increases a person's chance of cancer by 3.5%.

481.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

482.    As a direct and proximate result of the use and implementation of Infuse®, Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result, Plaintiff has an increased fear of cancer.

483.    The surgery performed by Dr. Durrani was medically unnecessary.

484.    As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

485.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use the drug.

### FACTUAL ALLEGATIONS OF PLAINTIFF TARA BROWN

486.    In 2004 or early 2005, Plaintiff was diagnosed with Ehlers Danlos Syndrome and Hyperadrenergic P.OT.S. (Postural Orthostatic Tachycardia Syndrome).

487.    Plaintiff received treatment at Children's Hospital from a geneticists and heart specialist for pain related to her condition. At one of these office visits, Dr. Tinkle referred Plaintiff to Dr. Durrani because Dr. Tinkle told Plaintiff some people with EDS have instability in the cervical spine.

488.    Plaintiff first visited Dr. Durrani at his CAST office in Kentucky.  Dr. Durrani immediately recommended a C1-C2 cervical fusion surgery during this first office visit.   No consideration was given for conservative treatment.

489.    Plaintiff had a C1-C2 cervical fusion surgery with Dr. Durrani in early October 2011 at West Chester Hospital.  During the surgery, Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

490.     The use of Infuse® increases a person's chance of cancer by 3.5%.

491.    This surgery was not medically necessary.

492.    Due to the unnecessary surgery performed on Plaintiff by Dr. Durrani, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

493.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

494.    Plaintiff woke up after surgery noticing she was in pain.

495.    After surgery Plaintiff was bedridden for weeks, her recovery was long and painful.

496.    Before the surgery with Dr. Durrani, Plaintiff did not have any pain; now Plaintiff has pain in her neck and head, she has lost mobility, has difficulty sleeping, and is limited in the activities that she can perform.

497.    Plaintiff had brief office visits for post-operative care at Dr. Durrani's CAST office.

498.    As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

499.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF KAYLA BURTON

500.    During August 2007, Plaintiff Kayla Burton went to see her doctor, Dr. Goodlander, about dizziness and back pain.

501.    Plaintiff was referred to Mason Montgomery Children's Hospital; x-ray's were taken and revealed a cracked vertebrae.

502.    Dr. Goodlander referred Plaintiff to Dr. Durrani at Cincinnati Children's Hospital.

503.    During October of 2007, Plaintiff had her first appointment with Dr. Durrani.  At the first office visit Dr. Durrani ordered MRI and CT scans.

504.    At the second office visit, Dr. Durrani told Plaintiff that she had spondylolisthesis.

505.    Dr. Durrani told Plaintiff that the vertebrae would keep collapsing on each other and would cause Plaintiff more pain.

506.    Dr. Durrani told Plaintiff that after surgery she "would be as good as new, with no restrictions."

507.    On February 11, 2008, Plaintiff had spine surgery at Children's Hospital.

508.    Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

509.    The surgery performed by Dr. Durrani was medically unnecessary .

510.    The use of Infuse® increases a person's chance of cancer by 3.5%.

511.    Due to the unnecessary surgery Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

512.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result, Plaintiff has an increased fear of cancer.

513.    After surgery, Plaintiff was in a lot of pain. Due to Plaintiff's severe pain Children's Hospital kept her a day longer.

514. On February 26, 2008, Plaintiff saw Dr. Durrani at Children's for follow-up care and at this time Dr. Durrani recommended physical therapy. Plaintiff completed all the required and requested physical therapy.

515. On May 20, 2008, Plaintiff had her second post-operative visit with Dr. Durrani at which time she complained of pain.

516. Dr. Durrani told Plaintiff that she would be able to return to playing sports and she was never able to do so.

517. Plaintiff can no longer carry her text books due to pain.

518. Plaintiff cannot pull, push, or lift more than 50 pounds; cannot sit Indian style, cannot stand for long periods of time, and cannot sit for long periods of time.

519. As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, the Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

520. Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use INFUSE®.

### FACTUAL ALLEGATIONS OF PLAINTIFF TIMOTHY BYRD

521. Plaintiff Timothy Byrd was injured in a work accident on December 1, 2006. He was taken to University Hospital for emergency treatment.

522. Dr. Durrani was working as a surgeon for University Hospital and examined Plaintiff.

523. Dr. Durrani recommended immediate surgery for Plaintiff. No consideration for conservative treatment was given.

524. On December 3, 2006, Dr. Durrani performed spinal fusion surgery on Plaintiff at University Hospital.

525.   Plaintiff had an increase in pain and a loss in range of movement following surgery.

526.   When Plaintiff inquired about this, Dr. Durrani told Plaintiff to "go back to school because you will never work again."

527.   Plaintiff continues to suffer from back pain because of the surgery performed by Dr. Durrani.

528.   Dr. Durrani recommended a possible follow up surgery but Plaintiff elected against treating with him again.

529.   Plaintiff continues to suffer from constant back pain.

530.   Dr. Durrani used Infuse® off label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

531.   The surgery performed by Dr. Durrani was medically unnecessary .

532.   The use of Infuse® increases a person's chance of cancer by 3.5%.

533.   Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

534.   As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  Plaintiff has an increased fear of cancer.

535.   As a direct and proximate result of Mr. Byrd's surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

536.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF RICHARD CAMPBELL

537.    Plaintiff Robert Campbell first saw Dr. Durrani in December 2010 for pain in his lower back that radiated down his right leg.

538.    After taking X-rays and an MRI, Dr. Durrani immediately recommended surgery as soon as possible.  No consideration was given to conservative treatment.

539.    Although Dr. Durrani claimed he was "booked" until January 2012, he was able to "squeeze" in Mr. Campbell on December 15, 2010.  Dr. Durrani told Mr. Campbell that after the surgery that Mr. Campbell would be pain free and be able to go back his life with no restrictions within 6 months.

540.    On December 15, 2010, Dr. Durrani performed an Axialif procedure at L4-L5 and L5-S1.

541.    During the surgery, Defendants, through Dr. Durrani, experimentally used Infuse® off-label without Robert Campbell's consent or knowledge.

542.    Plaintiff's consent to use Infuse® off-label was never obtained prior to the surgery or ever.

543.    It was never disclosed to Plaintiff that Infuse® would be used in him off-label, and further, that Infuse® would be use in a way not approved by the FDA.

544.    The surgery performed by Dr. Durrani was medically unnecessary.

545.    Mr. Campbell saw Dr. Durrani a few weeks later for a follow up and explained he was still in pain, to which Dr. Durrani assured him the sciatica nerve was still in motion and had to "calm down."  Dr. Durrani prescribed gabapentin and a topical lotion for the pain.

546.    At another follow up visit a few weeks later, Dr. Durrani angrily told Mr. Campbell to "keep taking the damn pills!" Dr. Durrani recommended visiting a pain management specialist.

547.    Mr. Campbell's pain eventually began to subside, but has recently begun to worsen.

548.    Mr. Campbell's pain has begun to get worse and his mobility has diminished.

549.    He has been unable to return to his active lifestyle and cannot run or play soccer at all.

550.    Plaintiff is in pain all of the time, and has missed work because of it. He feels Dr. Durrani made his pain worse, and then abandoned him.

551.    As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

552.    Given his worsening condition, Mr. Campbell made an appointment with a spine specialist at Beacon Orthopedics for September 23, 2014, and was told he would be seeing a Dr. Chanduri.

553.    Mr. Campbell obtained his Medical Records from WCH/UC Health and dropped them off at Beacon Orthopedics.

554.    He received a call from Dr. Chanduri's office stating that Dr. Chanduri would have to review the records before agreeing to see Mr. Campbell.

555.    A few days later, Mr. Campbell received a call from Beacon Orthopedics stating that while Dr. Chanduri had agreed to see him, he would not provide any

commentary or dialog regarding anything Dr. Durrani had done. This caused Mr. Campbell to become nervous and cancel his appointment at Beacon.

556. Mr. Campbell contacted counsel shortly thereafter.

557. Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use INFUSE®.

## FACTUAL ALLEGATIONS OF PLAINTIFF JACOB COTTER

558. When he was 12 years of age, Plaintiff Jacob Cotter was referred to Dr. Durrani at Children's Hospital for numbness in his fingers due to Klippel-Feil Syndrome.

559. At Plaintiff's first visit with Dr. Durrani, Dr. Durrani initially recommended surgery, then changed his mind, deciding it would be better to wait about one year due to risks involved in the procedure.

560. After approximately one year from this initial consultation, Dr. Durrani operated on Jacob. Specifically, on September 19, 2008, at Children's Hospital, Dr. Durrani performed a suboccipital craniectomy at C1–2, a laminectomy at C1, and a posterior spinal fusion at C1–2.

561. Dr. Durrani used Infuse® without Jacob or Jacob's parents' knowledge or consent, causing Jacob harm and economic loss.

562. The surgery Dr. Durrani performed on Jacob was performed improperly and medically unnecessary.

563. After his surgery, Jacob experienced new, severe pain and developed a staph infection.

564. Dr. Durrani, however, told Jacob and his parents that his surgery was a success and that the staph infection was nothing about which to worry.

565. Eventually, Jacob's incision tore open, and his parents took him to Children's Hospital. Because Dr. Durrani was not available, other doctors treated Jacob, who tested Jacob positive for gram- and gram + Staphylococcus, requiring the Infectious Disease unit to become involved in Jacob's treatment.

566. Dr. Dorothy Brady of the Infection Disease unit told Jacob's mother that Jacob was only hours away from death when she brought him into the hospital because of this very serious infection.

567. Dr. Durrani was aware of Jacob's condition but did not come to visit Jacob at the hospital until the next day.

568. At this point, Jacob's parents became very disappointed with Dr. Durrani's treatment (or lack thereof) of Jacob and therefore, Dr. Mangano took Dr. Durrani's place of treating Jacob.

569. On September 29, 2008, a plastic surgeon closed Jacob's incision wound. Jacob required antibiotics for 12–14 weeks, missing half of his school year.

570. During this time, Dr. Brady from the Infectious Disease unit treated Jacob.

571. Currently, Jacob experiences worse pain than ever before, requiring pain medications, muscle relaxants, and constant monitoring and management.

572. The use of Infuse® increases a person's chance of cancer by 3.5%.

573. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

574. As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. Plaintiff has an increased fear of cancer.

575. As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Jacob has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

576. Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use INFUSE®.

## FACTUAL ALLEGATIONS OF PLAINTIFF BARBARA COUCH

577. Plaintiff Barbara Couch sought treatment with Dr. Durrani at his CAST office for herniated disks in her back and neck.

578. During Plaintiff's first appointment with Dr. Durrani, she complained of pain in lower, mid, and upper back with pain radiating in the legs and numbness in the legs.

579. Dr. Durrani recommended a fusion with instrumentation for Plaintiff at the first office visit. No consideration of conservative treatment was made.

580. Dr. Durrani performed surgery on Plaintiff's L5-S1 at Christ Hospital in October 2007.

581. The surgery performed by Dr. Durrani was medically unnecessary .

582. Dr. Durrani used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

583. The use of Infuse® increases a person's chance of cancer by 3.5%.

584. Due to this unnecessary surgery that Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

585. As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

586.     Plaintiff followed-up with Dr. Durrani at CAST after her surgery. Plaintiff complained of pain that was now constant and worse than prior to surgery.

587.     When Plaintiff complained of pain, Dr. Durrani told Plaintiff to give it time and she would heal from surgery.

588.     Plaintiff continued to follow-up with Dr. Durrani at his CAST offices, which is when he told Plaintiff she needed a revision surgery.

589.     Dr. Durrani performed surgery at West Chester Hospital in October 2010. This surgery was also medically unnecessary .

590.     Plaintiff followed-up with Dr. Durrani, at CAST, until approximately 2011.

591.     After two surgeries with Dr. Durrani, Plaintiff now has difficulty walking for extended periods of time, difficulty with washing dishes and vacuuming her home. Plaintiff lives in constant pain after her two surgeries with Dr. Durrani.

592.     As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

593.     Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF TODD GREEN

594.     Plaintiff Todd Greene was experiencing severe back pain at the first time he saw Dr. Durrani.

595.     Dr. Durrani recommended surgery when he first met with Plaintiff.  No consideration was given for conservative treatment.

596.   Plaintiff had a C3-C6 fusion surgery by Dr. Durrani at Christ Hospital in April 2007.

597.   The surgery performed by Dr. Durrani was medically unnecessary .

598.   Dr. Durrani used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

599.   The use of Infuse® increases a person's chance of cancer by 3.5%.

600.   Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

601.   As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result, Plaintiff has an increased fear of cancer.

586.   Following the surgery, Plaintiff has neck stiffness, sharp pain in the lower back and neck, and pain close to the shoulder blades, and new pain in his shoulder and collarbones.

602.   As a direct and proximate result of the surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

587.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

**FACTUAL ALLEGATIONS OF PLAINTIFF DAVID HARRIS**

588.   Plaintiff David Harris was first referred to Dr. Durrani from Westside Pediatrics in mid-2005.

589.   At Plaintiff's first office visit with Dr. Durrani, at Cincinnati Children's Hospital Medical Center, Plaintiff complained of shooting pain from mid to lower back.

Dr. Durrani told Plaintiff that he needed surgery. No consideration was given for conservative treatment.

590. In May 2006, Dr. Durrani performed surgery on Plaintiff at Children's Hospital.

591. The surgery performed by Dr. Durrani was medically unnecessary.

592. Dr. Durrani used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

593. The use of Infuse® increases a person's chance of cancer by 3.5%.

594. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

595. As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result Plaintiff has an increased fear of cancer.

596. After Plaintiff's surgery with Dr. Durrani, Plaintiff noticed he now had numbness in his legs.

597. After surgery with Dr. Durrani, Plaintiff is in more pain than prior to surgery and his leg numbness hinders all aspects of Plaintiff's daily life.

603. As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

598. Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF ADAM HARTMAN

621.    Plaintiff Adam Hartman was referred to Dr. Durrani in the summer of 2008 by a friend of his mother.  At the time, Plaintiff had been experiencing pain in his back for a few years.  It was an intermittent aching pain that only rarely limited Plaintiff's activities.

622.    During their first consultation, Dr. Durrani immediately recommended that Plaintiff undergo a spinal fusion.  Conservative treatment was not given any consideration.  Dr. Durrani informed the Plaintiff that if he did not have the surgery that he would "be in a wheelchair by the time [he was] 20."

623.    In November 2008, Dr. Durrani performed surgery on the Plaintiff consisting of an axial lumbar interbody fusion and disc replacement at Children's Hospital.

624.    Dr. Durrani used Infuse® "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

625.    Plaintiff received postoperative care from Dr. Durrani and CAST following this surgery, but by December of that year his pain was worse than it had been prior to the surgery.

626.    Plaintiff returned to Dr. Durrani seeking additional treatment.

627.    Dr. Durrani informed the Plaintiff that he would need to have an additional surgery to install hardware, and that this surgery would get rid of his pain.

628.    In January 2009, Dr. Durrani performed another surgery on the Plaintiff consisting of the installation of hardware on Plaintiff's lumbar spine at Children's Hospital.

629.     Dr. Durrani used Infuse® "off-label" during this second surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

630.     Plaintiff continued to receive follow-up treatment with Dr. Durrani and CAST after this second surgery.

631.     Since the surgery, Plaintiff has lost a significant amount of flexibility, and now suffers from constant burning and stabbing pains in his back.

632.     Plaintiff last consulted with Dr. Durrani in the summer of 2009.

633.     Plaintiff's pain continues to increase, and has now radiated into his neck and legs from his lower back.

634.     The surgeries performed by Dr. Durrani were medically unnecessary.

635.     The use of Infuse® increases a person's chance of cancer by 3.5%.

636.     Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

637.     As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  Plaintiff has an increased fear of cancer.

604.     As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

638.     Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel reviewed Plaintiff's medical bills.

### FACTUAL ALLEGATIONS OF PLAINTIFF THERESA HELTON

639.     During January 2009, Plaintiff Theresa Helton sought out treatment for pain that she had been experiencing in her lower back for years.  Bethesda Family

Practice referred Plaintiff to Dr. Durrani. Plaintiff was told that Dr. Durrani could work miracles.

640.    At the first appointment at Deaconess Hospital, Dr. Durrani told Plaintiff she needed "minor" surgery. Dr. Durrani told Plaintiff that she needed an immediate spinal fusion to stop further damage to her spine. Dr. Durrani told Plaintiff that she would be back on her feet within 1-2 weeks of the surgery. Dr. Durrani also told Plaintiff that she would have a 2-inch incision site with no scar. Conservative treatment was not given any consideration.

641.    Dr. Durrani performed surgery on April 24, 2009, at Deaconess Hospital. Dr. Durrani performed a fusion with instrumentation on Plaintiff at L4-S1.

642.    Dr. Durrani used Infuse® off-label, without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

643.    The surgery performed by Dr. Durrani was medically unnecessary.

644.    The use of Infuse® increases a person's chance of cancer by 3.5%.

645.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

646.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. Plaintiff has an increased fear of cancer.

647.    After Plaintiff awoke from surgery, Plaintiff began experiencing immediate pain.

648.    At home, Plaintiff was unable to sit-up and was bed-ridden for weeks due to pain.

649.    Plaintiff informed Dr. Durrani at her follow-up appointments that she was having pain in her low back.  Dr. Durrani told Plaintiff that she needed to toughen up and go to physical therapy.

650.    Plaintiff asked Dr. Durrani why she was not up and moving like Dr. Durrani had informed Plaintiff she would be at this stage in her recovery; Dr. Durrani responded by telling Plaintiff she was overweight and that needed to be addressed.

651.    After four months post surgery, Plaintiff could walk without the assistance of a walker.

652.    Plaintiff still must take pain medication to get through her day.

653.    Plaintiff started treating with a pain specialist in 2010 and still treats with a pain specialist.

654.    Plaintiff was not able to return to work, at any point in time, after Dr. Durrani performed surgery on Plaintiff.

655.    Since Plaintiff's surgery with Dr. Durrani, Plaintiff has been placed on disability.

656.    Plaintiff is unable to perform everyday tasks like cooking and cleaning.

657.    Plaintiff still has severe back pain that she deals with on a daily basis.

605.     As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

658.     Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF MARTHA HUTTON

671.    Plaintiff Martha Hutton was referred to Dr. Durrani in 2008 by her primary care physician, Dr. Timothy Linker.  At the time, Plaintiff was experiencing some lower back pain that had begun to radiate down into her legs.

659.    Dr. Durrani immediately recommended that Plaintiff undergo surgery to correct her low back pain.  Conservative treatment was not given any consideration.

672.    On October 11, 2008, Dr. Durrani performed surgery on the Plaintiff consisting of a lumbar spinal fusion from L5-S1 at Christ Hospital.

673.     Dr. Durrani used Infuse® "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

674.    This surgery performed by Dr. Durrani was medically unnecessary.

675.    Plaintiff received post-operative care from Dr. Durrani periodically over the next six months at his CAST office in Blue Ash.

676.    After this surgery, Plaintiff lost a measure of her flexibility but otherwise experienced no decrease in pain.  Dr. Durrani told the Plaintiff that her recovery was "great" and that she should continue coming in for regular postoperative care.

677.    However, in late 2011 Dr. Durrani recommended that the Plaintiff undergo an additional surgery.

678.    On March 9, 2012, Dr. Durrani performed surgery on the Plaintiff consisting of a bone spur removal that had developed at the site of Plaintiff's previous surgery at West Chester Medical Center.

679.    This surgery performed by Dr. Durrani was also medically unnecessary.

680.     Dr. Durrani used Infuse® off-label in this second surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

681. After this surgery, Plaintiff continued to receive post-operative care from Dr. Durrani at his CAST office.

682. Plaintiff continues to suffer from increased low back pain that is growing increasingly worse.

683. Plaintiff is now unable to stand, sit, or lie down unaided for more than a short period of time without suffering from tremendous pain.

684. The use of Infuse® increases a person's chance of cancer by 3.5%.

685. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

686. As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. Plaintiff has an increased fear of cancer.

606. As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

687. Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel reviewed Plaintiffs' medical records.

## FACTUAL ALLEGATIONS OF PLAINTIFF JEFFREY HYDE

690. Plaintiff Jeffrey Hyde was experiencing pain in his low back and numbness in his left leg in May 2008 when he was referred to Dr. Durrani at Children's Hospital. During Plaintiff's office visit with Dr. Durrani, he immediately recommended that Plaintiff undergo surgery for L5-S1. Conservative treatment was not given any consideration.

691. On July 2, 2008, Dr. Durrani performed a lumbar area surgery on Plaintiff at Christ Hospital.

692. Dr. Durrani used Infuse® off label without Plaintiff's knowledge or consent, causing him harm and economic loss.

693. This surgery performed by Dr. Durrani was medically unnecessary.

694. Following this first surgery, Plaintiff continued to treat with Dr. Durrani.

695. Plaintiff continued to experience pain and ended up going to the West Chester Emergency Room. Plaintiff continued experiencing pain and Dr. Durrani recommended another surgery.

696. On August 27, 2009, Dr. Durrani performed a laminectomy at L1-L2 and Posterior spinal fusion with instrumentation at L1-L5 using allograft at West Chester Hospital/UC Health.

697. Dr. Durrani again used Infuse® "off-label" in this second surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

698. This second surgery performed by Dr. Durrani was also medically unnecessary.

699. Following this surgery, Plaintiff continued to treat with Dr. Durrani and CAST.

700. Plaintiff continued to complaint about pain being at a 6 on the pain scale and was continuing use of pain medications to get through his day.

701. Plaintiff told Dr. Durrani that he still had leg numbness and now foot numbness, and that everything from his waist down, on the left side, was numb.

702. Plaintiff complained that he had sexual complications and had tried other medical means to aid the issue, to no avail.

703.    The use of Infuse® increases a person's chance of cancer by 3.5%.

704.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

705.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  Plaintiff has an increased fear of cancer.

706.    Plaintiff now experiences new, different and worse pain than he did prior to his treatment with Dr. Durrani and CAST, Children's and West Chester/UC Health.

707.    As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

708.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use the drug.

## FACTUAL ALLEGATIONS OF PLAINTIFF ALYSSA JACKSON

709.    Plaintiff Alyssa Jackson first started having back pain in 2004.  Plaintiff visited her primary care physician, Dr. Singh Murthy.  Dr. Murthy recommended Plaintiff seek treatment from Dr. Durrani.

710.    At her first visit with Dr. Durrani, Plaintiff was told she had spondyloslisthesis.  Dr. Durrani recommended Plaintiff undergo surgery, even though she was 16 years old at the time.  Conservative treatment was not given any consideration.

711.    Dr. Durrani performed surgery on Plaintiff in November 2006 at Children's Hospital.

712.     Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

713.     The use of Infuse® increases a person's chance of cancer by 3.5%.

714.     Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

715.     As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  Plaintiff has an increased fear of cancer.

716.     After surgery, Plaintiff was in pain and the pain did not improve.  Dr. Durrani told Plaintiff that her pain would get better over time, but it did not.

717.     Plaintiff went to physical therapy and performed all the required exercises that the physical therapist requested.

718.     Plaintiff attempted engaging in everyday activities, like running, and was unable to engage to do so without experiencing excruciating pain.  Dr. Durrani told Plaintiff that she was no longer able to run.

719.     Dr. Durrani suggested that Plaintiff try steroid injections for the pain.

720.     On June 22, 2009, Plaintiff had a revision surgery at Deaconess Hospital. Dr. Durrani informed Plaintiff that one of the rods in her back bent and damaged vertebrae, so Dr. Durrani added 2 more screws and replaced the rod.

721.     After this surgery Plaintiff lost significant flexibility.

722.     Plaintiff is still unable to run, has decreased range of motion and flexibility, and is unable to lie on her back without experiencing horrible amounts of pain.

723.     The surgery performed by Dr. Durrani was medically unnecessary.

724.    As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

725.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

**FACTUAL ALLEGATIONS OF PLAINTIFFS TRACY JANSON**

726.    Plaintiff Tracy Janson first began experiencing low back pain in 2000 and injured his back in 2006.  He was referred to Dr. Durrani for back discomfort and pain by Dr. Saul Blecher in the spring of 2008.

727.    Mr. Janson met with Dr. Durrani at his Children's Hospital office in spring of 2008.  His chief complaint was he could not "stand up straight" due to back pain. Dr. Durrani immediately recommended surgery, telling Mr. Janson that this surgery would immediately remove all pain and allow him to stand straight. Conservative treatment was not given any consideration.

728.    In September, 2008, Dr. Durrani performed an L5-S1 spinal fusion on Mr. Janson.

729.    Dr. Durrani used either Infuse® off label during Plaintiff's surgery without his knowledge or consent, causing Plaintiff harm and economic loss.

730.    After Mr. Janson was released from Children's Hospital, he continued follow-up care with Dr. Durrani.  Mr. Janson expressed to Dr. Durrani that his pain had increased and he now was having trauma and nightmares based on being awake during the surgery.  Dr. Durrani recommended another follow up surgery so that Mr. Janson "could return to work" and not feel any more pain.

731.     When Mr. Janson refused another surgery, Dr. Durrani dropped him as a patient from his care and refused to treat him.  Mr. Janson then returned to his original doctor who had referred him to Dr. Durrani.  Mr. Janson then sought medical treatment for the additional pain and suffering incurred after the surgery.

732.     Dr. Durrani's abrupt removal of medical treatment left Mr. Janson with substantial unnecessary pain and suffering.

733.     The surgery performed by Dr. Durrani was medically unnecessary.

734.     The use of Infuse® increases a person's chance of cancer by 3.5%.

735.     Due to the unnecessary surgery Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

736.     As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  Plaintiff has an increased fear of cancer.

737.     Further, as a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

738.     Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

**FACTUAL ALLEGATIONS OF PLAINTIFF JACQUELINE JUDKINS**

739.     Plaintiff Jacqueline Judkins was referred to Dr. Durrani by a family member for her migraines headaches, numbness and tingling of arms and fingers, back pain, tingling in legs and toes.

740.     Plaintiff had visits with Dr. Shanti, who was under the direction and supervision of Dr. Durrani.  Dr. Shanti informed Plaintiff that Dr. Durrani believed

Plaintiff had degenerative disc disease, herniated discs, and immediate surgery was required or she would be paralyzed.

741.    Dr. Shanti, directed by Dr. Durrani, performed a C5-C6 spinal fusion with instrumentation on March 9, 2011 at West Chester Hospital/UC Health.

742.    Infuse® was used on Plaintiff off-label, without her knowledge or consent, causing Plaintiff harm and economic loss.  Further, the surgery was not medically necessary.

743.    At Plaintiff's follow-up appointments, at CAST, Plaintiff complained of mid- and low back pains with tingling in her legs and toes.

744.    Dr. Durrani and Dr. Shanti recommended that Plaintiff have a lower lumbar fusion surgery.

745.    On October 31, 2012 at WCH, Dr. Shanti with Dr. Durrani directing, performed a L4-L5 fusion with instrumentation.

746.     During this surgery, Plaintiff's blood vessel were cut, this resulted in more pain and more numbness.

747.    Infuse® was again used on Plaintiff off-label, without her knowledge or consent, causing Plaintiff harm and economic loss.  Further, the surgery was not medically necessary.

748.    Dr. Shanti and Dr. Durrani recommended a third surgery.

749.    On December 7, 2012, Dr. Shanti under the direction of Dr. Durrani performed a L4-L5 fusion with instrumentation at West Chester Hospital.

750.    Plaintiff had follow-up appointments with Dr. Shanti and Dr. Durrani at CAST until December 2013 or January 2014.

751.    Currently, Plaintiff experiences pain in her hips down to her toes, she has right thigh numbness with tingling.  Plaintiff has a implanted pain stimulator in her spine; however, this pain stimulator does not help with her lower back pain.

752.    After three surgeries, under Dr. Durrani's direction and discretion, Plaintiff is now disabled, she had difficulty with intimacy, has difficulty being touched at the incision site, and cannot perform household chores, Plaintiff's fiancée has to help her with everyday tasks.

753.    The use of Infuse® increases a person's chance of cancer by 3.5%.

754.    Due to the unnecessary surgeries performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

755.     As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result Plaintiff has an increased fear of cancer.

756.    As a direct and proximate result of these surgeries and the wrongful conduct performed under and attributable to Dr. Durrani and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

757.     Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF MICHELLE KEPLINGER

758.    Plaintiff Michelle Keplinger first visited Dr. Durrani for neck and low back pain.  At the first office visit, Dr. Durrani took MRIs.  After reviewing the MRIs, Dr. Durrani told Plaintiff she needed to undergo surgery because she had cervical disk disease.  Conservative treatment was given no consideration.

759.    On October 28, 2008, Dr. Durrani performed anterior cervical disectomy and fusion at C5-C6 at Christ Hospital.

760.    Dr. Durrani used Infuse® "off-label" without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

761.    The surgery performed by Dr. Durrani was medically unnecessary.

762.    After surgery Plaintiff's pain was much worse than she expected.

763.    On February 6, 2009, approximately two months after Plaintiff's neck surgery, Dr. Durrani performed a Percutaneous L5-S1 with facet screws at Christ Hospital.

764.    After Plaintiff's back surgery, Plaintiff's pain was much worse and Dr. Durrani's recommendation for controlling the pain was more pain pills.

765.    At a follow up appointment at CAST, Dr. Durrani told Plaintiff that she had a spot on her spinal cord and needed surgery immediately.

766.    On August 29, 2012, Dr. Durrani performed a T10-T11 Posterior spinal fusion with Instrumentation; a T10-T11 Laminectomy; and T10-T11 Bilateral Foraminotomies; Decompression of the left nerve root with Allo and Autografts.

767.    After two surgeries with Dr. Durrani, Plaintiff now has difficulty turning her head, she must have assistance with the cleaning of her home, and she is unable to garden, which was one of her passions.

768.    Plaintiff has pain 24/7, she is unable to play with her grandchildren or pick them up, and has significant scarring.

769.    Plaintiff has since treated with Dr. Rohmiller and he has recommended Plaintiff have a revision surgery to properly fuse the thoracic spine.

770.    The surgeries performed by Dr. Durrani were medically unnecessary.

771. The use of Infuse® increases a person's chance of cancer by 3.5%.

772. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

773. As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. Plaintiff has an increased fear of cancer.

774. As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

775. Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF MARTHA KIBLER

776. Plaintiff Martha Kibler's primary care physician referred her to Dr. Durrani in 2008 at CAST in Blue Ash. Plaintiff sought treatment for her chronic moderate-to-severe pain in her neck and back.

777. At the first office visit, Dr. Durrani told Plaintiff she needed surgery starting with her neck and then later her back. No consideration was given for conservative treatment.

778. Dr. Durrani performed a laminiectomy and C5-C6 fusion on Plaintiff in August 2009 at West Chester Hospital.

779. Dr. Durrani used Infuse® "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

780. This surgery performed by Dr. Durrani was medically unnecessary.

781. The use of Infuse® increases a person's chance of cancer by 3.5%.

782. Due to the unnecessary surgery that Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

783. As a direct and proximate result of the use and implementation of Infuse®, Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

784. Plaintiff went to CAST for follow-up care.

785. Plaintiff told Dr. Durrani that her neck was bothering her.

786. Dr. Durrani told Plaintiff that she needed another surgery this time for her lower back.

787. In January 2013, Dr. Durrani performed a L4-L5 fusion on Plaintiff at West Chester Hospital.

788. At a follow-up visit, Dr. Durrani told Plaintiff she would need a third surgery to rid her of her pain, but this surgery would be extensive and a very difficult surgery.

789. Before Plaintiff could have this surgery Dr. Durrani fled the country.

790. After the two surgeries, Plaintiff is no longer able to do household chores without assistance.

791. Plaintiff currently has pain in her neck and lower back, as well as numbness in her hands.

792. After two surgeries with Dr. Durrani, Plaintiff is disabled due to chronic debilitating pain.

793. The two surgeries performed by Dr. Durrani were medically unnecessary.

794.    As a direct and proximate result of the surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

795.   2634.  Plaintiff did not become aware the use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF KATIE LEHMKUHL

796.    Plaintiff Katie Lehmkuhl was referred to Dr. Durrani by a cardiologist with whom she was employed.

797.    Plaintiff sought treatment with Dr. Durrani at his Christ Hospital office for mild to moderate pain, muscle tightness, right shoulder blade pain, and lower upper back pain.  During the first office visit, Dr. Durrani did not recommend physical therapy.  Dr. Durrani told Plaintiff to wait and see if the curvature of her spine increased.

798.    Three months later during Plaintiff's second office visit, Dr. Durrani told Plaintiff that she needed surgery for scoliosis.

799.    Plaintiff was diagnosed with scoliosis at a young age.  She wore a back brace for a period of time; however, other doctors had told Plaintiff that her spine was stable and that she did not need surgery.  Plaintiff told Dr. Durrani she wanted a second opinion; however, Dr. Durrani told Plaintiff that there was no time for a second opinion.  Dr. Durrani told Plaintiff that if she did not have the surgery the scoliosis would affect her lungs and eventually her heart.

800.   Dr. Durrani performed surgery on Plaintiff on August 8, 2008, at Christ Hospital.  Specifically, Dr. Durrani performed a video assisted thoracic surgery,

anterior release with cage insertion and fusion from T4-T5 to T11-T12, followed by percutaneous posterior spinal fusion with instrumentation of T3-L1.

801.   After surgery, Dr. Durrani told Plaintiff that she was the first adult that he had performed a video assisted thoracic surgery, anterior release with cage insertion and fusion from T4-T5 to T11-T12 followed by percutaneous posterior spinal fusion with instrumentation of T3-L1 surgery on.

802.   At the last minute Dr. Durrani changed the procedure he was to perform without Plaintiff's consent.

803.   Dr. Durrani used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

804.   The surgery performed by Dr. Durrani was medically unnecessary.

805.   The use of Infuse® increases a person's chance of cancer by 3.5%

806.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

807.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

808.   Plaintiff continued to follow-up with Dr. Durrani at his Christ Hospital office and his CAST offices.

809.   Plaintiff complained of increased upper back pain and neck pain.  She also told Dr. Durrani that she was having muscle spasms and trouble swallowing.

810.   Dr. Durrani told Plaintiff that her neck pain was not related to her surgery and that she had herniated disks in her neck.  Plaintiff later found out, that she never had a herniated disk in her neck.

811.    A few months after this office visit with Dr. Durrani, another doctor diagnosed Plaintiff with an inflamed esophagus, which started after surgery.

812.    Dr. Durrani recommended injections to help with Plaintiff's pain; however, the injections did not help with Plaintiff's pain.

813.    Plaintiff now has constant pain in her upper back, pain behind her shoulder blades and adjacent to her spine, constant neck and back stiffness, trouble swallowing, inflammation in the esophagus, numbness of the upper back and tailbone region, sciatic nerve pain, muscle spasms, headaches, and arm weakness.

814.    Due to her pain, Plaintiff was forced to reduce her work hours from 40-32 hours a week, she suffers from anxiety and depression and has difficulty with washing dishes, sweeping, and folding laundry.

815.    As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

816.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel reviewed her records.

## FACTUAL ALLEGATIONS OF PLAINTIFF KIMBERLY LUSE

817.    Plaintiff Kimberly Luse was treating at EHR Family Chiropractics in 2007 for pain in her neck and back. Plaintiff was first referred to Dr. Durrani by one of its chiropractors.

818.    At Plaintiff's first office visit with Dr. Durrani at Children's Hospital, Dr. Durrani ordered MRIs. At the second office visit Dr. Durrani told Plaintiff she needed surgery. No attempt at conservative treatment was attempted.

819.    On April 4, 2008 Dr. Durrani performed a C6-C7 ACDF surgery on Plaintiff at Christ Hospital.

820.     Dr. Durrani used Infuse® "off-label," without Plaintiff's knowledge or consent, causing her harm and economic loss.

821.    The surgery performed by Dr. Durrani was medically unnecessary.

822.    The use of Infuse® increases a person's chance of cancer by 3.5%.

823.    Due to the unnecessary surgery that Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

824.    As a direct and proximate result of the use and implementation of Infuse®, Plaintiff has incurred a 3.5% increase in the risk of cancer.   As a result Plaintiff has an increased fear of cancer.

825.    Plaintiff attended follow-up appointments with Dr. Durrani at CCHMC. During those appointments, Plaintiff complained of upper back and neck pain and discomfort with swallowing.  In addition, Plaintiff has lost flexibility and has headaches, vertigo, and neck and arm pain.

826.    As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

827.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

**FACTUAL ALLEGATIONS OF PLAINTIFF MARY MAUNTEL**

828.    Plaintiff Mary Mauntel is a minor individual.  Her claims and causes of action are brought by her parent and next friend, Donald Mauntel.

829.    Plaintiff Mary Mauntel treated with her pediatrician because she was falling at school, and her parents and the school were concerned.  Plaintiff was referred to Dr. Durrani.

830.    Plaintiff had her first visit with Dr. Durrani on November 24, 2007, at Children's Hospital.  Dr. Durrani told Plaintiff and Donald Mauntel, Mary's father, that Mary's spinal cord was being pinched due to instability in her spine.  Dr. Durrani told Plaintiff that surgery was the only option and that if surgery was not performed as soon as possible, then Mary would become paralyzed.  Conservative treatment was not considered.

831.    Dr. Durrani performed a fusion at C2-C3 on December 21, 2007, at Children's Hospital.  At this time, Plaintiff was approximately 9 years old.

832.    Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

833.    The surgery performed by Dr. Durrani on Plaintiff was medically unnecessary.

834.    The use of Infuse® increases a person's chance of cancer by 3.5%.

835.    Due to the unnecessary surgery Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

836.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

837.    Plaintiff had three follow-up appointments with Dr. Durrani at Children's Hospital.  Dr. Durrani told Plaintiff and Donlad Mauntel during those appointments that Mary's pain would get better with time.

838.    Since surgery with Dr. Durrani, Plaintiff's pain has not resolved.  She has become frightened of all doctors, is aggressive to others, and has lost flexibility.  Before surgery with Dr. Durrani, Mary Mauntel had a 10-15-word vocabulary, now she speaks about only five words.

839.    As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

840.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

**FACTUAL ALLEGATIONS OF PLAINTIFF KERRY MCNEAL**

841.    In 2009, Plaintiff Kerry McNeal began experiencing pain in his neck, chest, left arm, thumb, and index finger.  Dr. Durrani had previously performed surgery on Mr. McNeal's son.  On March 3, 2009, Mr. McNeal visited Dr. Durrani.  Dr. Durrani recommended cervical surgery and prescribed pain medication during the first visit.  Conservative treatment was not considered.

842.    On April 1, 2009, Dr. Durrani performed cervical surgery on Mr. McNeal at Christ Hospital.

843.     Dr. Durrani used Infuse® off-label on Plaintiff without his knowledge or consent, causing Plaintiff harm and economic loss.

844.    Further following this surgery, Plaintiff experienced the same pain he experienced prior to undergoing surgery with Dr. Durrani.  Dr. Durrani recommended a second surgery.

845.    On June 19, 2009, Dr. Durrani performed a second cervical surgery on Plaintiff at Deaconess Hospital.

846.    Dr. Durrani again used Infuse® off label on Plaintiff without his knowledge or consent, causing him harm and economic loss.

847.    Following the surgery, Plaintiff followed up with Dr. Durrani at CAST. His pain did not improve following the second surgery.  This time, Dr. Durrani recommended lumbar surgery.

848.    In January 2010, Dr. Durrani performed lumbar surgery on Mr. McNeal at West Chester Hospital.

849.    Dr. Durrani again used Infuse® off-label on Plaintiff without his knowledge or consent, causing him harm and economic loss.

850.    Following the surgery, Mr. McNeal followed up with Dr. Durrani at CAST. His pain did not improve following the third surgery.  Dr. Durrani recommended a fourth surgery.

851.    In June 2010, Dr. Durrani performed lumbar surgery on Mr. McNeal at West Chester Hospital.

852.    Dr. Durrani again used Infuse® off label on Plaintiff without his knowledge or consent, causing him harm and economic loss.

853.    Following the fourth surgery, Plaintiff continued to follow up with Dr. Durrani at CAST.

854.    Plaintiff's pain did not improve following the fourth surgery.  His pain levels increased after each surgery with Dr. Durrani.

855.    Mr. McNeal gained over one hundred pounds following his surgeries, for which he has had to undergo bariatric surgery.

856.    Mr. McNeal now experiences pain in his lower back and mid back that is worse than the pain he experienced prior to his surgeries with Dr. Durrani.

857.    Mr. McNeal further experiences tingling, burning, and numbness in his left arm and both legs, which has also become worse since his surgeries with Dr. Durrani.

858.    The surgeries performed by Dr. Durrani were medically unnecessary.

859.    The use of Infuse® increases a person's chance of cancer by 3.5%.

860.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

861.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

862.    As a direct and proximate result of Plaintiff's surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

863.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

**FACTUAL ALLEGATIONS OF PLAINTIFF DAWN BOWLING-MERLAND**

864.    In 2009, Plaintiff Dawn Bowling-Merland began experiencing low back pain with pain radiating down her left leg.  Ms. Bowling-Merland initially tried muscle relaxers, physical therapy, and pain medication to relieve her pain, all to no avail.

865.    Ms. Bowling-Merland was referred to Dr. Durrani and first met with him in 2009 at CAST.  Dr. Durrani told Ms. Bowling-Merland he knew all about the therapy, shots, and medicine that she had tried.

866.    Dr. Durrani recommended that Ms. Bowling-Merland undergo surgery during the initial consultation.  Dr. Durrani told Ms. Bowling-Merland that the surgery

would fix the problem and that he performs that surgery all the time.

867.    During July 2009, Dr. Durrani performed surgery on Ms. Bowling-Merland at Christ Hospital by implanting a metal rod and screws and performing a fusion at L5-S1.

868.    During this surgery, Dr. Durrani used Infuse® off label without Ms. Bowling-Merland's knowledge or consent, thereby causing her harm and economic loss.

869.    The surgery performed by Dr. Durrani was medically unnecessary.

870.    Following the surgery, Ms. Bowling-Merland's pain returned and was worse than the pain she experienced prior to surgery.

871.    Mrs. Bowling-Merland continued to treat with Dr. Durrani.

872.    During the beginning of 2013, Dr. Durrani recommended physical therapy and took a new MRI.  Dr. Durrani told Ms. Bowling-Merland that she had a bone spur and that he would probably have to perform surgery again. Dr. Durrani recommended that Ms. Bowling-Merland receive injections prior to surgery.  Ms. Bowling-Merland received four injections, which did not help her pain.

873.    Ms. Bowling-Merland stopped treating with Dr. Durrani.  Ms. Bowling-Merland currently experiences lower back pain and pain radiating down her left leg.

874.    As a direct and proximate result of Plaintiff's surgery and Dr. Durrani's and Defendants' wrongful conduct, Ms. Bowling-Merland has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

875.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF RYAN MILLER

876.    Plaintiff Ryan Miller discovered Dr. Durrani at his CAST office in Blue Ash in 2010 conducting research to find local spine surgeons.  At the time, Plaintiff was experiencing some pain in his low back.

877.    At his initial appointment, Dr. Durrani immediately recommended that Plaintiff undergo a lumbar spinal fusion with the installation of hardware. Conservative treatment was given no consideration.

878.    On April 26, 2010 Dr. Durrani performed surgery on Plaintiff consisting of a lumbar spinal fusion with installation of hardware from L4-S1 at West Chester Hospital.

879.     Dr. Durrani used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

880.    The surgery performed by Dr. Durrani was medically unnecessary.

881.    After the surgery, Plaintiff began to suffer from extreme, stabbing pains in his low back, including burning sensations and increased sensitivity.  Plaintiff also lost flexibility as a result of this surgery.

882.    At his one-year postoperative appointment at CAST, Dr. Durrani told Plaintiff that he had recovered as much as he ever would, and "not to look for any more improvement."  Nevertheless, Dr. Durrani recommended additional surgeries, but Plaintiff declined to proceed.  Plaintiff continued to receive follow-up treatment with Dr. Durrani until 2012.

883.    Plaintiff sought the opinions of other physicians, who informed him that he should never have had the surgery.  According to these physicians, Plaintiff's only option is to "wait for back technology to improve."

884.   As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, the Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

885.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel reviewed Plaintiff's bills.

## FACTUAL ALLEGATIONS OF PLAINTIFF WILLIAM MOORE

886.   Plaintiff William Moore sought Dr. Durrani's services for numbness in his legs.  At the first office visit, Dr. Durrani informed Plaintiff that he had an old fracture of his spine and that the fracture had given way and caused his back to compress and pinch the nerves in the spine.  Dr. Durrani told Plaintiff that he could fix it by a spinal fusion and that he would only need to take off 5 weeks of work.  Conservative treatment options were never considered.

887.   In June 2011, Dr. Durrani performed a spinal fusion at West Chester Hospital on Plaintiff's spine at L5-S1.

888.   Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

889.   The surgery performed by Dr. Durrani was medically unnecessary.

890.   The use of Infuse® increases a person's chance of cancer by 3.5%.

891.   Due to the unnecessary surgery Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

892.   As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

893.   After surgery Plaintiff felt worse.  He began experiencing new pain and was prescribed Morphine to deal with his severe pain.

894.   After Plaintiff was discharged from the hospital, Plaintiff's legs began to swell and he was unable to breathe.

895.   The Emergency Room Doctor informed Plaintiff that he had blood clots.

896.   After Plaintiff was released for his blood clots, Plaintiff began physical therapy and treated with Dr. Durrani at CAST.

897.   Plaintiff was off work for 5 months and suffered many financial hardships.

898.   As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

899.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF STEPHANIE MUELLER

900.   Plaintiff Stephanie Mueller was injured in a motor vehicle crash in early 2008.  Plaintiff was treated at Children's Hospital, who then referred her to Dr. Durrani within the orthopedic department at Cincinnati Children's Hospital.

901.   At the first office visit, at Children's Hospital, Plaintiff told Dr. Durrani that she was experiencing neck pain that radiated into her arms.  Dr. Durrani told Plaintiff that she needed surgery and physical therapy.  Conservative treatment was never considered.

902.   In March 2008, Dr. Durrani performed surgery on Plaintiff's cervical spine at C4-C5 at Children's Hospital.

903.   Dr. Durrani used Infuse® off label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

904.   The surgery performed by Dr. Durrani was medically unnecessary.

905.   The use of Infuse® increases a person's chance of cancer by 3.5%.

906.   Due to the unnecessary surgery Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

907.   As a direct and proximate result of the use and implementation of Infuse®, Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

908.   Ever since the surgery, Plaintiff has been in constant pain.  She experiences intense neck pain that radiates into her arms, shoulder pain, upper back pain, hip pain, and low back pain.

909.   Plaintiff has sought further treatment for her pain and has been told by doctors that her pain will likely never go away.

910.   As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

911.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF GARY NEU

912.   Plaintiff Gary Neu was diagnosed with degenerated discs and spinal stenosis and was dealing with pain therefrom for a few years.  Plaintiff was treating his pain with pain medications and regular visits to a chiropractor.

913.    Plaintiff was referred to Dr. Durrani and at the first office visit Dr. Durrani stated that he could help Mr. Neu by surgery.  Conservative treatment was never considered.

914.    Plaintiff had a DLIF with a side approach by Dr. Durrani at West Chester Hospital/UC Health on August 25, 2010.

915.    During the surgery, Infuse® was used off label by Dr. Durrani without Plaintiff's knowledge or consent, causing him harm and economic loss.

916.    The surgery performed by Dr. Durrani was medically unnecessary.

917.    The use of Infuse® increases a person's chance of cancer by 3.5%.

918.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

919.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result Plaintiff has an increased fear of cancer.

920.    Additionally, Dr. Durrani did not inform Plaintiff that the first surgery was stage 1 of a 2 stage procedure that the Plaintiff would have to endure.

921.     On October 13, 2010 Dr. Durrani performed an AXIAL with Instrumentation and 200 staples.  A rod was placed at the base of Plaintiff's spine.

922.    Plaintiff had follow up care at Dr. Durrani's CAST office.  When Plaintiff informed Dr. Durrani that he was in pain, Dr. Durrani would tell Plaintiff "it will take time."

923.    Plaintiff continued to go to Dr. Durrani for follow-up care until his sciatic pain started.  Dr. Durrani recommended a branch block, but the block did not stop the pain.

924.    Dr. Durrani performed a foraminotomy and decompression surgery on Plaintiff on April 1, 2011 at WCH/UC Health.

925.    When Plaintiff woke up in recovery he began projectile vomiting and had a substantial fever.

926.    Plaintiff was moved to ICU for 10 days following surgery with Dr. Durrani.

927.    Finally, after extensive tests, kidney specialists, and an infectious disease specialist, WCH/UC Health determined Plaintiff had Bacterial Spinal Meningitis.

928.    Plaintiff was forced into physical therapy as quickly as possible; when Plaintiff began physical therapy at the Drake Center, Plaintiff could not even walk.

929.    After 73 days, Plaintiff was released from the Rehab Center.

930.    Plaintiff can now walk with the assistance of a walker, requires help to get in and out of a vehicle.

931.    After the April 1, 2011, surgery with Dr. Durrani, Plaintiff has been diagnosed with Normal Pressure Encephalitis on his brain.

932.    As a direct and proximate result of Plaintiff's surgery wherein Infuse® was implanted off label and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

933.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF GAIL NORDEMAN

934.    Plaintiff Gail Nordeman was experiencing radiating pain in her upper back when she decided to get a consultation from Dr. Durrani.  During Plaintiff's first

visit at Children's Hospital, Dr. Durrani recommended a spinal fusion from T1-S1. Dr. Durrani told Plaintiff that he could operate and strengthen her spine. Plaintiff trusted and had confidence in Dr. Durrani because he was the first doctor to tell Plaintiff that he could fix her spine. Conservative treatment was not considered.

935. Dr. Durrani performed surgery on Plaintiff at Christ Hospital on April 9, 2008.

936. Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

937. The surgery performed by Dr. Durrani was medically unnecessary.

938. The use of Infuse® increases a person's chance of cancer by 3.5%.

939. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

940. As a direct and proximate result of the use and implementation of Infuse®, Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

941. When Plaintiff woke-up from surgery, which took 11 hours, she was in more pain than prior to surgery. Plaintiff's pain gradually increased even though Plaintiff was taking pain medications.

942. Plaintiff followed up with Dr. Durrani, at CAST and at Christ Hospital, and complained of pain. Dr. Durrani told Plaintiff that she just needed time to heal and prescribed epidural injections in the lower spine to help with the pain.

943. Dr. Durrani performed a second surgery, at West Chester Hospital, on June 10, 2011. Dr. Durrani performed a L5-S1 Laminectomy and removal of a right S1 screw.

944.    After her surgeries with Dr. Durrani, Plaintiff is in constant pain that requires her to be constantly medicated, she experiences pain in her upper and lower spine with pain that radiates into her legs.

945.    Plaintiff has sought care from other doctors who have informed her that she has nerve damage in her spine.

946.    Plaintiff is no longer a candidate for epidural injections due to chronic pain.

947.    As a direct and proximate result of Plaintiff's surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

948.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF WENDY OBERLANDER

949.    Plaintiff Wendy Oberlander's primary care physician, Dr. Michael Chunn, referred her to Dr. Durrani at his CAST office in Blue Ash in 2009.  At the time of her referral, Plaintiff was experiencing intermittent pain in her neck, shoulders, and legs.

950.    Dr. Durrani ordered the Plaintiff to undergo an MRI while he prescribed her medication for her pain.  Upon reviewing Plaintiff's MRI films, Dr. Durrani immediately recommended that the Plaintiff undergo surgery.  Conservative treatment was not considered.

951.    In late 2009 Dr. Durrani performed surgery on the Plaintiff consisting of a spinal fusion with bone abrasion from L4-L5 at West Chester Hospital.

952.    Dr. Durrani used Infuse® off label in this first surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

953.    The surgery performed by Dr. Durrani was medically unnecessary.

954.    Following this first surgery, Plaintiff attended follow-up treatments with Dr. Durrani at CAST.  Plaintiff began to suffer from severe pain in her lower back and legs following this first surgery.

955.    Dr. Durrani informed the Plaintiff during her recovery that she need only be alert for instances of swelling and pain, and to watch for infection.  Dr. Durrani also informed the Plaintiff that the surgical procedures performed in her first surgery would have to be repeated as "the bone was growing back."

956.    In 2010 Dr. Durrani performed surgery on the Plaintiff, consisting of the same spinal fusion with bone abrasion from L4-L5 that had been previously performed, at West Chester Hospital.

957.    Dr. Durrani again used Infuse® off label in this second surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

958.    The second surgery performed by Dr. Durrani was medically unnecessary.

959.    Plaintiff continued to suffer from increased pain in her legs and lower back following this second surgery, and continued to follow-up with Dr. Durrani.

960.    In 2011 Dr. Durrani performed surgery on the Plaintiff consisting of a cervical spinal fusion and the installation of a spacer as the result of degenerative disc disease at West Chester Hospital.

961.    Dr. Durrani again used Infuse® off-label in this third surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

962.    This third surgery performed by Dr. Durrani was medically unnecessary.

963. In June 2012, Dr. Durrani performed surgery on the Plaintiff, again consisting of the same spinal fusion with bone abrasion from L4-L5 that had been performed twice before, at West Chester Hospital.

964. Dr. Durrani used Infuse® off-label in this fourth surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

965. This fourth surgery performed by Dr. Durrani was medically unnecessary.

966. Plaintiff continued to follow-up with Dr. Durrani at his CAST offices until the fall of 2012, when she and her husband relocated to Michigan.

967. Plaintiff is no longer able to lift her legs the way she previously could, and trips easily over even slightly uneven surfaces. Additionally, she suffers from continues pain in her neck, causing migraines; as well as from pain in her legs and lower back.

968. Since her return to Michigan, Plaintiff has sought the aid of other physicians, and is currently being treated by Dr. Mark Moulton. Dr. Moulton has informed the Plaintiff that he believes her surgeries were unnecessary. He disputes Dr. Durrani's diagnosis of spinal stenosis.

969. As a direct and proximate result of Plaintiff's fourth surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

970. Plaintiffs did not become aware of Dr. Durrani's use of Infuse® until legal counsel reviewed Plaintiffs' bills.

### FACTUAL ALLEGATIONS OF PLAINTIFF JEFFREY POFF

971. Plaintiff Jeffrey Poff was referred to Dr. Durrani by Christ Hospital in 2009. Christ Hospital had been treating Plaintiff for pain in his low back. His pain was above and below the waistline and that he had right leg numbness from hip to knee.

972.    At the first office visit, Dr. Durrani recommended a spinal fusion surgery and two disc replacements. Dr. Durrani told Plaintiff that the discs at L1-L3 were the cause of his pain, that once he had the surgery it would take 6 months to heal, and then Plaintiff would be 100% pain free and the numbness would be eliminated. Conservative treatment was given no consideration.

973.    On August 18, 2010, Dr. Durrani performed a L1-L3 fusion with instrumentation on the Plaintiff at West Chester Hospital/UC Health.

974.    Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent, causing harm and economic loss.

975.    The surgery performed by Dr. Durrani was medically unnecessary.

976.    The use of Infuse® increases a person's chance of cancer by 3.5%.

977.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

978.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

979.    Following this surgery, Plaintiff continued to treat with Dr. Durrani. Plaintiff continued experiencing pain and told Dr. Durrani that his pain was worse than before surgery. Plaintiff was told that the pain was normal. Dr. Durrani told Plaintiff he just needed time to heal.

980.    Plaintiff now experiences worse pain than he did prior to his treatment with Dr. Durrani. Before Plaintiff had surgery, he worked full-time and participated in one of his favorite past-times, bowling, and many other activities. Now Plaintiff is on

disability, has trouble sleeping, standing, and sitting and can no longer engage in activities that once brought him great joy.

981.    As a direct and proximate result of Plaintiff's surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

982.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF DAVID ROHLING

983.    Plaintiff David Rohling started having back issues in the fall of 2003. After seeing Dr. Tobler from February 2004 to March 2006, Plaintiff still had no relief from the back pain. Plaintiff decided to get a second opinion.

984.    Plaintiff started seeing Dr. Durrani in April 2006.  Plaintiff explained that Dr. Tobler fused L1-L4 on his spine and that it did not help the back pain.  Dr. Durrani then recommended fusing L5-S1.  Plaintiff was hesitant to go through fusion surgery knowing how hard it was on his body and the long painful recovery time. Dr. Durrani persuaded Plaintiff to have the surgery saying that it would help relieve the back pain.

985.    Dr. Durrani performed surgery on August 31, 2006 at Christ Hospital.

986.    Dr. Durrani used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

987.    The surgery performed by Dr. Durrani was medically unnecessary.

988.    The use of Infuse® increases a person's chance of cancer by 3.5%.

989.    Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

990.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result, Plaintiff has an increased fear of cancer.

991.    Plaintiff attended follow up care after his surgery in August 2006.

992.    After another difficult and painful recovery Plaintiff still was in more pain than before surgery.

993.    After surgery Plaintiff couldn't straighten his back without severe pain which limited the amount of time Plaintiff could stand and walk.

994.    Following surgery, Plaintiff had to use a wheelchair and mobility scooter, due to this Plaintiffs' mobility and muscles deteriorated and Plaintiff started being treated for diabetes.

995.    Plaintiff spends most of his days either in bed, fully reclined in a chair, or doing therapy in the swimming pool.

996.    Plaintiff has increased hip and back pain and severely limited mobility.

997.    Plaintiff has been unable to work since July 2004.

998.    As a direct and proximate result of Plaintiff's surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

999.    Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF DELORES SCOTT

1000.  Plaintiff Delores Scott was referred by her primary physician to seek treatment with Dr. Durrani in 2010 for constant back pain.  Dr. Durrani first recommended injections.  When these did not work, Dr. Durrani informed Mrs. Scott

she needed immediate surgery or she would be paralyzed from the waist down within a year.

1001. On September 13, 2010 Dr. Durrani performed a L3-4 and direct lateral interbody fusion and posterior spinal fusion on Plaintiff at West Chester Hospital.

1002. Dr. Durrani used Infuse® "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

1003. The surgery performed by Dr. Durrani was medically unnecessary.

1004. The use of Infuse® increases a person's chance of cancer by 3.5%.

1005. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

1006. As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

1007. Immediately following surgery, Plaintiff began to feel new pain in her back and legs. She informed Dr. Durrani she had numbness radiating into her legs.

1008. Plaintiff became paralyzed in her right leg following surgery. Plaintiff now is unable to stand up straight, walk, has constant back pain and is confined to a wheelchair. Dr. Durrani informed her there was no relief for these and nothing more he could do.

1009. As a direct and proximate result of Plaintiff's surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1010. Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF PATRICIA SHOTT, EXECUTRIX OF THE ESTATE OF GREGORY S. SHOTT

1011.   In 2009, Gregory S. Shott was experiencing intermittent back pain and sought treatment from Dr. Durrani at his offices at CAST and Christ Hospital.

1012.   During June 2009, Mr. Shott met with Dr. Durrani.  Dr. Durrani diagnosed Mr. Shott with severe spinal stenosis of the lumbar region and immediately recommended surgery.  Conservative treatment was given no consideration.

1013.   On July 8, 2009, Dr. Durrani performed lumbar surgery on Mr. Shott at Christ Hospital.

1014.   Dr. Durrani used Infuse® on Mr. Shott without his knowledge, causing him harm and economic loss.

1015.   The surgery performed by Dr. Durrani was medically unnecessary.

1016.   Following surgery, Mr. Shott's pain became worse and he followed up with Dr. Durrani at CAST and/or West Chester Hospital.  Mr. Shott received pain injections to try to manage his pain at West Chester Hospital.  Dr. Durrani ignored Mr. Shott's concerns about his increased pain, and told him it would take time to heal.

1017.   Before his death, Mr. Shott experienced severe constant back pain that had increased in both intensity and duration from the pain he experienced prior to undergoing surgery with Dr. Durrani.

1018.   As a direct and proximate result of Mr. Shott's surgery and Dr. Durrani's and Defendants' wrongful conduct, Mr. Shott suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1019.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

**FACTUAL ALLEGATIONS OF PLAINTIFF SHANDON SIMMONS**

1020.  Plaintiff Shandon Simmons was experiencing severe back and right rib pain when she first saw Dr. Durrani.  Dr. Durrani recommended surgery during their first appointment.  Conservative treatment was given no consideration.

1021.  On August 13, 2010, Dr. Durrani performed lumbar surgery on Plaintiff at Christ Hospital.

1022.  Dr. Durrani used Infuse® on Plaintiff without her knowledge, causing her harm and economic loss.

1023.  The surgery performed by Dr. Durrani was medically unnecessary.

1024.  The use of Infuse® increases a person's chance of cancer by 3.5%.

1025.  Due to the unnecessary surgery that Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

1026.  As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result, Plaintiff has an increased fear of cancer.

1027.  Plaintiff had follow up care with Dr. Durrani at CAST from 2010-2013.  At Plaintiff's first post-surgery visit Dr. Durrani told Plaintiff that she needed time to heal from major back surgery, the pain was normal, and then gave her medicine.

1028.  Since her surgery, Plaintiff has shooting pain from the right rib to the left rib and a loss of flexibility.  Plaintiff also suffers from new pain in her lower back, mid back, and pain radiating down her right side.

1029.  As a direct and proximate result of Plaintiff's surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1030.  Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF KAREN SISSON

1031.  Plaintiff Karen Sisson was involved in a motor vehicle crash in late 2008. She initially treated with Dr. Rissover for low back pain, neck pain and shoulder pain, who prescribed therapy and visits with the chiropractor.

1031.  Plaintiff was referred to Dr. Durrani by a friend in early spring of 2009. Plaintiff sought treatment with Dr. Durrani for low back pain, neck pain and shoulder pain.

1032.  Dr. Durrani, at either the second or third visit, told Plaintiff that she must have surgery.  Dr. Durrani told Plaintiff that there was no other choice or she would not be able to walk in the future due to disk deterioration.  Dr. Durrani insisted that surgery be performed and said no other option existed.

1033.  On September 30, 2009, Dr. Durrani performed a two-level ACDF at C5-C6 and C6-C7 on Plaintiff at Christ Hospital.

1034.  Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

1035.  The surgery performed by Dr. Durrani was medically unnecessary.

1036.  The use of Infuse® increases a person's chance of cancer by 3.5%.

1037.   Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

1038.   As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result, Plaintiff has an increased fear of cancer.

1039.   Plaintiff went to CAST for follow-up care.  Plaintiff told Dr. Durrani about the pain she was experiencing and Dr. Durrani told Plaintiff that she would be fine in a few weeks.

1040.   Plaintiff took a month off from work after her surgery. Plaintiff returned to work only on part-time status due to pain.  Plaintiff only returned to work because she feared that if she missed any more work she would lose her employment.

1041.   Dr. Durrani informed Plaintiff during a follow-up appointment that she needed an additional surgery on her lower back; however, Plaintiff did not have an additional surgery with Dr. Durrani.

1042.   Plaintiff continues to have neck spasms, loss of flexibility in her cervical spine and shoulders, and is in constant pain.

1043.   Plaintiff now has continuous pain in her neck, and pain in her low back.

1032.   As a direct and proximate result of Plaintiff's surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1044.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF MICHELLE SIZEMORE

1045.   Plaintiff Michelle Sizemore was experiencing pain in her low back and leg in early 2001 when she was referred to Dr. Durrani at West Chester Hospital/UC Health office.  During Plaintiff's first consultation, surgery was recommended. Conservative treatment was not considered.

1046.  On April 18, 2011, Dr. Durrani performed a L3-L4 and L4-L5 lateral lumbar interbody disectomy and fusion with instrumentation at West Chester Hospital.

1047.   Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent in this surgery, causing her harm and economic loss.

1048.   The surgery performed by Dr. Durrani was medically unnecessary.

1049.   After surgery, Plaintiff had new pain in her limbs and swollen legs.

1050.   Plaintiff's pain and swelling became so severe that she went to the West Chester Hospital Emergency Room for treatment.  Plaintiff was told that she may need future surgery for her back because the level above L3-L4 was showing stress and needed to be repaired.

1051.   On May 10, 2011, Plaintiff underwent an irrigation and debridement an evacuation of hematoma in the lumbar spine at West Chester Hospital.

1052.   Following this surgery, Plaintiff continued to treat with CAST and eventually required pain management to deal with her pain.

1053.   Plaintiff now experiences new, different and worse pain than she did prior to her treatment with Dr. Durrani and CAST.  Plaintiff's pain consists of lower and mid back pain; right hip pain; numbness, swelling, burning, and pain in right ankle.  Plaintiff sleeps poorly due to her pain and cannot stand or sit for long periods of time.

1054.   The use of Infuse® increases a person's chance of cancer by 3.5%.

1055.   Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

1056.   As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result, Plaintiff has an increased fear of cancer.

1033.  As a direct and proximate result of these procedures and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1057.  Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF EARL STAMPS

1058.  Plaintiff Earl Stamps first noticed he was having back paud during his junior or senior year of high school.  He played football.  After a game, Plaintiff noticed he could not fully stand up the next morning.

1059.  Plaintiff went to Mercy Hospital Fairfield for treatment.  The hospital staff believed Plaintiff had pulled a muscle and that he should not engage in football for a week or so.

1060.  Plaintiff tried physical therapy with chiropractor and felt relief only with traction therapy.

1061.  Plaintiff's primary care physician recommended seeing a spine specialist at Children's Hospital.  That specialist ended up being Dr. Durrani.

1062.  During the second office visit, Dr. Durrani recommended a spinal fusion surgery with instrumentation.  Dr. Durrani said that without this surgery, Plaintiff would be paralyzed.

1063.  In February 2008, Dr. Durrani performed L5-S1 TLIF surgery at Children's Hospital.

1064.  Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent in this surgery, causing him harm and economic loss.

1065.  The surgery performed by Dr. Durrani was medically unnecessary.

1066.   The use of Infuse® increases a person's chance of cancer by 3.5%.

1067.   Due to the unnecessary surgery Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

1068.   As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result Plaintiff has an increased fear of cancer.

1069.   After surgery Plaintiff had to use a walker to move around for several weeks and he missed several weeks of school.

1070.   Plaintiff has difficulty walking, moving, and has numbness in his legs. There is a popping and grinding noise in Plaintiff's spine when he moves, which was not present before surgery.  Plaintiff missed out on activities in high school that his class mates were able to participate in and he missed out on the opportunity to take free college courses while still in high school due to surgery.

1034.   As a direct and proximate result of this unnecessary surgery and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1071.   Plaintiff did not become aware of Infuse® until he contacted legal counsel.

**FACTUAL ALLEGATIONS OF PLAINTIFF TEKIRA TAYLOR**

1072.   Plaintiff Tekira Taylor is a minor individual.  Her claims and causes of action are brought by her parent and next friend, Kimberly Taylor.

1073.   Plaintiff Tekira Taylor is a 14 year old female with a history of cervical spine instability.

1074.    The cervical spine instability led to a subsequent posterior spine fusion in April 2005 performed by Dr. Durrani at Cincinnati Children's Hospital Medical Center.   Conservative treatment was given no consideration.

1075.    Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent in this surgery, causing her harm and economic loss.

1076.    The surgery performed by Dr. Durrani was medically unnecessary.

1077.    The use of Infuse® increases a person's chance of cancer by 3.5%.

1078.    Due to the unnecessary surgery Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

1079.    As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result Plaintiff has an increased fear of cancer.

1080.    As a result of her fusion, Plaintiff is unable to play any contact sports or engage in physical activities.

1081.    Tekira has more limited range of motion as a result of the surgery.

1035.    As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1082.    Plaintiff did not become aware of Infuse® until she contacted her legal counsel.

## FACTUAL ALLEGATIONS OF PLAINTIFF CLARA TUBBS-HILL

1083.    Plaintiff Clara Tubbs-Hill first met with Dr. Durrani at his Blue Ash CAST office because she has been experiencing pain and numbness in her legs.  Dr. Durrani

immediately recommended that Plaintiff undergo surgery. Conservative treatment was given no consideration.

1084. Plaintiff had a L5-S1 fusion surgery at West Chester Hospital in May 2011.

1085. Dr. Durrani used Infuse® off-label without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

1086. The surgery performed by Dr. Durrani was medically unnecessary.

1087. The use of Infuse® increases a person's chance of cancer by 3.5%.

1088. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

1089. As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer. As a result, Plaintiff has an increased fear of cancer.

1090. Plaintiff had follow up care at the Drake Center after the first surgery.

1091. Dr. Durrani informed Plaintiff that her recovery would take time and "Rome was not built in one day," "be patient," "give your body time to heal," and "everyone's body is different."

1092. As a result of the surgery, Plaintiff experienced high fevers and was unable and decreased ability to move around and participate in basic every day activities without needing assistance. Plaintiff also had new and increased pain in her legs, lower and mid back, and in her hips and buttocks following the surgery.

1036. As a direct and proximate result of this surgery and Dr. Durrani's and Defendants' wrongful conduct Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1093.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

### FACTUAL ALLEGATIONS OF PLAINTIFF BROOKE VANDERVORT

1094.   Plaintiff Brooke Vandervort was referred to Dr. Durrani at Children's Hospital by Wilmington Pediatrics in December 2005 for mid-back pain.

1095.   Dr. Durrani told Plaintiff that she had a 50-degree curve in her spine and that she needed to wear a back brace.  Plaintiff wore a back brace for approximately 6 months.

1096.   On August 16, 2006, Dr. Durrani removed a tumor from Plaintiff's spine.

1097.   After surgery, Plaintiff received follow up care at Children's Hospital. Plaintiff informed Dr. Durrani that she still had pain in her mid-back.

1098.   On November 27, 2007, Dr. Durrani informed Plaintiff that she needed to have another surgery to correct her scoliosis.  Dr. Durrani manipulated the x-ray findings and told Plaintiff that her spine was getting worse and not better, which was contrary to the actual x-ray findings.

1099.   Dr. Durrani performed spinal fusions at T8-L3 on Plaintiff at Children's Hospital on December 10, 2007.

1100.   Dr. Durrani used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss. The Infuse® was used in a 14-year-old skeletally immature minor, and implanted in multiple levels of the spine.

1101.   The surgery performed by Dr. Durrani was medically unnecessary.

1102.   The use of Infuse® increases a person's chance of cancer by 3.5%. Due to the unnecessary surgery Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

1103.   As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.  As a result, Plaintiff has an increased fear of cancer.

1104.   Plaintiff experiences sharp pains in her mid-back that were not present before surgery.

1037.   As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1105.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of his propensity to use Infuse®.

## FACTUAL ALLEGATIONS OF PLAINTIFF TERESA WORLEY

1106.   Plaintiff Teresa Worley had treatment with the UC Orthopedic Clinic, but she was informed that they could not help Plaintiff with her kyphoscoliosis and that Dr. Durrani could fix her and make her spine straighter.

1107.   Plaintiff sought Dr. Durrani out because of the constant pain she was experiencing in her upper and lower back pain that radiated down legs with some numbness and difficulty standing erect.

1108.   During their first appointment, Plaintiff recalled Dr. Durrani walking into the room, looking at Plaintiff and diagnosing her with scoliosis.

1109.   Dr. Durrani recommended surgery at the first office visit.  Dr. Durrani informed Plaintiff that, during surgery, he would be implanting titanium steel rods and that these rods could not break.

1110.   On October 27, 2006, Plaintiff underwent posterior spinal instrumentation T3 to the sacrum, pedicle subtraction osteotomy L3 and L4, posterior

spinal fusion from T3 to the sacrum, lamectonomy L3, L4 and L5, and facetectomy L3-L4 and L4/ L5 at Christ Hospital.

1111.    Dr. Durrani used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

1112.    After surgery, Plaintiff developed a hump in her back.  Dr. Durrani diagnosed Plaintiff with kyphosis at Plaintiff's follow-up appointment.  Dr. Durrani recommended a second surgery to "fix" the kyphosis.

1113.    On April 20, 2007, Plaintiff had L3-L4 anterior lumbar interbody fusion perimeter cages, L4-L5 anterior lumbar interbody fusion perimeter cages, L5/S1 anterior lumbar interbody fusion cages, and posterior spinal fusion from L4 to the pelvis at Christ Hospital.

1114.    Dr. Durrani again used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

1115.    After surgery, Dr. Durrani sent Plaintiff to physical therapy; however, physical therapy only caused more pain.

1116.    At a follow-up appointment Dr. Durrani informed Plaintiff that one of the rods in Plaintiff's back had broken.

1117.    On August 6, 2008, Plaintiff had a third surgery with Dr. Durrani to fix the rods in her back at Christ Hospital; specifically, pedicle subtraction osteotomy, L4 and re-instrumentation, L1 to the pelvis.

1118.    Dr. Durrani again used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

1119.   At a post-operative visit at Dr. Durrani's office, Dr. Durrani informed Plaintiff that the rods in her back broke for a second time, and she required a fourth surgery.

1120.   On March 24, 2009, Plaintiff underwent a fourth surgery with Dr. Durrani at Christ Hospital.  This was Plaintiff's second hardware failure and fourth spine surgery by Dr. Durrani.  This fourth surgery consisted of a revision/redo posterior spinal fusion with re-augmentation of fusion, and thoracic spinal lamectonomy from T11-T12 and L1-L2.

1121.   Dr. Durrani again used Infuse® off-label in this surgery without Plaintiff's knowledge or consent, causing harm and economic loss.

1122.   Plaintiff had to stop gardening, biking, playing volleyball, swimming, and cooking due to her pain.

1123.   Plaintiff is unable to play with her grandchildren.  She cannot pick her grandchildren up.

1124.   Plaintiff has depression and she is embarrassed to go out in public because of her appearance after Dr. Durrani's surgeries.

1125.   Plaintiff's new treating doctors have told Plaintiff that eventually she will be wheelchair bound.

1126.   Dr. Durrani used Infuse® "off-label" in all four spine procedures without Plaintiff's knowledge or consent, causing Plaintiff harm and economic loss.

1127.   The use of Infuse® increases a person's chance of cancer by 3.5%.

1128.   Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of Infuse®.

1129.   As a direct and proximate result of the use and implementation of Infuse® Plaintiff has incurred a 3.5% increase in the risk of cancer.   As a result Plaintiff has an increased fear of cancer.

1038.   As a direct and proximate result of these surgeries and Dr. Durrani's and Defendants' wrongful conduct, Plaintiff has suffered harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1130.   Plaintiff did not become aware of Dr. Durrani's use of Infuse® until legal counsel informed Plaintiff of Dr. Durrani's propensity to use Infuse®.

## VII.   PLAINTIFFS' DISCOVERY OF DEFENDANTS' DECEPTION AND WRONFUL ACTS.

1131.   Despite diligent investigation by Plaintiffs into the cause of their injuries, including numerous consultations with their medical providers and the nature of Plaintiffs' injuries and damages, their relationship to Infuse® was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiffs' claims, which was due to their legal counsel's review of their medical records and bills after Dr. Durrani's indictment in July 2013.

1132.   As a result, Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through affirmative misrepresentation and omissions by their agent, consultant, representative, or joint venturer, Dr. Durrani, to the Plaintiffs of the true risks associated with Infuse®.

1133.   As a result of Defendants' fraudulent concealment, Plaintiffs were unaware, and could not have known or have learned through reasonable diligence, that Plaintiffs were exposed to the risks alleged herein with the Infuse® product and that

those risks were the direct and proximate result of the wrongful acts and omissions of Defendants, or their employees, agents, consultants, representatives or assigns, including Dr. Durrani.

### VIII. CAUSES OF ACTION.

### COUNT I -- Fraudulent Concealment, Misrepresentation and Fraud in the Inducement.

1134.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further allege as follows.

1135.   As pharmaceutical companies and medical device manufacturers, Defendants and their agents, consultants, representatives, and joint venturors had an affirmative continuing duty to warn the public, including Plaintiffs, regarding the risks they knew, learned, or should have known about associated with their medical devices.

1136.   Defendants and their agent, consultant, representative, or joint venturer, Dr. Durrani, concealed adverse information and provided inaccurate or misleading information that would have been material to Plaintiffs in deciding whether to permit the use of Infuse® in off-label manners during their surgeries.  This misleading information, along with omissions of material fact related to Infuse's® safety and effectiveness, caused patients and the general public, including Plaintiffs, to be uninformed and misled about Infuse's® risks and benefits and deprived Plaintiffs from making a proper risk/benefit assessment regarding the off-label use of Infuse®.

1137.   Through internal adverse event reports and otherwise, Defendants knew that the off-label use of Infuse® was not effective and could lead to serious side effects, including, without limitation, unwanted bone growth, inflammation, and other serious side effects.  Defendants failed to take any measures whatsoever to alert the public

regarding these risks and instead continued to promote the off-label use of Infuse® as safe and effective.

1138.   Despite knowing that the off-label promotion of Infuse® was illegal, Defendants, through their agents, representatives, consultants, and joint venturers, promoted the off-label use of Infuse® and concealed that the off-label use of Infuse® could result in unwanted bone growth and other serious adverse side effects.

1139.   When the above representations or omissions were made by Defendants through their agents, representatives, consultants, and joint venturers, they knew those representations or omissions to be false or willfully and wantonly and recklessly without regarded whether the representations or omissions were true.  These representations or omissions were made by Defendants with the intent of defrauding and deceiving the public with the intent of inducing patients like Plaintiffs to give their informed consent to the off-label use of Infuse®.

1140.   Defendants knew that Plaintiffs would reasonably regard the matters Defendants concealed and misrepresented to be important in determining the course of treatment for each of them, including Plaintiffs' decisions whether or not to allow and consent to the use of Infuse® off-label.

1141.   Defendants intended to cause Plaintiffs to rely on their concealment of information and misrepresentations about the safety risks related to Infuse® to induce them to make off-label use of Infuse® for Plaintiffs' spine surgeries.

1142.   Plaintiffs were unaware of the falsity of said representations or omissions by Defendants.  Plaintiffs were justified in relying on Defendants' and Dr. Durrani's wrongful concealment of information about the safety risks related to Infuse® off label use in deciding whether to undergo spine surgery.

1143.   Plaintiffs would not have allowed or consented to the use Infuse® off-label by utilizing a posterior approach, by using Infuse® at unapproved locations throughout the spine, by using Infuse® without an LT-Cage, by using Infuse® in multiple procedures or at multiple levels of the spine, or by otherwise using it in a manner not approved by the FDA, had they known of the safety and health risks related to the off-label use of Infuse® that Defendants and Dr. Durrani concealed from them.

1144.   Any of the following is sufficient to establish independently Defendants' liability for fraudulent misrepresentation, fraudulent concealment, or fraud in the inducement:

    a.   Defendants fraudulently concealed and misrepresented the health and safety hazards, constellation of symptoms, diseases and/or health problems associated with the off-label use of Infuse®.

    b.   Defendants fraudulently concealed and misrepresented their practice of promoting and marketing the risks and benefits of the off-label practice of utilizing a posterior approach, using Infuse® at unapproved locations in the spine, using INFUSE® without an LT-Cage, and otherwise using Infuse® in a manner not approved by the FDA.

    c.   Defendants fraudulently concealed and misrepresented information about the known comparative risks and benefits of the use of Infuse® and the relative benefits and availability of alternate products, treatments, or therapies.

    d.   Defendants deceptively promoted off-label use of Infuse® through their sales representatives by having them assist in operating rooms during off-label surgeries, giving implicit approval to those experimental surgeries

which Defendants and their agent, representative, consultant, or joint venturer, Dr. Durrani, knew to be high-risk.

e.  Defendants deceptively promoted off-label use of Infuse® through their sales representatives by having them distribute or parrot the false and misleading medical literature that was written and/or edited by Defendants.

f.  Defendants deceptively promoted off-label use of Infuse® through their sales representatives by having them falsely represent that the off-label use proposed being used was common, prevalent, normal, or with minimal risk.

g.  Defendants deceptively promoted off-label use of Infuse® by having its distributors purchase gifts for physicians and facilities with the aim of inducing them to use Infuse® off-label.

h.  Defendants deceptively promoted off-label use of Infuse® by instructing and arranging for "Opinion Leaders" and other consultants to promote off-label uses of Infuse®.

i.  Defendants deceptively promoted off-label use of Infuse® by paying kickbacks to Key Opinion Leaders, and then actively ghostwriting, tampering with, and editing the published medical literature on Infuse®, such that the literature appeared to reflect a complication rate of approximately 0% rather than the true complication rate of greater than 40%.

j.  Defendants deceptively promoted off-label use of Infuse® by choosing not to report to the FDA known adverse events that were being reported to

them and which they knew were likely the result of off-label use of Infuse®.  By April 2008, over 500,000 surgeries had been performed using Infuse.  The true rate of adverse events occurring from 2002 to 2008 was conservatively 10-50%.  Thus, by April 2008, even if the rate were only 10%, at least 50,000 adverse events had occurred.  Given how closely Defendants representatives worked with surgeons on an ongoing basis – being present in the operating room during implantation and revision operations, they were necessarily aware of the majority of these adverse events.  Nevertheless, by the end of 2008, only 262 adverse events involving Infuse had been reported to the FDA.  In contrast, after *The Spine Journal* exposed data about the true adverse event rate in 2011, the number of reported adverse events sharply increased even while Infuse® utilization declined.  In 2013 alone, there were 3001 reported adverse events.

1145.  Defendants' and Dr. Durrani's motive in failing to advise Plaintiffs of these risks and inefficacies, and to obtain their informed consent to off-label use of Infuse® during their surgeries was for financial gain and fear that, if they provided proper and adequate information, the Infuse® would lose sales revenue and market share.  This motive is evidenced in part by the huge number of unnecessary surgeries performed on Plaintiffs by Dr. Durrani using Defendants' Infuse® device off-label without their informed consent or agreement.

1146.  The actions of Defendants, their agents, representatives, consultants, and joint venturers, including Dr. Durrani, were wanton, grossly negligent, and reckless and demonstrated a complete disregard and reckless indifference to the safety of

Plaintiffs in particular and to the public at large generally in that Defendants did willfully and knowingly promote the off-label use of Infuse® with the specific knowledge that informed consent to the use thereof would be sought from Plaintiffs and other patients without adequate knowledge regarding its efficacy, risks, and side effects.

1147.   As the direct, proximate and legal cause and result of the Defendants' fraudulent concealment and misrepresentations and suppression of material health and safety risks relating to Infuse® and Defendants' dangerous and irresponsible marketing and promotion practices, each Plaintiff has been injured and has incurred damages, including but not limited to medical and hospital expenses, lost wages and lost earning capacity, physical and mental pain and suffering, and loss of the enjoyment of life.

1148.   Each Plaintiff is therefore entitled to damages in an amount to be proven at trial in excess of $75,000.00, exclusive of interest and costs, together with interest thereon and costs.

1149.   Defendants' conduct, and that of their agents, representatives, consultants, and joint venturers, including Dr. Durrani, was malicious, fraudulent, and oppressive toward Plaintiffs in particular and the public generally, and Defendants conducted themselves in a willful, wanton, and reckless manner.  Despite their specific knowledge regarding risks set forth above, Defendants deliberately recommended the off-label use of Infuse® and promoted it as being safe and effective.

1150.   In doing the things aforesaid, Defendants are guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitled to recovery punitive, or exemplary, damages in a sum according to proof at trial.

## COUNT II – Ohio Products Liability Act (Failure To Warn)

1151.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows.

1152.   Plaintiffs are "claimants" as defined at R.C. 2307.71(A)(1).

1153.   Defendants are "manufacturers" as defined at R.C. 2307.71(A)(9).

1154.   Infuse® is a "product" as defined at R.C. 2307.71(A)(12)(a).  Infuse® is not human tissue, blood, or organs.

1155.   The claim at this Count is a "product liability claim" as defined at R.C. 2307.71(A)(13).

1156.   Defendants and their agents, consultants, representatives, and joint venturers had a duty to warn the Plaintiffs about the risks and dangers of off label use of Infuse® of which they knew, or in the exercise of ordinary care, should have known, at the time the Infuse® left Defendants' and Dr. Durrani's control.

1157.   Defendants and their agents, consultants, representatives, and joint venturers, such as Dr. Durrani, knew or should have known of the risks and dangers of off-label use of Infuse®, including the dangers of bony overgrowth, ectopic bone growth, cyst formation, subsidence, resorption, and resulting nerve damage, which they knew or should have known were associated with the use of Infuse® without an LT-Cage, and in posterior surgical approaches, and in surgical applications at multiple levels.  Any warning given by Defendants and Dr. Durrani to Plaintiffs was rendered inadequate because of the improper, false, and contrary promotion by Defendants of the off-label use of Infuse®.

1158.   Defendants and Dr. Durrani knew of the risks and dangers of off-label uses of Infuse® and breached this duty by failing to warn Plaintiffs of the many risks

and dangers of off-label uses of the product and by illegally promoting the off-label use of Infuse® and use of the same on Plaintiffs.

1159. Plaintiffs have three theories upon which they allege a claim based on Defendants' failure to warn. First, Defendants breached their duty by illegally promoting Infuse® for use in off-label procedures.

a. In the course of unlawfully and deceptively promoting Infuse® for off-label use, Defendants made affirmative misrepresentations regarding the safety and desirability of Infuse® when used off-label. Defendants' over promotion of Infuse® negated and nullified any warnings it had given.

b. Any warnings Defendants may have issued concerning the dangers of off-label use of Infuse® or regarding the risk of ectopic bone growth were insufficient in light of Defendants' contradictory prior, contemporaneous, and continuing illegal promotional efforts and over promotion of Infuse® for non-FDA-approved off-label use, and contemporaneous efforts to hide or downplay the true risks of off-label use of Infuse®.

c. Through Defendants' off-label over promotion of Infuse® to Plaintiffs, which negated any warnings regarding off-label Infuse®, Defendants and Dr. Durrani used Infuse® off-label within each Plaintiff.

1160. Second, Defendants breached their duty in that, in the course of promoting Infuse® for off-label use (a use which the FDA had not reviewed or approved and for which the FDA had not reviewed or approved any written warnings), Defendants both affirmatively misrepresented and omitted information regarding the risks of the very off-label use Defendants were promoting. These misrepresentations and omissions included but were not limited to the following:

a.    In the course of paying for, editing, influencing, and ghost-writing studies regarding Infuse®, Defendants used these studies to promote off-label use of Infuse® as a safe and efficacious device. Through these publications, which constituted unlawful off-label promotion, Defendants failed to warn of the risks of Infuse®, by concealing such risks through deliberate use of methodological biases, withholding of information about adverse events, and reporting of adverse events in a biased manner that did not attribute them to INFUSE®.

b.    In the course of promoting Infuse® for off-label use, Defendants made affirmative, favorable representations regarding off-label use of Infuse®, yet failed and omitted to warn regarding the attendant risks of off-label use of Infuse®.

1161.    Third, Defendants breached its duty to warn by failing to communicate the growing number of adverse events to the FDA from 2002 to 2011, as it was required to do by federal law. This claim mirrors the claim approved by the Court of Appeals for the Ninth Circuit in *Stengel v. Medtronic,* 704 F.3d 1224 (9th Cir. 2013).

a.    The FDCA requires medical device manufacturers to maintain and submit information as required by regulation, 21 U.S.C. § 360i, including submitting adverse event reports, 21 C.F.R. § 803.50, and establishing internal procedures for review complaints and event reports, 21 C.F.R. §820.198(a).

b.    By April 2008, over 500,000 surgeries had been performed using Infuse®. Spinal fusions accounted for 92.8 percent of these procedures. Approximately 95% of these were for off-label uses.

c.  According to the above-described analysis conducted by Dr. Eugene Carragee, et al. (*The Spine Journal*, June 2011) the true rate of adverse events related to Infuse® was between 10 to 50%, meaning that, by April 2008, there had been approximately 50,000 to 250,000 adverse events involving Infuse®.

d.  Most of these adverse events were associated with off-label use. Emily Woo, M.P.H., a current FDA employee, published an article in *The Spine Journal* in 2012 showing that greater than 98% of all adverse events involving Infuse® are due to off-label use.

e.  Nevertheless, by the end of April 2008, only 262 total adverse events involving Infuse® had been reported to the FDA. By August 2011, approximately 844 adverse events involving Infuse® in spinal surgeries had been reported to the FDA. This reflects vast underreporting of adverse events.

f.  From 2002 to 2008, Defendants' sales representatives personally attend the majority of Infuse® surgeries, including off-label Infuse® surgeries, and worked closely with implanting surgeons on an ongoing basis. Thus, Defendants were aware of the majority of adverse events and were aware of the adverse events with Infuse® in which their agent, consultant, representative, or joint venturer, Dr. Durrani, was the implanting surgeon.

g.  There are specific known occasions in which Defendants were explicitly aware of an adverse event involving Infuse®, which a surgeon attributed

to Infuse®, and Defendants took no steps to report such adverse event to the FDA.

h.    The FDA maintains a MAUDE database on reported adverse events, which is a public database known to, and discussed in, the medical community.

i.    Defendants affirmatively advertised the absence of adverse events to the medical community.

j.    If Defendants had communicated adverse events to the FDA as required by law, this would have effectively warned of those adverse events – both directly and through the discussion of those adverse events that would have followed.

1162.   Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of Infuse®, whose lack of sufficient warnings caused Infuse® have an unreasonably dangerous propensity to cause catastrophic injuries.

1163.   In the course of these promotions, misrepresentations, omissions, and underreporting of adverse events, Defendants failed to adequately warn Plaintiffs, in light of their scientific and medical knowledge at the time, of the dangers associated with Infuse® when used off-label, including, but not limited to, pain and weakness in limbs, loss of sensation, radiculitis, subsidence, ectopic bone formation, osteolysis, and poorer global outcomes than alternative treatments.

1164.   In the course of these promotions, misrepresentations, omissions, and underreporting, Defendants failed to provide the level of information that an ordinary consumer would expect when using Infuse® in an off-label manner that had been

encouraged by, and was thus reasonably foreseeable to Defendants. Defendants either negligently, or recklessly, or intentionally minimized and/or downplayed the risks of serious side effects related to the off-label use of Infuse®, including, but not limited to, pain and weakness in limbs, loss of sensation, radiculitis, subsidence, ectopic bone formation, osteolysis, and poorer global outcomes than alternative treatments.

1165.   Defendants knew that the risks and dangers described above were not readily recognizable to ordinary patients.

1166.   Plaintiffs would not have consented and agreed to the use of Infuse® off-label by utilizing a posterior approach, using Infuse® for an off-label indication, and by using Infuse® without an LT-Cage and in a manner otherwise not approved by the FDA had they known of the true safety risks and dangers related to off-label uses of Infuse®.

1167.   At the times Dr. Durrani or his associates used and injected Infuse® on Plaintiff(s), Defendants and they knew or should have known of the potential for and/or actual defect in associated with the off-label use of Infuse®, which directly led to Plaintiffs' injuries and suffering. Having such knowledge, Defendants failed to provide adequate warnings and/or instructions, both at the time of marketing and afterwards. Such failure constitutes violations of Ohio Revised Code 2307.76, 21 U.S.C. §§331, 333, 352, 360h, and 360i, and 21 CFR §§800, *et seq.*, 801.6, 803.50, 803.52, or 814.82, among other statutes and regulations.

1168.   Under Ohio Revised Code 2307.80, Defendants' actions constitute a flagrant disregard of the safety of persons situated just like the Plaintiffs who might be harmed by Defendants' Infuse® devise.

1169.   Defendants' and Dr. Durrani's motive in failing to advise Plaintiffs of these risks and inefficacies, and to obtain their informed consent to off-label use of Infuse® during their surgeries was for financial gain and fear that, if they provided proper and adequate information, the Infuse® would lose sales revenue and market share.  This motive is evidenced in part by the huge number of unnecessary surgeries performed on Plaintiffs by Dr. Durrani using Defendants' Infuse® device off-label without their informed consent or agreement.

1170.   As a direct and proximate result of Defendants' failure to warn with the resultant failure to obtain Plaintiffs' informed consent to the use of Infuse® during their surgeries, and Defendants' violations Ohio Revised Code 2307.76 and 2307.80, 21 §331, 333, 352, 360h, and 360i, and 21 CFR §§800, *et seq.*, 801.6, 803.50, 803.52, or 814.82, among other statutes and regulations, Dr. Durrani or his associates knowingly used Infuse® in an unapproved manner by implanting and injecting into Plaintiffs' bodies off-label, causing the Plaintiff(s) to suffer and undergo additional reasonable and necessary medical examination and treatment, including, but not limited to, diagnostic examinations, monitoring, surgery, hospitalization, the use of medications, and other harm and economic loss.  Plaintiff(s) will also likely endure future medical care, surgery and treatment with associated medical expenses.

1039.   As a direct and proximate result of Defendants' failure to warn and violations Ohio Revised Code 2307.76 and 2307.80, 21 U.S.C. §§§331, 333, 352, 360h, and 360i, and 21 CFR §§800, *et seq.*, 801.6, 803.50, 803.52, or 814.82, among other statutes and regulations, each Plaintiff has been caused to endure physical and emotional pain and suffering, loss of enjoyment of the  pleasures of life, lost past, present, and future income, a decreased earning capacity, severe restrictions and

limitations of physical and life activities, and other harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1171.   Plaintiff(s) are therefore entitled to compensatory damages in an amount to be proven at trial, together with interest thereon and costs.

### COUNT III -- Ohio Product Liability Act (Misrepresentations)

1172.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows.

1173.   The claim at this Count is a "product liability claim" as defined at R.C. 2307.71(A)(13).

1174.   At all time herein mentioned, Defendants utilized journal articles, advertising media, agents, representatives, consultants, joint venturers, and paid Key Opinion Leaders to use and to urge to use, purchase, and utilization of the off-label use of Infuse® and expressly and impliedly warranted to Plaintiffs and other members of the general public that such off-label uses, including the off-label uses during Plaintiffs' surgeries, was safe and effective.

1175.   In the course of affirmatively marketing and promoting Infuse®, Defendants made untrue representations of material facts and omitted material information to Plaintiffs and the public at large.  The misrepresentations and omissions included the following:

a.   Defendants sponsoring, authoring, or editing biased medical trials, reports, and articles that wrongfully and inaccurately claimed that the dangers inherent to off-label use of Infuse® did not exist or were significantly less than the actual dangers.

b.     Defendants promoting off-label use of Infuse® through their sales representatives by having them assist in operating rooms during off-label surgeries, giving implicit approval to those surgeries that Defendants and Dr. Durrani knew to be high-risk;

c.     Defendants promoting off-label use of Infuse® through their sales representatives by having them give advice to Dr. Durrani during off-label surgeries, including advice regarding dosing, concentrations, and loading of cages, despite the fact that proper dosing, concentrations, and technique in the context of off-label use had not been established, and was high-risk and experimental;

d.     Defendants promoting off-label use of Infuse® through their sales representatives by having them distribute or parrot the false and misleading literature that was sponsored, written or edited by Defendants;

e.     Defendants promoting off-label use of Infuse® by representing that its use off-label was common, prevalent, or normal;

f.     Defendants promoting off-label use of Infuse® by instructing and arranging for "Opinion Leaders" and other paid consultants to promote off-label uses of Infuse®;

g.     Defendants promoting off-label use of Infuse® by payments to Key Opinion Leaders, and then actively ghostwriting, tampering with, and editing the published medical literature on Infuse®, such that the literature appeared to reflect a complication rate for Infuse® of

approximately 0% rather than the true complication rate of greater than 40%.

h.   Defendants promoting off-label use of Infuse® by choosing not to report to the FDA known adverse events that were being reported to Defendants and which Defendants knew were likely the result of off-label use of Infuse®, including those adverse events that are the subject of this action. By April 2008, over 500,000 surgeries had been performed using Infuse. The true rate of adverse events occurring from 2002 to 2008 was conservatively 10-50%. Thus, by April 2008, even if the rate were only 10%, at least 50,000 adverse events had occurred. Defendants were necessarily aware of the majority of these adverse events. Nevertheless, by the end of 2008, only 262 adverse events involving Infuse had been reported to the FDA. In contrast, after *The Spine Journal* exposed data about the true adverse event rate in 2011, the number of reported adverse events sharply increased even while Infuse utilization declined. In 2013 alone, there were 3001 reported adverse events.

1176.   Defendants and their agents, consultants, representatives, and joint venturers, including Dr. Durrani, knew or, in the exercise of reasonable diligence, should have known that off-label uses of Infuse® had the serious side effects set forth herein.

1177.   At all relevant times, Defendants and Dr. Durrani were engaged in the business of promoting and selling Infuse® for use in spine surgeries, and in fact did sell the Infuse® device for off-label use in spine surgeries.

1178.   Plaintiffs would not have consented and agreed to off-label use of Infuse® by utilizing a posterior approach, by using Infuse® in multiple locations and in multiple surgeries, by using Infuse® without an LT-Cage, by using it in areas of the spine not approved by the FDA, and by otherwise using it in manners not approved by the FDA had they been truthfully and adequately warned of the risks and dangers associated with off label use of Infuse®.

1179.   Defendants and their agent, consultant, representative, or joint venturer, Dr. Durrani, were fraudulent or, alternatively, negligent in making the untrue misrepresentations and omitting material information because they knew, or had reason to know, of the actual, unreasonable dangers and defects in their Infuse® product.

1180.   Plaintiffs would reasonably be expected to use products and devices approved of by their surgeon.  Defendants and Dr. Durrani intended to induce Plaintiffs to rely on their misrepresentations and omissions to use Infuse® in off-label manners.

1181.   Plaintiffs were justified in relying, and did rely, on the misrepresentations and omissions about the lack of safety risks related to off label use of Infuse® in deciding to undergo spine surgeries with Dr. Durrani and his associates by utilizing a posterior approach, by using Infuse® in multiple locations and in multiple surgeries, by using Infuse® without an LT-Cage, by using it in areas of the spine not approved by the FDA, and by otherwise using it in manners not approved by the FDA.

1182.   Defendants' and Dr. Durrani's motive underlying its wrongful conduct was for financial gain and fear that, if they provided proper and adequate representations, Infuse® would lose sales revenue and market share.  This motive is

evidenced in part by the huge number of unnecessary surgeries performed on Plaintiffs by Dr. Durrani using Defendants' Infuse® device off-label without their informed consent or agreement.

1183.   In violation of Ohio Revised Code 2307.77 and 21 CFR §801.6, among other statutes and regulations, Defendants provided a device, Infuse®, that failed to conform to their representations as set forth within this Complaint.

1184.   As the direct, proximate and legal result of Defendants' negligent or fraudulent misrepresentations, each Plaintiff had Infuse® surgically implanted into his or her body on an off-label, unconsented, and uninformed basis by Defendants' agent, consultant, representative, or joint venturer, Dr. Durrani, suffered and will severe physical pain, medical and hospital expenses, lost wages, pain and suffering, pecuniary loss, and harm and economic loss.

1185.   As also demonstrated by each Plaintiffs' need for additional surgery, continued medical treatment, and the instability of the spine fusion and other complications from the unnecessary use of Infuse® product, Defendants' representations were false when stated or published.

1186.   As a direct and proximate result of Defendants' negligent and fraudulent misrepresentations, Infuse® was used in Plaintiffs in unlawful, off-label manners by implanting and injecting into the Plaintiffs' bodies, causing the Plaintiffs to suffer and undergo additional reasonable and necessary medical examination and treatment, including, but not limited to, diagnostic examinations, monitoring, surgery, hospitalization, and the use of medications.  Plaintiffs will also likely endure future medical care, surgery and treatment with associated medical expenses, and additional harm and economic loss.

1040.  As a direct and proximate result of Defendants' negligent and fraudulent misrepresentations, each Plaintiff has been caused to endure physical and emotional pain and suffering, loss of enjoyment of the pleasures of life, lost past, present, and future income, a decreased earning capacity, severe restrictions and limitations of physical and life activities, and other harm and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1187.  Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1188.  Under Ohio Revised Code 2307.80, Defendants' actions constitute a flagrant disregard of the safety of persons situated just like the Plaintiffs who might be harmed by Defendants' Infuse® devise.

### COUNT IV – Ohio Product Liability Act (Defective Product).

1189.  Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows.

1190.  The claim at this Count is a "product liability claim" as defined at R.C. 2307.71(A)(13).

1191.  Defendants designed, manufactured, distributed and sold Infuse®, an unreasonably dangerous malfunctioning, and defective product to Ohio consumers, including Plaintiffs.

1192.  Defendants' agent, consultant, representative, or joint venturer, and plaintiffs' spine surgeon, Dr. Durrani, used and injected into Plaintiffs' bodies Infuse® in substantially the same condition as it was when it left Defendants' direct possession and control.

1193.   In violation of Ohio Revised Code 2307.74 and 2307.75, the Medical Device Act, 21 U.S.C. §§ 301-399 (specifically including, but not limited to, 21 U.S.C. §§360, 360c, 360d, 360e, 360i and 360j), and 21 CFR §§800, *et seq*., 801.4, 801.5, 803.1(a), 803.50, 812, 812.3(d), 820.198(a), 888.3080 (among other statutes and regulations), Defendants' Infuse®, which was used by Dr. Durrani and his associates and caused harm and economic loss to Plaintiffs, contained a design and/or defect for off-label use, failed to comply with Pre-Market Approval specifications as used, was not safe and/or effective, was non-conforming as used on the Plaintiffs, and violated use and performance standards when sold by Defendants and injected by Dr. Durrani, so much so, that such defect and use rendered Defendants' Infuse® more dangerous than an ordinary patient consumer would expect in an intended or reasonably foreseeable manner.

1194.   Due to Defendants' defective product, they are strictly liable to Plaintiffs for the injuries caused by Infuse®.

1195.   As a direct and proximate result of the use of Defendants' defective product Infuse® and violations of Ohio Revised Code 2307.74 and 2307.75, the Medical Device Act 21 U.S.C. §§301-399 (specifically including, but not limited to, 21 U.S.C. §§360, 360c, 360d, 360e, 360i and 360j), and 21 CFR §§800, *et seq*., 801.4, 801.5, 801.6, 803.1(a), 803.50, 812, 812.3(d), 820.198(a), 888.3080, Plaintiffs have been caused to suffer physical injuries including, but not limited to, emotional trauma, physical trauma associated with the initial surgery and additional surgery and anesthesia, constant fear of recurrent injuries and life-threatening and paralyzing injuries due to the unapproved and unconsented off-label use of Infuse® on Plaintiffs, and other harm and economic loss.

1196.   As a direct and proximate result of Defendants' defective product and violations of Ohio and Federal statutes and regulations, Plaintiffs have been caused to undergo additional reasonable and necessary medical examination and treatment, including, but not limited to, diagnostic examinations, monitoring, surgery, hospitalization, and the use of medications.  Plaintiffs will also likely endure future medical care, surgery and treatment with associated medical expenses.

1041.   As a direct and proximate result of Defendants' defective product and violations of Ohio and Federal statutes and regulations, each Plaintiff has been caused to endure physical and emotional pain and suffering, loss of enjoyment of the pleasures of life, lost past, present, and future income, a decreased earning capacity, severe restrictions and limitations of physical and life activities, harm, and economic loss in an amount in excess of $75,000.00, exclusive of interest and costs.

1197.   Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1198.   Under Ohio Revised Code 2307.80, Defendants' actions constitute a flagrant disregard of the safety of persons situated just like the Plaintiffs who might be harmed by Defendants' Infuse® devise.

## DEMAND FOR  JURY TRIAL

Each Plaintiff demands trial by jury on all issues so triable.

## PRAYER  FOR  RELIEF

WHEREFORE,  Plaintiffs, and each of them, demand judgment as follows against Defendants Medtronic, Inc. and Medtronic Sofamor Danek USA, Inc., jointly and severally:

A.    For general damages in amounts to be proven at the time of trial;

B.    For past and future medical, incidental, hospital, psychological care and other expenses in amounts to be proven at the time of trial;

C.    For past and future loss of earnings, destruction of earning capacity, and economic loss in amounts to be proven at the time of trial;

D.    For past and future mental, emotional, physical pain and suffering, loss of enjoyment of life, and harm in amounts to be proven at trial;

D.    For an award of pre-judgment and post-judgment interest as provided by law;

E.    For consequential damages in amounts to be proven at time of trial;

F.    For punitive or exemplary damages against Defendants Medtronic, Inc. and Medtronic Sofamor Danek USA, Inc. as provided by law;

G.    An award costs and expenses of this action, including reasonable attorney's fees, if applicable;

H.    Trial by jury on all issues so triable; and

I.    For such other and further relief to which Plaintiffs may appear entitled.

Respectfully submitted,

/s/Robert A. Winter, Jr.
Robert A. Winter, Jr. (#0038673)
Trial Attorney for Plaintiffs
P.O. Box 175883
Fort Mitchell, Kentucky 41017-5883
(859) 250-3337
robertawinterjr@gmail.com